# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

PRIME INTERNATIONAL TRADING, LTD., on behalf of itself and all others similarly situated,

Plaintiff,

- against -

BP PLC, ROYAL DUTCH SHELL PLC, STATOIL ASA AND JOHN DOE NOS. 1-50,

Defendants.

Docket No.

ECF Case

13 CV 3473

JUDGE KARAS

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Prime International Trading, Ltd. ("Plaintiff") complains, upon knowledge as to itself and his own acts, and upon information and belief as to all matters, against Defendants (defined at ¶¶16-20), as follows:

## INTRODUCTION

1.      This action arises from Defendants' unlawful combination, agreement and conspiracy to fix and restrain trade in, and intentional manipulation of North Sea Brent Crude Oil ("Brent Crude oil") and the prices of Brent Crude oil futures contracts traded on the New York Mercantile Exchange ("NYMEX") and the Intercontinental Exchange ("ICE") during the period of at least 2002 through the present (the "Class Period"), in violation of the Commodity Exchange Act ("CEA"), as amended 7 U.S.C. § 1, *et seq.* (the "CEA"), the Sherman Act, 15 U.S.C. §§ 1 and 2, and common law.

2.      Defendants deliberately reported inaccurate, misleading and false information regarding Brent Crude oil prices to Platts, a unit of McGraw Hill Financial Inc., and the leading global provider of spot and contract pricing for the physical and financially settled derivatives Brent Crude oil markets.  Platts' Brent Crude oil prices are used to price and settle physical floating Brent Crude oil deals under long-term contracts on a physical (spot) basis, and to settle Brent Crude oil derivatives contracts, including NYMEX and ICE Brent Crude oil futures contracts.  False reporting of Brent Crude oil prices to Platts thereby undermines the entire pricing structure for the Brent Crude oil market.  *See, e.g.*, *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 509 (S.D.N.Y. 2004)(the submission of false reports of price and volume information of physical (spot) natural gas transactions to Platts at numerous natural gas delivery hubs across the country undermined pricing in the U.S. natural gas market).

3.      As major producers and market participants in the Brent Crude oil market, including contributors of Brent Crude oil prices to Platts, Defendants had and continue to have market power and the ability to influence prices in the Brent Crude oil market. By purposefully reporting inaccurate, misleading and false Brent Crude oil trade information to Platts, Defendants manipulated and restrained trade in both the physical (spot) Brent Crude oil market and the Brent Crude Oil futures market.

4.      On May 14, 2013 the European Commission confirmed that it, along with the EFTA Surveillance Authority, had carried out unannounced inspections of several companies active in and providing services to the crude oil, refined oil products and biofuels sectors. The European Commission undertook the inspections on concerns that (i) the companies may have colluded in reporting distorted prices to a Price Reporting Agency ("PRA") to manipulate the published prices for a number of oil and biofuel products; and (ii) the companies may have prevented others from participating in the price assessment process, to facilitate the monopoly over price setting and to distort published prices. As described by the European Commission,

> The prices assessed and published by Price Reporting Agencies serve as benchmarks for trade in the physical and financial derivative markets for a number of commodity products in Europe and globally. Even small distortions of assessed prices may have a huge impact on the prices of crude oil, refined oil products and biofuels purchases and sales, potentially harming financial consumers.

5.      Almost immediately following the European Commission's announcement on May 14, Defendants BP plc, Royal Dutch Shell plc and Statoil ASA each confirmed they are the subject of the European Commission investigation. In particular, Defendant Statoil confirmed that its office in Stavanger (Norway) was subject to an inspection by the EFTA Surveillance Authority, assisted by the Norwegian Competition Authority. Statoil acknowledged that the inspection was carried out at the request of the European Commission. Further, Statoil

confirmed that the scope of the European Commission's investigation is "related to the Platts' Market-On-Close price assessment process, used to report prices in particular for crude oil, refined oil products and biofuels" extending back to as early as 2002.

6.      On May 17, 2013, the U.K. Serious Fraud Office announced that it was "urgently reviewing" the European Commission's allegations of price-fixing in the oil markets and determining whether to accept the case for "criminal investigation." That same day, the United States Senate called for the U.S. Department of Justice to join the European Commission investigation.

7.      The foregoing investigations are expected to yield information from Defendants' internal records (*e.g.*, instant messages, e-mails, telephone records, Brent crude oil trading data, etc.) that provide further support for Plaintiff's claims. Plaintiff believes further evidentiary support for the allegations will be unearthed after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

8.      This action arises under Section 22 of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 25, Section 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, and common law, respectively.

9.      Brent Crude oil is a "commodity" and is the "commodity underlying" the Brent Crude oil futures contracts traded on the NYMEX and ICE, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

10.      This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a), and 28 U.S.C. §§ 1331 and 1337, respectively. This Court also has jurisdiction over the state law claim under 28 U.S.C. § 1367 because that claim is

so related to the federal claim that it forms part of the same case or controversy, and under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

11.     Venue is proper in the Southern District of New York, pursuant to, among other statutes Section 22 of the CEA, 7 U.S.C. §25(c), Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. §1391(b), (c) and (d).  One or more of the Defendants resided, transacted business, were found, or had agents in the District, and a part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

12.     The New York Mercantile Exchange is located in this District at One North End Avenue, New York, New York.  Further, Platts' global headquarters are located in New York, New York.  Platts is a unit of McGraw Hill Financial Inc., which is also headquartered in New York, New York.  The Brent Crude oil prices published and compiled by Platts are widely disseminated in the U.S. to Brent Crude oil spot and futures traders, including Plaintiff, located in the U.S.

13.     Brent Crude oil and Brent Crude oil futures contracts are each a commodity that trades in U.S. interstate commerce.  Defendants' restraint of trade and manipulation of Brent Crude oil and Brent Crude oil futures contract prices had direct, substantial, and reasonably foreseeable effects in the U.S., and on Plaintiff and members of the Class.  Brent Crude oil futures contracts are traded on the NYMEX and domestically on electronic boards of trade and on exchanges, such as ICE, accessible within the U.S.  Defendants, as sophisticated Brent Crude oil market participants, knew, or had good reason to know, that Brent Crude oil prices published and compiled by Platts, respectively, are disseminated in the U.S., and are used to price, settle, and benchmark Brent Crude oil futures contracts and/or other Brent Crude oil derivative

contracts traded in the U.S.  For these reasons, Defendants knew, or had good reason to know, that misreporting the price of Brent Crude oil to Platts, respectively, as well as other manipulative and collusive conduct in the Brent Crude oil market, would, and did, have direct, substantial and reasonably foreseeable effects in the United States, including, without limitation, on the prices of Brent Crude oil futures contracts transacted domestically.

14.    Defendants, directly and indirectly, singly and in concert, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate and/or international commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

## PARTIES

15.    Plaintiff Prime International Trading, Ltd., a proprietary commodity trading company headquartered in Chicago, Illinois and member of the Chicago Board of Trade, Chicago Mercantile Exchange, NYMEX, and ICE, traded hundreds of thousands of NYMEX and ICE Brent Crude futures contracts during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein.  Plaintiff was deprived of transacting in a lawful, non-manipulated, competitive market in Brent Crude oil futures, and otherwise suffered legal injury as a direct and proximate result of Defendants' unlawful conduct.

16.    Defendant BP Plc is multinational oil and gas company headquartered in London, England, United Kingdom.

17.    Defendant Royal Dutch Shell Plc is a multinational oil and gas company headquartered in The Hague, Netherlands.

18.    Defendant Statoil ASA is a Norwegian oil and gas company, formed by the 2007 merger of Statoil with the oil and gas division of Norsk Hydro.  Statoil maintains offices in the United States, including in Stamford, Connecticut, Washington, D.C. and Houston, Texas.

19.    John Doe Defendants Nos. 1-50 are other entities or persons, including oil, gas or other energy companies as well as other co-conspirators whose identities are currently unknown to Plaintiff.  The John Doe Defendants participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of the physical price of Brent Crude oil and the prices of Brent Crude oil futures contracts.

### AGENTS AND UNNAMED CO-CONSPIRATORS

20.    Various other entities and individuals, including, but not limited to, subsidiaries and/or affiliates of the Defendants participated as co-conspirators and manipulators in the acts complained of and performed acts and made statements that aided and abetted and furthered the unlawful conduct as alleged herein.  The unnamed co-conspirators, along with the above-named Defendants, performed, participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of the prices of Brent Crude oil and Brent Crude oil futures contracts.

### SUBSTANTIVE ALLEGATIONS

I.    **Background**

   A.    **Brent Crude Oil: The Physical Trading Market**

21.    Brent Crude is a major trading classification of sweet light crude oil comprising Brent Blend, Forties Blend, Oseberg and Ekofisk crudes.  Together, Brent, Forties, Oseberg and Ekofisk are known to crude oil traders as the "Brent Crude" market or "BFOE."  The Brent

oilfields in the North Sea currently have the highest physical daily output of any of the world's recognized oil benchmarks.  Brent is the leading global price benchmark for Atlantic basin crude oils and it is used to price two thirds of the world's internationally traded crude oil supplies.

22.     The underlying Brent physical market consists of (1) Dated (or wet) Brent; and (2) Cash (or forward) Brent.

23.     Dated Brent refers to the spot price for Brent crude oil.  Dated Brent is a market term for a cargo of North Sea Brent blend crude oil that has been "assigned a date" when it will be loaded onto a tanker.  These cargoes are also commonly referred to as dated cargoes, wet cargoes or wet barrels.

24.     Dated Brent prices—as published by Platts— is the leading global benchmark for Brent crude oil.

25.     As of January 2012, Platts' Dated Brent market represents assessments of trades in BFOE cargoes in the period between 10-25 days ahead of the date when it will be loaded on a tanker.  Originally, the Dated Brent market was assessed on a 7 to 15 day range, *i.e.*, cargoes loading 7 to 15 days forward.  The assessment period was extended by Platts to 10 to 21 days in 2002 and to its current 10 to 25 day assessment period on January 6, 2012.

26.     By contrast, cargoes that have not been "assigned a date" are known as paper barrels or "cash brent" and are traded for speculative or hedging purposes.  Cargoes from a "cash" contract month are progressively "dated" or "wetted," until the 25th day before the end of that delivery month, at which point all cargoes for that delivery month must become "Dated."  Cash cargoes become Dated cargoes when they have been "assigned a date" to be loaded onto a tanker.  The cash BFOE cargoes trade in chains between potential users of the physical oil until it becomes a "Dated" cargo.

**B.**     **Brent Crude Oil: The Futures Market**

27.     A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity.  In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based.

28.     The bilateral aspect of the futures contract is that there is a seller and a buyer.

29.     The sellers are one-half of the bilateral futures contract and one-half of the commodity futures market.  They are referred to as "shorts."

30.     The buyers are the other one-half, and are referred to as "longs."

**a.  NYMEX**

31.     The NYMEX is a designated contract market under Section 5(b) of the CEA, 7 U.S.C. § 7(b).  NYMEX is the world's largest physical commodity futures exchange and the preeminent forum for energy and precious metals.

32.     NYMEX futures contracts priced, settled or benchmarked to Brent crude oil include: (i) the Brent Crude Oil Last-Day Futures (BZ); (ii) Brent Financial Futures (CY); and (iii) Brent Crude Oil Futures (BB).

33.     These contracts are transacted electronically on the Chicago Mercantile Exchange ("CME") Globex and CME ClearPort trading platforms.  Additionally, the Brent Crude Oil Last Day Futures and the Brent Financial Futures trade through open outcry at the NYMEX in New York.  Globex is an electronic trading platform owned by the NYMEX's parent company, the CME Group.  Open outcry is a method of public auction for making bids and offers in the trading pits of the futures exchange.

34.     The size of the (i) Brent Crude Oil Last-Day Futures (BZ); (ii) Brent Financial Futures (CY); and (iii) Brent Crude Oil Futures (BB) is 1,000 barrels.

35.     Trading in the NYMEX Brent Crude Oil Last-Day Futures (BZ) terminates on the same termination day as the ICE Brent Crude Oil Futures Contract for the delivery month, *i.e.*, on the business day immediately preceding the 15th day prior to the first day of the delivery month, if such 15th day is a banking day in London.  If the 15th day is a nonbanking day in London (including Saturday), trading shall cease on the business day immediately preceding the first business day prior to the 15th day.

36.     Trading in the NYMEX Brent Financial Futures (CY) terminates on the last business day of the contract month.

37.     Trading in the NYMEX Brent Crude Oil Futures (BB) terminates on one business day prior to the termination of the ICE Brent futures contract, *i.e.*, two business days before the fifteenth calendar day prior to the first day of the delivery month, if the fifteenth calendar day is not a holiday or weekend in London.  If the fifteenth calendar day is a holiday or weekend in London, trading shall end three business days prior to the last business day preceding the fifteenth calendar day.

38.     Trading in NYMEX Brent Crude Oil Last-Day Futures (BZ), Brent Financial Futures (CY), and Brent Crude Oil Futures (BB) is subject to the rules and regulations of the NYMEX, and prices are quoted in U.S. dollars and cents per barrel.

39.     The daily settlements for the NYMEX Brent Crude Oil (BB) and the Brent Crude Oil Last Day (BZ) futures contracts are equivalent to the settlements in the corresponding ICE Brent Crude Oil futures contracts, discussed below.

40.     Final settlement for the NYMEX Brent Crude Oil futures contract (BB) is based on its Floating Price.  The Floating Price is equal to the Brent Crude Oil (ICE) Futures 1st nearby contract settlement price on the penultimate trading day for the delivery month.

41.     Final settlement for the NYMEX Brent Crude Oil Last Day (BZ) is based on its Floating Price. The Floating Price is equal to the ICE Brent Crude Oil Index price as published one day after the final trading day of the contract month.

42.     Final settlement for the NYMEX Brent Financial Futures (CY) is based on its Floating Price. The Floating Price is equal to (a) the arithmetic average of the Brent Crude Oil (ICE) Futures 1st nearby contract settlement prices, except as set forth in Section (B) below, for each business day that it is determined during the contract month. (B) The settlement price of the 1st nearby contract month will be used except on the last day of trading for the expiring Brent Crude Oil Futures contract when the settlement price of the 2nd nearby Brent Crude Oil Futures contract will be used.

### b. ICE

43.     The International Petroleum Exchange ("IPE") was one of the world's largest energy futures and options exchanges. Its flagship commodity, Brent Crude, was a world benchmark for oil prices. The IPE was acquired by the IntercontinentalExchange in 2001. Brent Crude oil futures contracts were traded via open outcry on the floor of the IPE until April 7, 2005, when its name was changed to ICE Futures and all trading in Brent Crude oil futures was shifted onto an electronic trading platform. Today, ICE Futures is the second largest regulated energy futures exchange in the world. ICE Futures hosts more than 50% of the world's crude and refined oil futures trading, and the ICE Brent Crude futures contract is relied upon to price two-thirds of the world's physical oil. ICE Futures is regulated by the U.K. Financial Conduct Authority, with oversight by the U.S. Commodity Futures Trading Commission for linked contracts.

44.     The ICE Brent crude oil futures contract is traded at ICE Futures Europe and executed on the WebICE trading platform, which is distributed in more than 70 countries, including the U.S.

45.     In 2012, the ICE Brent futures contract became the world's largest crude oil futures contract in terms of volume, and the volume of Brent crude oil futures contracts traded on ICE has almost doubled since 2008.

46.     The size of the ICE Brent crude oil futures contract is 1,000 barrels.

47.     ICE Brent crude oil futures contracts is a deliverable contract based on "exchange for physical" ("EFP") delivery with an option to cash settle, *i.e.*, the ICE Brent Index price for the day following the last trading day of the futures contract.

48.     Trading in ICE Brent futures contracts terminates at the end of the designated settlement period on the Business Day (a trading day which is not a public holiday in England and Wales) immediately preceding: (i) either the 15th day before the first day of the contract month, if such 15th day is a Business Day; or (ii) if such 15th day is not a Business Day, the next preceding Business Day.

49.     Prices of ICE Brent crude oil futures contracts are quoted in U.S. dollars and cents per barrel.

50.     The ICE Brent crude oil futures contract was developed in 1988 when the Brent crude oil physical market was trading on a 15-day basis. The expiry calendar established at that point, which continues today for existing ICE Brent futures, reflected the 15-day timetable. Existing ICE Brent crude oil futures therefore currently expire 10 days after BFOE contracts have started to go "wet," *i.e.*, to turn into specific Dated Brent contracts with respect to the contract delivery month in question.

51.     As per ICE, "[t]he ICE Brent futures contract is based on the underlying physical BFOE (Brent-Forties-Oseberg-Ekofisk) market...The ICE Brent futures contract is linked to forward BFOE contracts and hence the underlying Dated Brent market by the Exchange for Physical (EFP) mechanism.  The contract settles against the ICE Brent Index price for the day following the last trading day of the Brent futures contract.   At expiry of a Brent futures contract, the index price is based on the average value of BFOE cash cargoes on expiry day.  The index is also calculated by the exchange every day."

52.     Further, as per ICE, "[t]he cash settlement price for ICE Brent...is based on the ICE Brent Index at their respective expiries.  The index represents the average price of trading in the 25-day 'cash' BFOE market in the relevant delivery month as reported and confirmed by the industry media [Platts]...The index is calculated by the Exchange as an average of the following elements: (1) A weighted average of first month cargo trades in the 25-day BFOE market.  (2) A weighted average of second month cargo trades in the 25-day BFOE market plus a straight average of the spread trades between the first and second months. (3) A straight average of designated assessments published in media reports [Platts]."

53.     In response to Platts extending its assessment period to 10-25 days, ICE launched the ICE Brent NX Brent futures contract, which have an expiry calendar based on the 25-Day BFOE market and therefore align the futures expiry calendar with the physical BFOE market.

### C. U.S. Based Transactions in Brent Crude Oil Futures Contracts on ICE

### i.     The CFTC Granted No-Action Relief to ICE and IPE for the Domestic (U.S. Based) Trading of Brent Crude Oil Futures Contracts

54.     On November 12, 1999, the CFTC issued a no-action letter in which it confirmed that it would not recommend that the CFTC institute enforcement action against the International Petroleum Exchange of London Limited ("IPE") (acquired by ICE in 2001) or its members

solely based upon IPE's failure to obtain contract market designation pursuant to Sections 5 and 5a of the CEA, "if: (i) IPE members trade for their proprietary accounts through ETS [Energey Trading System II] in the United States; (ii) IPE members who are registered with Commission as [futures commission merchants] FCMs or who are Rule 30.10 Firms submit orders from United States customers for transmission to ETS; and/or (iii) IPE members who are registered with the Commission as FCMs or who are Rule 30.10 Firms accept orders through United States [automated order routing systems] AORS from United States customers for submission to ETS." CFTC Staff Letter No. 99-69 (Nov. 12, 1999), at p. 15 (emphasis added).

55.     The November 12, 1999 IPE no-action letter was amended by the CFTC four times between July 26, 2002 and April 14, 2003 as trading of the contracts was transitioned from the ETS to ICE Platform operated by the Intercontinental Exchange, Inc. in Atlanta, Georgia and trading hours were extended.  CFTC Staff Letter No. 09-37 (Aug. 20, 2009), at p. 2.

56.     Significantly, on April 14, 2003,the CFTC issued a no-action letter in which it amended its November 12, 1999 no-action letter and confirmed that it would not recommend that the CFTC institute enforcement action against IPE or its members solely based upon IPE's failure to seek contract market  designation or registration as a derivatives transaction execution facility under Sections 5 and 5a of the CEA "if the IPE makes all of its current contracts, including Brent Crude futures...available in the U.S. on the ICE Platform during the course of the entire trading day."  CFTC Staff Letter No. 03-17 (April 14, 2003), at p. 3 (emphasis added).

**D.     The Role of Platts in the Brent Crude Oil Market**

57.     Almost all physical BFOE crude oil is traded in the over-the-counter ("OTC") market, where the transaction details are not readily observable.  As a result, Platts plays the central role in establishing and reporting spot prices of Brent Crude oil.

58.     Platts uses a "Market-On-Close" methodology in establishing and reporting Brent crude oil spot prices. Platts' Market-On-Close methodology is based upon bids, offers and transactions for spot Brent Crude oil (as reported to Platts) that take place during the 30 to 45 minutes before the close of the market (generally 4:00PM to 4:30PM London time). This 30-45 minute period of time is referred to as the "Platts window." Market participants can adjust their bids and offers during the Platts window subject to Platts' guidelines. Market participants who failed to declare their intention to submit bids and offers during the Platts window may not submit bids and offers during the Platts window, but may still choose to accept a bid or an offer posted during the Platts window. Following the close of the market (generally 4:30 p.m. London time), Platts' editors examine the bids, offers, and transactions for spot Brent Crude oil that took place during the Platts window and use that data to establish an end-of-day (or market-on-close) Brent Crude oil spot price. Platts subscribers have access to the real-time trading data published by Platts during the Market-On-Close process

59.     Although participation in the Platts' Market-On-Close is voluntary, Platts is highly selective as to which market participants are permitted to participate in its Market-On-Close process.

60.     Platts' Market-On-Close (or end-of-day) Brent Crude oil spot price is the most important price marker for Brent Crude oil in the world.

**E.      Brent Crude Oil Spot and Futures Prices are Inextricably Linked**

61.     The Brent Crude oil futures market can be thought of as a clearinghouse for trades among buyers and sellers of Brent Crude oil futures contracts, which are standardized contracts used to price Brent crude oil at various maturities. The Brent Crude oil futures market is inextricably linked to the spot market for Brent Crude oil and thus to Platts pricing (see ¶¶31-53),

and price movements in the spot market can and do cause price movements in the futures markets.

62.     In particular, Brent Crude oil futures traders refer to the spot prices published by the reporting firms, such as Platts, for price discovery and for assessing price risks in the Brent Crude oil market.  An increase in the spot price published by Platts, signals either stronger demand or weakened supply, and futures traders take account of both price movements and changes in the supply/demand balance when conducting their futures trading. This price impact is expected. Brent Crude oil futures overlay the conventions and conditions of the Brent Crude oil spot market.  Brent crude oil futures prices derive their valuation from spot transactions. The spot market is the first point in a commercial transaction.  Brent Crude oil spot and futures prices are sympathetic -- they move in the same direction. That is why people use futures markets to hedge price exposure.  This is just another way of expressing the integrated characteristics and thus arbitrage realities of Brent crude oil.  What happens in the Brent Crude oil spot market by definition affects Brent Crude oil futures.  The expiration of a Brent Crude oil futures contract into a physical position (see ¶51), also results in the convergence of price especially when the spot price sets the futures expiration price. The physical delivery mechanism ensures price convergence between the spot and futures market.  When these high correlations or conversions are disrupted by the manipulation of prices (creating false values/ prices), *i.e.*, a manipulation of the Platts Brent Crude oil benchmarks, it has effects that ripple throughout the Brent Crude oil market.

F.     **Defendants Unlawful Conduct Has Led to Government Investigations**

63.     On May 14, 2013 the European Commission confirmed that it, along with the EFTA Surveillance Authority,  had carried out unannounced inspections of several companies

active in and providing services to the crude oil, refined oil products and biofuels sectors. The European Commission undertook the inspections on concerns that (i) the companies may have colluded in reporting distorted prices to a Price Reporting Agency ("PRA") to manipulate the published prices for a number of oil and biofuel products; and (ii) the companies may have prevented others from participating in the price assessment process, with a view to distorting published prices. As described by the European Commission,

> The prices assessed and published by Price Reporting Agencies serve as benchmarks for trade in the physical and financial derivative markets for a number of commodity products in Europe and globally. Even small distortions of assessed prices may have a huge impact on the prices of crude oil, refined oil products and biofuels purchases and sales, potentially harming financial consumers.

64. Almost immediately following the European Commission's announcement on May 14, Defendants BP plc, Royal Dutch Shell plc and Statoil ASA each confirmed they are the subject of the European Commission investigation. In particular, Defendant Statoil confirmed that its office in Stavanger (Norway) was subject to an inspection by the EFTA Surveillance Authority, assisted by the Norwegian Competition Authority. Statoil acknowledged that the inspection was carried out at the request of the European Commission. Further, Statoil confirmed that the scope of the European Commission's investigation is "related to the Platts' Market-On-Close price assessment process, used to report prices in particular for crude oil, refined oil products and biofuels" extending back to as early as 2002.

65. On May 17, 2013, the U.K. Serious Fraud Office announced that it was "urgently reviewing" the European Commission's allegations of price-fixing in the oil markets and determining whether to accept the case for "criminal investigation." That same day, the United States Senate called for the U.S. Department of Justice to join the European Commission investigation.

**II.    Defendants' Intentionally Manipulated Brent Crude Oil Futures Prices by Falsely Reporting Brent Crude Oil Spot Prices to Platts**

66.    Defendants purposefully manipulated prices of Brent Crude oil and Brent Crude oil futures contracts through their deliberate and systematic submission of false Brent Crude oil trade information to Platts.

67.    Defendants knew that this false trade information was used by Platts in calculating and publishing its Brent crude oil prices. Further, they also knew, as sophisticated market participants, that the (mis)information they reported impacted the prices of Brent Crude oil futures contracts and other Brent Crude oil derivative contracts traded in the U.S.

**CLASS ACTION ALLEGATIONS**

68.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on his own behalf and as a representative of the following Class[1]:

> All persons or entities (other than Defendants and any parent, subsidiary, affiliate, or agent of any Defendant) that purchased or sold a Brent Crude Oil futures contract on the NYMEX or ICE during the period of at least 2002 through the Present (the "Class Period").

69.    The Class is so numerous that the individual joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least thousands of geographically dispersed Class members transacted in Brent Crude Oil futures contracts during the Class Period.

70.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each

---

[1] Plaintiff has defined the Class based on currently available information and hereby reserves the right to amend the definition of the Class, including, without limitation, the Class Period.

member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

71.     Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is an adequate representative of the Class and has no interests which are adverse to the interests of absent Class members. Plaintiff has retained counsel competent and experienced in class action litigation, including commodity futures manipulation and antitrust class action litigation.

72.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. These common questions of law and facts include, without limitation:

(a) Whether Defendants manipulated Brent Crude Oil futures contracts in violation of the CEA;

(b) Whether such manipulation caused Brent Crude Oil futures contracts to be artificial;

(c) Whether such manipulation caused cognizable legal injury under the CEA;

(d) Whether Defendants unlawful acts violate Section 1 of the Sherman Act;

(e) Whether Defendants attempted to monopolize and/or did monopolize the market for North Sea Brent Crude Oil;

(f)  Whether Defendants' unlawful conduct caused injury to the business or property of Plaintiff and the Class;

(g) Whether Defendants were unjustly enriched at the expense of Plaintiff and members of the Class;

(h) The operative time period and extent of Defendants' foregoing violations; and

(i) Whether such injury or the fact or extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests.

73.    A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

74.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

75.    By its very nature, the unlawful activity, as alleged herein, that Defendants engaged in was self-concealing. Defendants, *inter alia*, falsely reported prices and volume and trade information to Platts in order to manipulate the spot price for Brent crude oil and the prices of Brent crude oil futures contracts traded on the NYMEX and ICE.

76.    Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until it became public. The first public reports of any government action relating to Defendants' unlawful conduct occurred on or about May 14, 2013, when the European Commission confirmed that it carried out unannounced inspections at the premises of several companies active in and providing services to the crude oil, refined oil products and biofuels sectors,

alleging that these companies colluded in reporting artificial prices to a PRA to manipulate the published prices for a number of oil and biofuel products.

77.     Because the Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiff and the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure in May 2013.

78.     Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled during the period of such fraudulent concealment.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(For Manipulation in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*)**

**Against All Defendants**

79.     Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

80.     By their intentional misconduct, the Defendants each violated Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), and caused prices of Brent Crude Oil futures contracts to be artificial, during the Class Period.

81.     Defendants' trading and other activities alleged herein constitute market power manipulation of the prices of Brent Crude Oil futures contracts in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a).

82.     Defendants' foregoing extensive manipulative conduct deprived Plaintiff and other traders of a lawfully operating market during the Class Period.

83.     Plaintiff and others who transacted in Brent Crude Oil futures contracts during the Class Period transacted at artificial and unlawful prices resulting from Defendants' manipulations in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*, and as a direct result thereof were injured and suffered damages.

84.     Plaintiff and the Class are each entitled to damages for the violations of the CEA alleged herein.

85.     Plaintiff and members of the Class who purchased or sold NYMEX Brent Crude Oil futures contracts during the Class Period were injured and are each entitled to their actual damages for the violations of the CEA alleged herein.

## SECOND CLAIM FOR RELIEF

### (For Principal-Agent Liability in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*)

### Against All Defendants

86.     Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

87.     Each Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

88.     Plaintiff and member of the Class are each entitled to actual damages sustained in NYMEX Brent Crude Oil futures contracts for the violations of the CEA alleged herein.

## THIRD CLAIM FOR RELIEF

### (For Aiding and Abetting Manipulation in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*)

### Against All Defendants

89.     Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

90.     Defendants knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein.  Defendants did so knowing of each other's manipulation of Brent crude oil market prices, and willfully intended to assist these manipulations, which resulted in Brent Crude Oil futures contracts to reach artificial levels, during the Class Period in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

91.     Plaintiff and member of the Class are each entitled to actual damages sustained in NYMEX Brent Crude Oil futures contracts for the violations of the CEA alleged herein.

## FOURTH CLAIM FOR RELIEF

### (For Violation of Section 1 of the Sherman Act, 15 U.S.C. §1, *et seq.*)

### Against All Defendants

92.     Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

93.     Defendants entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

94.     During the Class Period, Defendants possessed market power in the setting of Brent crude oil and the prices of Brent crude oil futures contracts.

95.     The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, suppressed and/or made artificial Brent crude oil market prices and the prices of Brent Crude Oil futures contracts.  Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

96.     Defendants' conspiracy, and resulting impact on Brent crude oil market prices and the prices of Brent Crude Oil futures contract, occurred in or affected interstate and international commerce.

97.     As a proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property.

98.     As a consequence, Plaintiff and the Class are each entitled to treble damages for the Defendants' violations of the Sherman Act alleged herein, and a permanent injunction restraining Defendants from engaging in additional anticompetitive conduct.

## FIFTH CLAIM FOR RELIEF

### (Violation of Section 2 of the Sherman Act, 15 U.S.C. §2)

### Against All Defendants

99.     Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

100.     In violation of Section 2 of the Sherman Act, Defendants attempted to monopolize and did monopolize the Relevant Markets as defined below.

101.     The Relevant Market ("Relevant Market") is North Sea Brent Crude Oil (BFOE).

102.     During the Class Period, as major producers and market participants (including Platts Brent crude oil contributors), Defendants attempted to monopolize and did monopolize the Relevant Market.

103.     Defendants' unlawful price control of the Relevant Market during the Class Period reflects monopoly power.

104.     Defendants' conduct and its resulting impact on the Relevant Market occurred in or affected interstate commerce.

105.   The anticompetitive effects of Defendants' conduct far outweigh any ostensible competitive benefits or justifications.

106.   Plaintiff and members of the Class have been injured in their business or property by Defendants' attempted monopolization and monopolization of the Relevant Market.

107.   Defendants' anticompetitive conduct had severe adverse consequences on competition and price discovery.  Plaintiff and other members of the Cass who traded Brent crude futures during the Class Period were deprived of normal, competitive trading patterns and, instead, were subjected to artificially determined prices as a result of Defendants' unlawful and manipulative conduct. As a consequence thereof, Plaintiff and the Class suffered financial losses and were, therefore, injured in their business of property.

## SIXTH CLAIM FOR RELIEF

### (For Unjust Enrichment)

### Against All Defendants

108.   Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

109.   Defendants financially benefited from their unlawful acts.  These unlawful acts caused Plaintiff and other members of the Class to suffer injury, lose money, and transact Brent Crude Oil futures contracts at artificial prices.

110.   As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner.

111.   Each Defendant should pay restitution or its own unjust enrichment to Plaintiff and members of the Class.

112.    Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

## PRAYER FOR RELIEF

Accordingly, Plaintiff demands relief as follows:

A.    For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representative, and his counsel be appointed as Class counsel;

B.    For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

C.    For the unlawful conduct alleged herein to be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act,

D.    For Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

E.    For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the federal antitrust laws, in an amount to be trebled in accordance with such laws;

F.    For a judgment awarding Plaintiff and the Class restitution of any and all sums received by the Defendants' unjust enrichment;

G.    For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

PRIME INTERNATIONAL TRADING, LTD., on
behalf of itself and all others similarly situated,

                    Plaintiff,

            - against -

BP PLC, ROYAL DUTCH SHELL PLC, STATOIL
ASA AND JOHN DOE NOS. 1-50,

                Defendants.

Docket No.

13 CV 3473

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**


USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

Plaintiff Prime International Trading, Ltd. ("Plaintiff") complains, upon knowledge as to itself and his own acts, and upon information and belief as to all matters, against Defendants (defined at ¶¶16-20), as follows:

## INTRODUCTION

1.      This action arises from Defendants' unlawful combination, agreement and conspiracy to fix and restrain trade in, and intentional manipulation of North Sea Brent Crude Oil ("Brent Crude oil") and the prices of Brent Crude oil futures contracts traded on the New York Mercantile Exchange ("NYMEX") and the Intercontinental Exchange ("ICE") during the period of at least 2002 through the present (the "Class Period"), in violation of the Commodity Exchange Act ("CEA"), as amended 7 U.S.C. § 1, *et seq.* (the "CEA"), the Sherman Act, 15 U.S.C. §§ 1 and 2, and common law.

2.      Defendants deliberately reported inaccurate, misleading and false information regarding Brent Crude oil prices to Platts, a unit of McGraw Hill Financial Inc., and the leading global provider of spot and contract pricing for the physical and financially settled derivatives Brent Crude oil markets.  Platts' Brent Crude oil prices are used to price and settle physical floating Brent Crude oil deals under long-term contracts on a physical (spot) basis, and to settle Brent Crude oil derivatives contracts, including NYMEX and ICE Brent Crude oil futures contracts.  False reporting of Brent Crude oil prices to Platts thereby undermines the entire pricing structure for the Brent Crude oil market.  *See, e.g.*, *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 509 (S.D.N.Y. 2004)(the submission of false reports of price and volume information of physical (spot) natural gas transactions to Platts at numerous natural gas delivery hubs across the country undermined pricing in the U.S. natural gas market).

3.    As major producers and market participants in the Brent Crude oil market, including contributors of Brent Crude oil prices to Platts, Defendants had and continue to have market power and the ability to influence prices in the Brent Crude oil market. By purposefully reporting inaccurate, misleading and false Brent Crude oil trade information to Platts, Defendants manipulated and restrained trade in both the physical (spot) Brent Crude oil market and the Brent Crude Oil futures market.

4.    On May 14, 2013 the European Commission confirmed that it, along with the EFTA Surveillance Authority, had carried out unannounced inspections of several companies active in and providing services to the crude oil, refined oil products and biofuels sectors. The European Commission undertook the inspections on concerns that (i) the companies may have colluded in reporting distorted prices to a Price Reporting Agency ("PRA") to manipulate the published prices for a number of oil and biofuel products; and (ii) the companies may have prevented others from participating in the price assessment process, to facilitate the monopoly over price setting and to distort published prices. As described by the European Commission,

> The prices assessed and published by Price Reporting Agencies serve as benchmarks for trade in the physical and financial derivative markets for a number of commodity products in Europe and globally. Even small distortions of assessed prices may have a huge impact on the prices of crude oil, refined oil products and biofuels purchases and sales, potentially harming financial consumers.

5.    Almost immediately following the European Commission's announcement on May 14, Defendants BP plc, Royal Dutch Shell plc and Statoil ASA each confirmed they are the subject of the European Commission investigation.  In particular, Defendant Statoil confirmed that its office in Stavanger (Norway) was subject to an inspection by the EFTA Surveillance Authority, assisted by the Norwegian Competition Authority.  Statoil acknowledged that the inspection was carried out at the request of the European Commission.  Further, Statoil

confirmed that the scope of the European Commission's investigation is "related to the Platts' Market-On-Close price assessment process, used to report prices in particular for crude oil, refined oil products and biofuels" extending back to as early as 2002.

6.       On May 17, 2013, the U.K. Serious Fraud Office announced that it was "urgently reviewing" the European Commission's allegations of price-fixing in the oil markets and determining whether to accept the case for "criminal investigation." That same day, the United States Senate called for the U.S. Department of Justice to join the European Commission investigation.

7.       The foregoing investigations are expected to yield information from Defendants' internal records (*e.g.*, instant messages, e-mails, telephone records, Brent crude oil trading data, etc.) that provide further support for Plaintiff's claims. Plaintiff believes further evidentiary support for the allegations will be unearthed after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

8.       This action arises under Section 22 of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 25, Section 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, and common law, respectively.

9.       Brent Crude oil is a "commodity" and is the "commodity underlying" the Brent Crude oil futures contracts traded on the NYMEX and ICE, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

10.       This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a), and 28 U.S.C. §§ 1331 and 1337, respectively. This Court also has jurisdiction over the state law claim under 28 U.S.C. § 1367 because that claim is

so related to the federal claim that it forms part of the same case or controversy, and under 28

U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000 and there are

members of the Class who are citizens of a different state than Defendants.

11.     Venue is proper in the Southern District of New York, pursuant to, among other

statutes Section 22 of the CEA, 7 U.S.C. §25(c), Sections 4, 12 and 16 of the Clayton Act, 15

U.S.C. §§ 15, 22 and 26, and 28 U.S.C. §1391(b), (c) and (d).  One or more of the Defendants

resided, transacted business, were found, or had agents in the District, and a part of the events or

omissions giving rise to the claims occurred in the Southern District of New York.

12.     The New York Mercantile Exchange is located in this District at One North End

Avenue, New York, New York.  Further, Platts' global headquarters are located in New York,

New York.  Platts is a unit of McGraw Hill Financial Inc., which is also headquartered in New

York, New York.  The Brent Crude oil prices published and compiled by Platts are widely

disseminated in the U.S. to Brent Crude oil spot and futures traders, including Plaintiff, located

in the U.S.

13.     Brent Crude oil and Brent Crude oil futures contracts are each a commodity that

trades in U.S. interstate commerce.  Defendants' restraint of trade and manipulation of Brent

Crude oil and Brent Crude oil futures contract prices had direct, substantial, and reasonably

foreseeable effects in the U.S., and on Plaintiff and members of the Class.  Brent Crude oil

futures contracts are traded on the NYMEX and domestically on electronic boards of trade and

on exchanges, such as ICE, accessible within the U.S.  Defendants, as sophisticated Brent Crude

oil market participants, knew, or had good reason to know, that Brent Crude oil prices published

and compiled by Platts, respectively, are disseminated in the U.S., and are used to price, settle,

and benchmark Brent Crude oil futures contracts and/or other Brent Crude oil derivative

contracts traded in the U.S.  For these reasons, Defendants knew, or had good reason to know, that misreporting the price of Brent Crude oil to Platts, respectively, as well as other manipulative and collusive conduct in the Brent Crude oil market, would, and did, have direct, substantial and reasonably foreseeable effects in the United States, including, without limitation, on the prices of Brent Crude oil futures contracts transacted domestically.

14.     Defendants, directly and indirectly, singly and in concert, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate and/or international commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

## PARTIES

15.     Plaintiff Prime International Trading, Ltd., a proprietary commodity trading company headquartered in Chicago, Illinois and member of the Chicago Board of Trade, Chicago Mercantile Exchange, NYMEX, and ICE, traded hundreds of thousands of NYMEX and ICE Brent Crude futures contracts during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein.  Plaintiff was deprived of transacting in a lawful, non-manipulated, competitive market in Brent Crude oil futures, and otherwise suffered legal injury as a direct and proximate result of Defendants' unlawful conduct.

16.     Defendant BP Plc is multinational oil and gas company headquartered in London, England, United Kingdom.

17.     Defendant Royal Dutch Shell Plc is a multinational oil and gas company headquartered in The Hague, Netherlands.

18.     Defendant Statoil ASA is a Norwegian oil and gas company, formed by the 2007 merger of Statoil with the oil and gas division of Norsk Hydro.  Statoil maintains offices in the United States, including in Stamford, Connecticut, Washington, D.C. and Houston, Texas.

19.     John Doe Defendants Nos. 1-50 are other entities or persons, including oil, gas or other energy companies as well as other co-conspirators whose identities are currently unknown to Plaintiff.  The John Doe Defendants participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of the physical price of Brent Crude oil and the prices of Brent Crude oil futures contracts.

## AGENTS AND UNNAMED CO-CONSPIRATORS

20.     Various other entities and individuals, including, but not limited to, subsidiaries and/or affiliates of the Defendants participated as co-conspirators and manipulators in the acts complained of and performed acts and made statements that aided and abetted and furthered the unlawful conduct as alleged herein.  The unnamed co-conspirators, along with the above-named Defendants, performed, participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of the prices of Brent Crude oil and Brent Crude oil futures contracts.

## SUBSTANTIVE ALLEGATIONS

**I.     Background**

**A.     Brent Crude Oil: The Physical Trading Market**

21.     Brent Crude is a major trading classification of sweet light crude oil comprising Brent Blend, Forties Blend, Oseberg and Ekofisk crudes.  Together, Brent, Forties, Oseberg and Ekofisk are known to crude oil traders as the "Brent Crude" market or "BFOE."  The Brent

oilfields in the North Sea currently have the highest physical daily output of any of the world's recognized oil benchmarks. Brent is the leading global price benchmark for Atlantic basin crude oils and it is used to price two thirds of the world's internationally traded crude oil supplies.

22. The underlying Brent physical market consists of (1) Dated (or wet) Brent; and (2) Cash (or forward) Brent.

23. Dated Brent refers to the spot price for Brent crude oil. Dated Brent is a market term for a cargo of North Sea Brent blend crude oil that has been "assigned a date" when it will be loaded onto a tanker. These cargoes are also commonly referred to as dated cargoes, wet cargoes or wet barrels.

24. Dated Brent prices—as published by Platts— is the leading global benchmark for Brent crude oil.

25. As of January 2012, Platts' Dated Brent market represents assessments of trades in BFOE cargoes in the period between 10-25 days ahead of the date when it will be loaded on a tanker. Originally, the Dated Brent market was assessed on a 7 to 15 day range, *i.e.*, cargoes loading 7 to 15 days forward. The assessment period was extended by Platts to 10 to 21 days in 2002 and to its current 10 to 25 day assessment period on January 6, 2012.

26. By contrast, cargoes that have not been "assigned a date" are known as paper barrels or "cash brent" and are traded for speculative or hedging purposes. Cargoes from a "cash" contract month are progressively "dated" or "wetted," until the 25th day before the end of that delivery month, at which point all cargoes for that delivery month must become "Dated." Cash cargoes become Dated cargoes when they have been "assigned a date" to be loaded onto a tanker. The cash BFOE cargoes trade in chains between potential users of the physical oil until it becomes a "Dated" cargo.

B.     **Brent Crude Oil: The Futures Market**

27.     A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity.  In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based.

28.     The bilateral aspect of the futures contract is that there is a seller and a buyer.

29.     The sellers are one-half of the bilateral futures contract and one-half of the commodity futures market.  They are referred to as "shorts."

30.     The buyers are the other one-half, and are referred to as "longs."

a. **NYMEX**

31.     The NYMEX is a designated contract market under Section 5(b) of the CEA, 7 U.S.C. § 7(b).  NYMEX is the world's largest physical commodity futures exchange and the preeminent forum for energy and precious metals.

32.     NYMEX futures contracts priced, settled or benchmarked to Brent crude oil include: (i) the Brent Crude Oil Last-Day Futures (BZ); (ii) Brent Financial Futures (CY); and (iii) Brent Crude Oil Futures (BB).

33.     These contracts are transacted electronically on the Chicago Mercantile Exchange ("CME") Globex and CME ClearPort trading platforms.  Additionally, the Brent Crude Oil Last Day Futures and the Brent Financial Futures trade through open outcry at the NYMEX in New York.  Globex is an electronic trading platform owned by the NYMEX's parent company, the CME Group.  Open outcry is a method of public auction for making bids and offers in the trading pits of the futures exchange.

34.     The size of the (i) Brent Crude Oil Last-Day Futures (BZ); (ii) Brent Financial Futures (CY); and (iii) Brent Crude Oil Futures (BB) is 1,000 barrels.

35.     Trading in the NYMEX Brent Crude Oil Last-Day Futures (BZ) terminates on the same termination day as the ICE Brent Crude Oil Futures Contract for the delivery month, *i.e.*, on the business day immediately preceding the 15th day prior to the first day of the delivery month, if such 15th day is a banking day in London.  If the 15th day is a nonbanking day in London (including Saturday), trading shall cease on the business day immediately preceding the first business day prior to the 15th day.

36.     Trading in the NYMEX Brent Financial Futures (CY) terminates on the last business day of the contract month.

37.     Trading in the NYMEX Brent Crude Oil Futures (BB) terminates on one business day prior to the termination of the ICE Brent futures contract, *i.e.*, two business days before the fifteenth calendar day prior to the first day of the delivery month, if the fifteenth calendar day is not a holiday or weekend in London.  If the fifteenth calendar day is a holiday or weekend in London, trading shall end three business days prior to the last business day preceding the fifteenth calendar day.

38.     Trading in NYMEX Brent Crude Oil Last-Day Futures (BZ), Brent Financial Futures (CY), and Brent Crude Oil Futures (BB) is subject to the rules and regulations of the NYMEX, and prices are quoted in U.S. dollars and cents per barrel.

39.     The daily settlements for the NYMEX Brent Crude Oil (BB) and the Brent Crude Oil Last Day (BZ) futures contracts are equivalent to the settlements in the corresponding ICE Brent Crude Oil futures contracts, discussed below.

40.     Final settlement for the NYMEX Brent Crude Oil futures contract (BB) is based on its Floating Price.  The Floating Price is equal to the Brent Crude Oil (ICE) Futures 1st nearby contract settlement price on the penultimate trading day for the delivery month.

41.     Final settlement for the NYMEX Brent Crude Oil Last Day (BZ) is based on its Floating Price. The Floating Price is equal to the ICE Brent Crude Oil Index price as published one day after the final trading day of the contract month.

42.     Final settlement for the NYMEX Brent Financial Futures (CY) is based on its Floating Price. The Floating Price is equal to (a) the arithmetic average of the Brent Crude Oil (ICE) Futures 1st nearby contract settlement prices, except as set forth in Section (B) below, for each business day that it is determined during the contract month. (B) The settlement price of the 1st nearby contract month will be used except on the last day of trading for the expiring Brent Crude Oil Futures contract when the settlement price of the 2nd nearby Brent Crude Oil Futures contract will be used.

**b. ICE**

43.     The International Petroleum Exchange ("IPE") was one of the world's largest energy futures and options exchanges. Its flagship commodity, Brent Crude, was a world benchmark for oil prices. The IPE was acquired by the IntercontinentalExchange in 2001. Brent Crude oil futures contracts were traded via open outcry on the floor of the IPE until April 7, 2005, when its name was changed to ICE Futures and all trading in Brent Crude oil futures was shifted onto an electronic trading platform. Today, ICE Futures is the second largest regulated energy futures exchange in the world. ICE Futures hosts more than 50% of the world's crude and refined oil futures trading, and the ICE Brent Crude futures contract is relied upon to price two-thirds of the world's physical oil. ICE Futures is regulated by the U.K. Financial Conduct Authority, with oversight by the U.S. Commodity Futures Trading Commission for linked contracts.

44.    The ICE Brent crude oil futures contract is traded at ICE Futures Europe and executed on the WebICE trading platform, which is distributed in more than 70 countries, including the U.S.

45.    In 2012, the ICE Brent futures contract became the world's largest crude oil futures contract in terms of volume, and the volume of Brent crude oil futures contracts traded on ICE has almost doubled since 2008.

46.    The size of the ICE Brent crude oil futures contract is 1,000 barrels.

47.    ICE Brent crude oil futures contracts is a deliverable contract based on "exchange for physical" ("EFP") delivery with an option to cash settle, *i.e.*, the ICE Brent Index price for the day following the last trading day of the futures contract.

48.    Trading in ICE Brent futures contracts terminates at the end of the designated settlement period on the Business Day (a trading day which is not a public holiday in England and Wales) immediately preceding: (i) either the 15th day before the first day of the contract month, if such 15th day is a Business Day; or (ii) if such 15th day is not a Business Day, the next preceding Business Day.

49.    Prices of ICE Brent crude oil futures contracts are quoted in U.S. dollars and cents per barrel.

50.    The ICE Brent crude oil futures contract was developed in 1988 when the Brent crude oil physical market was trading on a 15-day basis. The expiry calendar established at that point, which continues today for existing ICE Brent futures, reflected the 15-day timetable. Existing ICE Brent crude oil futures therefore currently expire 10 days after BFOE contracts have started to go "wet," *i.e.*, to turn into specific Dated Brent contracts with respect to the contract delivery month in question.

51.     As per ICE, "[t]he ICE Brent futures contract is based on the underlying physical BFOE (Brent-Forties-Oseberg-Ekofisk) market...The ICE Brent futures contract is linked to forward BFOE contracts and hence the underlying Dated Brent market by the Exchange for Physical (EFP) mechanism.  The contract settles against the ICE Brent Index price for the day following the last trading day of the Brent futures contract.   At expiry of a Brent futures contract, the index price is based on the average value of BFOE cash cargoes on expiry day.  The index is also calculated by the exchange every day."

52.     Further, as per ICE, "[t]he cash settlement price for ICE Brent...is based on the ICE Brent Index at their respective expiries.  The index represents the average price of trading in the 25-day 'cash' BFOE market in the relevant delivery month as reported and confirmed by the industry media [Platts]...The index is calculated by the Exchange as an average of the following elements: (1) A weighted average of first month cargo trades in the 25-day BFOE market.  (2) A weighted average of second month cargo trades in the 25-day BFOE market plus a straight average of the spread trades between the first and second months. (3) A straight average of designated assessments published in media reports [Platts]."

53.     In response to Platts extending its assessment period to 10-25 days, ICE launched the ICE Brent NX Brent futures contract, which have an expiry calendar based on the 25-Day BFOE market and therefore align the futures expiry calendar with the physical BFOE market.

### C.  U.S. Based Transactions in Brent Crude Oil Futures Contracts on ICE

### i.      The CFTC Granted No-Action Relief to ICE and IPE for the Domestic (U.S. Based) Trading of Brent Crude Oil Futures Contracts

54.     On November 12, 1999, the CFTC issued a no-action letter in which it confirmed that it would not recommend that the CFTC institute enforcement action against the International Petroleum Exchange of London Limited ("IPE") (acquired by ICE in 2001) or its members

solely based upon IPE's failure to obtain contract market designation pursuant to Sections 5 and 5a of the CEA, "if: (i) IPE members trade for their proprietary accounts through ETS [Energey Trading System II] in the United States; (ii) IPE members who are registered with Commission as [futures commission merchants] FCMs or who are Rule 30.10 Firms submit orders from United States customers for transmission to ETS; and/or (iii) IPE members who are registered with the Commission as FCMs or who are Rule 30.10 Firms accept orders through United States [automated order routing systems] AORS from United States customers for submission to ETS." CFTC Staff Letter No. 99-69 (Nov. 12, 1999), at p. 15 (emphasis added).

55.     The November 12, 1999 IPE no-action letter was amended by the CFTC four times between July 26, 2002 and April 14, 2003 as trading of the contracts was transitioned from the ETS to ICE Platform operated by the Intercontinental Exchange, Inc. in Atlanta, Georgia and trading hours were extended.  CFTC Staff Letter No. 09-37 (Aug. 20, 2009), at p. 2.

56.     Significantly, on April 14, 2003,the CFTC issued a no-action letter in which it amended its November 12, 1999 no-action letter and confirmed that it would not recommend that the CFTC institute enforcement action against IPE or its members solely based upon IPE's failure to seek contract market  designation or registration as a derivatives transaction execution facility under Sections 5 and 5a of the CEA "if the IPE makes all of its current contracts, including Brent Crude futures...available in the U.S. on the ICE Platform during the course of the entire trading day."  CFTC Staff Letter No. 03-17 (April 14, 2003), at p. 3 (emphasis added).

**D.     The Role of Platts in the Brent Crude Oil Market**

57.     Almost all physical BFOE crude oil is traded in the over-the-counter ("OTC") market, where the transaction details are not readily observable.  As a result, Platts plays the central role in establishing and reporting spot prices of Brent Crude oil.

58.     Platts uses a "Market-On-Close" methodology in establishing and reporting Brent crude oil spot prices.  Platts' Market-On-Close methodology is based upon bids, offers and transactions for spot Brent Crude oil (as reported to Platts) that take place during the 30 to 45 minutes before the close of the market (generally 4:00PM to 4:30PM London time).  This 30-45 minute period of time is referred to as the "Platts window."  Market participants can adjust their bids and offers during the Platts window subject to Platts' guidelines.  Market participants who failed to declare their intention to submit bids and offers during the Platts window may not submit bids and offers during the Platts window, but may still choose to accept a bid or an offer posted during the Platts window.  Following the close of the market (generally 4:30 p.m. London time), Platts' editors examine the bids, offers, and transactions for spot Brent Crude oil that took place during the Platts window and use that data to establish an end-of-day (or market-on-close) Brent Crude oil spot price.  Platts subscribers have access to the real-time trading data published by Platts during the Market-On-Close process

59.     Although participation in the Platts' Market-On-Close is voluntary, Platts is highly selective as to which market participants are permitted to participate in its Market-On-Close process.

60.     Platts' Market-On-Close (or end-of-day) Brent Crude oil spot price is the most important price marker for Brent Crude oil in the world.

**E.     Brent Crude Oil Spot and Futures Prices are Inextricably Linked**

61.     The Brent Crude oil futures market can be thought of as a clearinghouse for trades among buyers and sellers of Brent Crude oil futures contracts, which are standardized contracts used to price Brent crude oil at various maturities.  The Brent Crude oil futures market is inextricably linked to the spot market for Brent Crude oil and thus to Platts pricing (see ¶¶31-53),

and price movements in the spot market can and do cause price movements in the futures

markets.

62.     In particular, Brent Crude oil futures traders refer to the spot prices published by

the reporting firms, such as Platts, for price discovery and for assessing price risks in the Brent

Crude oil market.  An increase in the spot price published by Platts, signals either stronger

demand or weakened supply, and futures traders take account of both price movements and

changes in the supply/demand balance when conducting their futures trading. This price impact

is expected. Brent Crude oil futures overlay the conventions and conditions of the Brent Crude

oil spot market.  Brent crude oil futures prices derive their valuation from spot transactions. The

spot market is the first point in a commercial transaction.  Brent Crude oil spot and futures prices

are sympathetic -- they move in the same direction. That is why people use futures markets to

hedge price exposure.  This is just another way of expressing the integrated characteristics and

thus arbitrage realities of Brent crude oil.  What happens in the Brent Crude oil spot market by

definition affects Brent Crude oil futures.  The expiration of a Brent Crude oil futures contract

into a physical position (see ¶51), also results in the convergence of price especially when the

spot price sets the futures expiration price. The physical delivery mechanism ensures price

convergence between the spot and futures market.  When these high correlations or conversions

are disrupted by the manipulation of prices (creating false values/ prices), *i.e.*, a manipulation of

the Platts Brent Crude oil benchmarks, it has effects that ripple throughout the Brent Crude oil

market.

F.     **Defendants Unlawful Conduct Has Led to Government Investigations**

63.     On May 14, 2013 the European Commission confirmed that it, along with the

EFTA Surveillance Authority,  had carried out unannounced inspections of several companies

active in and providing services to the crude oil, refined oil products and biofuels sectors. The European Commission undertook the inspections on concerns that (i) the companies may have colluded in reporting distorted prices to a Price Reporting Agency ("PRA") to manipulate the published prices for a number of oil and biofuel products; and (ii) the companies may have prevented others from participating in the price assessment process, with a view to distorting published prices. As described by the European Commission,

> The prices assessed and published by Price Reporting Agencies serve as benchmarks for trade in the physical and financial derivative markets for a number of commodity products in Europe and globally. Even small distortions of assessed prices may have a huge impact on the prices of crude oil, refined oil products and biofuels purchases and sales, potentially harming financial consumers.

64.     Almost immediately following the European Commission's announcement on May 14, Defendants BP plc, Royal Dutch Shell plc and Statoil ASA each confirmed they are the subject of the European Commission investigation.   In particular, Defendant Statoil confirmed that its office in Stavanger (Norway) was subject to an inspection by the EFTA Surveillance Authority, assisted by the Norwegian Competition Authority.  Statoil acknowledged that the inspection was carried out at the request of the European Commission.  Further, Statoil confirmed that the scope of the European Commission's investigation is "related to the Platts' Market-On-Close price assessment process, used to report prices in particular for crude oil, refined oil products and biofuels" extending back to as early as 2002.

65.     On May 17, 2013, the U.K. Serious Fraud Office announced that it was "urgently reviewing" the European Commission's allegations of price-fixing in the oil markets and determining whether to accept the case for "criminal investigation." That same day, the United States Senate called for the U.S. Department of Justice to join the European Commission investigation.

II.     **Defendants' Intentionally Manipulated Brent Crude Oil Futures Prices by Falsely Reporting Brent Crude Oil Spot Prices to Platts**

66.     Defendants purposefully manipulated prices of Brent Crude oil and Brent Crude oil futures contracts through their deliberate and systematic submission of false Brent Crude oil trade information to Platts.

67.     Defendants knew that this false trade information was used by Platts in calculating and publishing its Brent crude oil prices.  Further, they also knew, as sophisticated market participants, that the (mis)information they reported impacted the prices of Brent Crude oil futures contracts and other Brent Crude oil derivative contracts traded in the U.S.

## CLASS ACTION ALLEGATIONS

68.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on his own behalf and as a representative of the following Class[1]:

> All persons or entities (other than Defendants and any parent, subsidiary, affiliate, or agent of any Defendant) that purchased or sold a Brent Crude Oil futures contract on the NYMEX or ICE during the period of at least 2002 through the Present (the "Class Period").

69.     The Class is so numerous that the individual joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least thousands of geographically dispersed Class members transacted in Brent Crude Oil futures contracts during the Class Period.

70.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein.  The injuries and damages of each

---

[1] Plaintiff has defined the Class based on currently available information and hereby reserves the right to amend the definition of the Class, including, without limitation, the Class Period.

member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

71.    Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff is an adequate representative of the Class and has no interests which are adverse to the interests of absent Class members.  Plaintiff has retained counsel competent and experienced in class action litigation, including commodity futures manipulation and antitrust class action litigation.

72.    Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  These common questions of law and facts include, without limitation:

(a) Whether Defendants manipulated Brent Crude Oil futures contracts in violation of the CEA;

(b) Whether such manipulation caused Brent Crude Oil futures contracts to be artificial;

(c) Whether such manipulation caused cognizable legal injury under the CEA;

(d) Whether Defendants unlawful acts violate Section 1 of the Sherman Act;

(e) Whether Defendants attempted to monopolize and/or did monopolize the market for North Sea Brent Crude Oil;

(f)  Whether Defendants' unlawful conduct caused injury to the business or property of Plaintiff and the Class;

(g) Whether Defendants were unjustly enriched at the expense of Plaintiff and members of the Class;

(h) The operative time period and extent of Defendants' foregoing violations; and

(i) Whether such injury or the fact or extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests.

73.     A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

74.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

### EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

75.     By its very nature, the unlawful activity, as alleged herein, that Defendants engaged in was self-concealing. Defendants, *inter alia*, falsely reported prices and volume and trade information to Platts in order to manipulate the spot price for Brent crude oil and the prices of Brent crude oil futures contracts traded on the NYMEX and ICE.

76.     Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until it became public. The first public reports of any government action relating to Defendants' unlawful conduct occurred on or about May 14, 2013, when the European Commission confirmed that it carried out unannounced inspections at the premises of several companies active in and providing services to the crude oil, refined oil products and biofuels sectors,

alleging that these companies colluded in reporting artificial prices to a PRA to manipulate the published prices for a number of oil and biofuel products.

77.     Because the Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiff and the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure in May 2013.

78.     Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled during the period of such fraudulent concealment.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(For Manipulation in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*)**

**Against All Defendants**

79.     Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

80.     By their intentional misconduct, the Defendants each violated Section 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), and caused prices of Brent Crude Oil futures contracts to be artificial, during the Class Period.

81.     Defendants' trading and other activities alleged herein constitute market power manipulation of the prices of Brent Crude Oil futures contracts in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a).

82.     Defendants' foregoing extensive manipulative conduct deprived Plaintiff and other traders of a lawfully operating market during the Class Period.

83.     Plaintiff and others who transacted in Brent Crude Oil futures contracts during the Class Period transacted at artificial and unlawful prices resulting from Defendants' manipulations in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*, and as a direct result thereof were injured and suffered damages.

84.     Plaintiff and the Class are each entitled to damages for the violations of the CEA alleged herein.

85.     Plaintiff and members of the Class who purchased or sold NYMEX Brent Crude Oil futures contracts during the Class Period were injured and are each entitled to their actual damages for the violations of the CEA alleged herein.

## SECOND CLAIM FOR RELIEF

### (For Principal-Agent Liability in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*)

### Against All Defendants

86.     Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

87.     Each Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

88.     Plaintiff and member of the Class are each entitled to actual damages sustained in NYMEX Brent Crude Oil futures contracts for the violations of the CEA alleged herein.

## THIRD CLAIM FOR RELIEF

### (For Aiding and Abetting Manipulation in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.*)

### Against All Defendants

89.     Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

90.     Defendants knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein.  Defendants did so knowing of each other's manipulation of Brent crude oil market prices, and willfully intended to assist these manipulations, which resulted in Brent Crude Oil futures contracts to reach artificial levels, during the Class Period in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

91.     Plaintiff and member of the Class are each entitled to actual damages sustained in NYMEX Brent Crude Oil futures contracts for the violations of the CEA alleged herein.

## FOURTH CLAIM FOR RELIEF

### (For Violation of Section 1 of the Sherman Act, 15 U.S.C. §1, *et seq.*)

### Against All Defendants

92.     Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

93.     Defendants entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

94.     During the Class Period, Defendants possessed market power in the setting of Brent crude oil and the prices of Brent crude oil futures contracts.

95.     The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, suppressed and/or made artificial Brent crude oil market prices and the prices of Brent Crude Oil futures contracts.  Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

96.     Defendants' conspiracy, and resulting impact on Brent crude oil market prices and the prices of Brent Crude Oil futures contract, occurred in or affected interstate and international commerce.

97.     As a proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property.

98.     As a consequence, Plaintiff and the Class are each entitled to treble damages for the Defendants' violations of the Sherman Act alleged herein, and a permanent injunction restraining Defendants from engaging in additional anticompetitive conduct.

## FIFTH CLAIM FOR RELIEF

### (Violation of Section 2 of the Sherman Act, 15 U.S.C. §2)

### Against All Defendants

99.     Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

100.     In violation of Section 2 of the Sherman Act, Defendants attempted to monopolize and did monopolize the Relevant Markets as defined below.

101.     The Relevant Market ("Relevant Market") is North Sea Brent Crude Oil (BFOE).

102.     During the Class Period, as major producers and market participants (including Platts Brent crude oil contributors), Defendants attempted to monopolize and did monopolize the Relevant Market.

103.     Defendants' unlawful price control of the Relevant Market during the Class Period reflects monopoly power.

104.     Defendants' conduct and its resulting impact on the Relevant Market occurred in or affected interstate commerce.

105.    The anticompetitive effects of Defendants' conduct far outweigh any ostensible competitive benefits or justifications.

106.    Plaintiff and members of the Class have been injured in their business or property by Defendants' attempted monopolization and monopolization of the Relevant Market.

107.    Defendants' anticompetitive conduct had severe adverse consequences on competition and price discovery.  Plaintiff and other members of the Cass who traded Brent crude futures during the Class Period were deprived of normal, competitive trading patterns and, instead, were subjected to artificially determined prices as a result of Defendants' unlawful and manipulative conduct. As a consequence thereof, Plaintiff and the Class suffered financial losses and were, therefore, injured in their business of property.

## SIXTH CLAIM FOR RELIEF

### (For Unjust Enrichment)

### Against All Defendants

108.    Plaintiff realleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

109.    Defendants financially benefited from their unlawful acts.  These unlawful acts caused Plaintiff and other members of the Class to suffer injury, lose money, and transact Brent Crude Oil futures contracts at artificial prices.

110.    As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner.

111.    Each Defendant should pay restitution or its own unjust enrichment to Plaintiff and members of the Class.

112.    Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

## PRAYER FOR RELIEF

Accordingly, Plaintiff demands relief as follows:

A.    For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representative, and his counsel be appointed as Class counsel;

B.    For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

C.    For the unlawful conduct alleged herein to be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act,

D.    For Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

E.    For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the federal antitrust laws, in an amount to be trebled in accordance with such laws;

F.    For a judgment awarding Plaintiff and the Class restitution of any and all sums received by the Defendants' unjust enrichment;

G.    For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

H.     For such other and further relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a trial by jury of all issues so triable.


Dated:  White Plains, New York
        May 22, 2013

                                        LOWEY DANNENBERG COHEN
                                          & HART, P.C.


                                        By:_____
                                        Vincent Briganti, Esq.
                                        Geoffrey M. Horn, Esq.
                                        Peter D. St. Phillip, Esq.
                                        Raymond P. Girnys, Esq.
                                        One North Broadway
                                        White Plains, New York 10601
                                        Tel.: 914-997-0500
                                        Fax: 914-997-0035

                                        *Counsel for Plaintiff and the Proposed
                                        Class*