USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 3-29-16

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x

In re:                                              :        **1:13-md-02475 (ALC)**
                                                    :
**NORTH SEA BRENT CRUDE OIL**                       :        **OPINION AND ORDER**
**FUTURES LITIGATION**                              :        **DISMISSING CLAIMS AGAINST**
                                                    :        **DEFENDANT STATOIL ASA**
**This document applies to:  ALL CASES**            :
                                                    :

-----------------------------------------------------------x

**ANDREW L. CARTER, JR., United States District Judge:**

    A putative class of futures and derivatives traders ("Trader Plaintiffs") and a putative

class of the owners of landholding and lease-holding interests in United States oil-producing

property ("Landowner Plaintiff") bring suit against a number of producers and traders of Brent

North Sea crude oil and selected affiliates. Plaintiffs allege that Defendants conspired to

intentionally manipulate Brent crude oil prices and the prices of Brent crude oil futures contracts

traded on the New York Mercantile Exchange ("NYMEX") and on the Intercontinental

Exchange ("ICE"), in violation of the Commodity Exchange Act, the Sherman Act, and the laws

of various states.

    Among the defendants are Statoil ASA and Statoil U.S. Holdings Inc. ("Statoil U.S.")

(collectively, the "Statoil Defendants"). Statoil ASA is an oil and gas company, two-thirds held

by the Government of Norway. The Statoil Defendants now move to dismiss, asserting, among

other grounds, that the Court lacks subject-matter jurisdiction over Statoil ASA under the

Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602-1611. For the reasons set

forth below, the Court finds that it does not have subject-matter jurisdiction over the claims

against Statoil ASA.

# BACKGROUND

## I.      Factual Background

As relevant to the Statoil Defendants, the alleged facts are as follows:

### a.  Brent Crude Oil

Plaintiffs allege that the Statoil Defendants, along with other producers and traders of Brent North Sea crude oil and selected affiliates, monopolized the Brent crude oil market and entered into unlawful agreements and conspiracies to fix and restrain trade in and intentionally manipulate Brent crude oil prices and the prices of Brent crude oil futures and derivatives contracts. (Traders' Second Amended Compl. ("SAC"), ECF No. 308, ¶ 2.)[1]

The Trader Plaintiffs are individuals and entities who trade Brent futures and derivatives contracts on NYMEX and ICE in the United States. (SAC ¶¶ 24-34.) The Landowner Plaintiff is a Louisiana resident who is a landowner and/or leaseholder of oil-producing lands, as well as the owner of multiple royalty and working interests in oil leases in the State of Louisiana. (Landowner's Second Amended Compl. ("Landowner SAC"), Landowner ECF No. 96, ¶ 10.) Statoil ASA is a Norwegian oil company that engages in the exploration, production, transportation, refining, and marketing of petroleum and petroleum-derived products. (SAC ¶ 40.) It is headquartered in Norway but also maintains offices in the United States, including in Connecticut, Texas, and Washington D.C. (*Id.*) Statoil US Holdings Inc. is a Delaware corporation responsible for trading Brent crude oil to North American markets. (*Id.* ¶ 42.)

Brent crude oil is a variety of crude oil pulled from the North Sea region of Europe. (SAC ¶ 4.) It is shipped into the United States by a number of companies, including the Statoil

---

[1] Unless otherwise noted, all references to "ECF" refer to the electronic docket for Case No. 13-md-2475, the Trader Action. All references to "Landowner ECF" refer to the electronic docket for Case No. 13-cv-2475, the Landowner Action.

Defendants. (SAC ¶ 477, Landowner SAC ¶ 53.) Brent crude oil serves as a benchmark for two-thirds of the world's internationally traded crude oil supplies. (SAC ¶ 4.) This benchmarking function is facilitated by Platts, a London-based division of New York-based McGraw Hill Financial. (SAC ¶ 4.) The Brent crude oil physical market primarily consists of private ("over-the-counter" or "OTC") trades in cargoes of crude oil in the North Sea. (*Id.* ¶¶ 77, 85.) Because the trades are based on OTC contracts, oil prices are not directly visible to the public; instead, Platts and other price-reporting agencies collect information on transactions from market participants and report them. (*Id.* ¶ 85.)

Platts reports prices for various submarkets in the Brent crude oil market, but the primary benchmark for Brent crude oil is "Dated Brent," physical cargoes of crude oil in the North Sea that have been assigned specific delivery dates. (SAC ¶¶ 88-89.) To assess pricing for Dated Brent, Platts uses the so-called Market-On-Close ("MOC") methodology. (*Id.* ¶ 92.) This methodology limits the analysis of market-pricing data to transactions that occur during a half-hour window at the end of the trading day (4:00 p.m. to 4:30 p.m. London time). (*Id.*) Platts collects trade information from this time and, in order to accurately capture the price of oil closest to the market, "carefully analyses transactional data to determine its fitness for an assessment of market value" before publishing it. (*Id.* ¶ 99.) "Platts applies judgment to the data it gathers, but that judgment is tied strictly to the underlying market." (*Id.* ¶¶ 99; 102-120 (describing factors and data considered in assessment process).)

Plaintiffs contend that Platts's and other price-reporting agencies' pricing assessments "are directly linked" to Brent crude oil futures and other derivative contract prices, as futures and exchange-based derivatives traders rely on prices published by Platts. (SAC ¶¶ 125-26.) Plaintiffs focus specifically on futures and derivatives trading on NYMEX and ICE Futures. (*Id.*

3

¶ 2). NYMEX is a U.S.-based physical commodity futures exchange (*Id.* ¶ 133) and ICE Futures is a "purely electronic" derivatives exchange owned by the Intercontinental Exchange Group, Inc., a Delaware corporation. (*Id.* ¶ 137.) NYMEX Brent Futures settle to ICE Brent futures. (*Id.* ¶ 123.) Plaintiffs allege a correlation of 85 percent or more between Platts's Dated Brent prices and ICE Brent Crude Oil futures (*Id.* ¶ 129.)

### b. Alleged Manipulations

Plaintiffs allege that the Statoil Defendants conspired with other Defendants to manipulate the Brent crude oil market by engaging in manipulative and fraudulent physical trades and deliberately and systematically submitting information about those trades to Platts. (SAC ¶ 224.) This also served to manipulate the prices of Brent crude oil futures and derivatives contracts. (*Id.*) Generally speaking, Plaintiffs allege that the Statoil Defendants, along with other Defendants, "selectively reported bids, offers, 'spoof' orders and transactions with aberrant pricing" and engaged in "prohibited wash sale transactions" during the MOC window. (*Id.* ¶ 8.) Plaintiffs nowhere allege that Statoil engaged in manipulative futures trading on NYMEX or ICE Futures; rather, they allege that the manipulation of the Platts Brent crude oil benchmarks, through manipulative physical trades and reporting, "has effects that ripple throughout the Brent Crude Oil and futures market, impacting a wide variety of derivative and futures contracts on NYMEX and ICE." (*Id.* ¶ 126.)

Plaintiffs allege specific incidents of manipulation involving the Statoil Defendants. First, Plaintiffs allege that in June 2010, Statoil ASA bought a cargo from Shell International Trading and Shipping Co. ("STASCO"); sold four cargoes but did not report the sale of one of the cargoes to Platts, placed orders for a certain grade of Brent with no effect on Platts pricing; sold a cargo to STASCO and tried to sell other cargoes at the same time; and purchased OTC

derivatives contracts. (SAC ¶¶ 254-77.) Plaintiffs allege that through this course of action, Statoil ASA and other companies "managed to achieve strong market effects in both the Platts MOC and in the futures trading coincident to the Platts MOC" by selling physical grades at improving differentials and hedging those sales with long positions. (*Id.* ¶ 265.) In this period, Plaintiffs allege, Statoil ASA engaged in collusive trading such as wash trades. (*Id.* ¶ 265.)

Second, Plaintiffs allege manipulative actions by the Statoil Defendants in January 2011. Plaintiffs allege that Statoil ASA participated in an Exchange for Physical or "EFP" transaction, in which physical oil is traded for an on-exchange contract position, "in a manner designed to inflate the Dated Brent and ICE Brent futures." (SAC ¶ 289.) However, "Platts makes no mention of these EFP trades in that day's MOC narrative recap." (*Id.* ¶ 290.) Plaintiffs allege that later the same month, Statoil ASA purchased three total cargoes and accumulated "large long positions in the physical [Brent] market" and the MOC market "became no more than a forum for a very few companies to participate in price manipulation while rotating physical cargoes through the MOC." (*Id.* ¶¶ 307-09, 317.) In this same month, Platts "noted a new Statoil internal directive to curtail the use of Yahoo! Instant Messenger in its daily activities," and further noted "that trading activity at this time was marked by a lack of the essential components of transparency and discovery."[2] (*Id.* ¶ 318.)

Third, Plaintiffs allege that in September 2012, Statoil ASA and STASCO booked two Very Large Crude Carriers ("VLLCs," oil tankers capable of transporting between one and two million barrels of crude oil), purportedly to transport Brent Crude Oil to the Far East and Korea, but in fact to add upward pressure to market prices. (SAC ¶¶ 391-95, 411-16.)

---

[2] Per Plaintiffs' expert, "Participants placed offers and bids via Yahoo Messenger and the relevant data was captured manually. Deals are confirmed by Yahoo messages from both counterparties." (Osterwald Rpt. ¶ 24.)

In sum, the Trader Plaintiffs allege that the Statoil Defendants' manipulations deprived them of trading in a lawful, market for Brent crude oil futures and derivatives contracts and that they were injured in their businesses and property. (SAC ¶ 3). They bring claims, on behalf of themselves and other similarly situated, under the Commodity Exchange Act, the Sherman Act, and common law. (*Id.* ¶ 2.). The Landowner Plaintiff alleges that the restraint in trade and intentional manipulation of Brent crude oil prices caused the suppression of prices in connected U.S. markets for other varieties of crude oil, and that as a result of the suppression of prices in those markets, the Landowner Plaintiff received reduced compensation from the sale of oil extracted from his leased and owned property, from the sale of interests in oil production, and from the sale of oil-producing land. (Landowner SAC ¶¶ 4-5.) The Landowner Plaintiff, on behalf of himself and others similarly situated, brings claims under the Sherman Act, and various state antitrust and unfair trade practices acts. (*Id.* ¶ 3.)

## II.     Procedural Background

After the various cases in this litigation were centralized and transferred to this Court in October 2013 (ECF No. 1), the Trader Plaintiffs filed an Amended Complaint on July 3, 2014. (ECF No. 166.) The Landowner Plaintiff, proceeding in a related case, filed an Amended Complaint on April 28, 2014. (Landowner ECF No. 40.)[3] Thereafter, all Defendants jointly filed three motions to dismiss: (1) a motion to dismiss the Trader Complaint (ECF No. 204); (2) a motion to dismiss the Landowner Complaint (ECF No. 219); and (3) a motion to dismiss both the Trader Complaint and the Landowner Complaint on the grounds that they exceeded the extraterritorial reach of United States law. (ECF No. 201.)

---

[3] Following a stipulation by all parties, the Trader Plaintiffs filed a Second Amended Complaint on February 27, 2015 ("SAC", ECF No. 308), and the Landowner Plaintiff filed a Second Amended Complaint on April 30, 2015. ("Landowner SAC," Landowner ECF No. 96.) The Second Amended Complaints substituted certain defendants but did not affect any claims against Statoil.

In addition, the Statoil Defendants, like the other Defendants, filed a supplemental motion to dismiss advancing arguments specific to them. ("Statoil Mot. Dismiss," ECF No. 205.) In support of their supplemental motion to dismiss, and in particular in support of its argument that this Court lacks subject-matter jurisdiction over Statoil ASA under the Foreign Sovereign Immunities Act, Statoil submitted the Declaration of Christopher L. Culp, Ph.D. ("Culp Decl.," ECF No. 207.) On October 6, 2014, the Plaintiffs and the Statoil Defendants stipulated and agreed that Plaintiffs could depose Dr. Culp concerning facts relevant to subject-matter jurisdiction under FSIA. (ECF No. 240; Landowner ECF No. 65.) On October 22, 2014, the Statoil Defendants submitted a corrected version of Dr. Culp's Declaration. (ECF Nos. 241-42.)

On October 27, 2014, Plaintiffs filed a motion in limine, moving to exclude Dr. Culp's opinions. ("Pl.'s Mot. Limine," ECF Nos. 255-56.) That same day, Plaintiffs filed their opposition to all Defendants' motions to dismiss, including the Statoil Defendants' supplemental motion to dismiss. ("Pl.'s Opp.," ECF No. 254.) On November 26, 2014, the Statoil Defendants filed their opposition to Plaintiffs' motion in limine. ("Statoil Opp. Mot. Limine," ECF No. 287.) On September 30, 2015, this Court issued an Order denying without prejudice and informed the parties that it would consider the motion in limine in the full context of its review of the motions to dismiss. (ECF No. 381.)

The Court now addresses Plaintiffs' motion in limine, as well as the subject-matter jurisdiction argument advanced in the Statoil Defendants' motion to dismiss.

## DISCUSSION

### I.    Federal Rule of Evidence 702

Federal Rule of Evidence ("FRE") 702 governs the admissibility of expert testimony. "It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert

opinions." *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005), and district courts enjoy broad discretion to admit expert testimony. *See United States v. Feliciano*, 223 F.3d 102, 120 (2d Cir. 2000).

However, "[t]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied," *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593 n. 10 (1993)), and "the district court is the ultimate 'gatekeeper.'" *Id.* As a threshold question, the Court must determine "whether a witness is 'qualified as an expert by knowledge, skill, experience, training, or education.'" *Nimely*, 414 F.3d at 395 n. 11 (quoting FRE 702). If that is established, then the Court must turn to "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Williams*, 506 F.3d at 160 (quoting *Daubert*, 509 U.S. at 597).

"In assessing reliability, the district court should consider the indicia of reliability identified in Rule 702, namely:

> (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case."

*Williams*, 506 F.3d at 160 (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)) (internal quotation marks omitted). This list of criteria is not exhaustive, *see Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004), and courts may also look to whether a theory or technique has been or can be tested; whether the theory or technique has been subjected to peer review and publication; the technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and whether a particular technique or theory has gained general acceptance in the relevant scientific community.

*Williams*, 506 F.3d at 160 (citing *Daubert*, 509 U.S. at 593-94). This list of factors "neither necessarily nor exclusively applies to all experts or even every case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Instead, the district court's inquiry is a "flexible one," *Daubert*, 509 U.S. at 594, and "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 142.

Finally, "[i]t is well-established that the *Daubert* gatekeeping standard is applied more flexibly when the judge is the factfinder," *Bank of New York Mellon Trust Co., Nat. Ass'n v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 639 (S.D.N.Y. 2012), as "the trial judge is presumed to be able to exclude improper inferences from his or her own decisional analysis.*" Bic Corp. v. Far E. Source Corp.*, 23 F. App'x 36, 39 (2d Cir. 2001).

## II.     The Foreign Sovereign Immunities Act

"The FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court." *Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek*, 600 F.3d 171, 175 (2d Cir. 2010) (quoting *Matar v. Dichter*, 563 F.3d 9, 12 (2d Cir. 2009)) (internal quotation marks omitted). "In general, a foreign state or an agency or instrumentality of a foreign state is immune from federal court jurisdiction unless a specific exception to the FSIA applies." *Id.* (internal citations and quotation marks omitted); *see also Swarna v. Al-Awadi*, 622 F.3d 123, 143 (2d Cir. 2010) (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993)) ("A foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception to the FSIA applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." (alteration and internal quotation marks omitted)).

"In contrast to a Rule 12(b)(6) motion to dismiss for failure to state a claim, in a challenge to FSIA subject matter jurisdiction, the defendant must present a *prima facie* case that it is a foreign sovereign." *Virtual Countries, Inc. v. Republic of S. Africa*, 300 F.3d 230, 241 (2d Cir. 2002) (quoting *Cargill Int'l S.A. v. M/T Pavel Dybenko,* 991 F.2d 1012, 1016 (2d Cir.1993)) (internal quotation mark omitted). If the defendant presents such a case, "*the plaintiff* has the *burden of going forward* with evidence showing that, under exceptions to the FSIA, immunity should not be granted." *Id*. (emphasis in original) (quoting *Cargill*, 991 F.2d at 1016) (internal quotation marks omitted). The plaintiff must establish "by a preponderance of the evidence that an exception under the FSIA permits jurisdiction over the foreign sovereign." *Swarna*, 622 F.3d at 143 (emphasis added).

To determine whether the plaintiff meets its burden, the Court should conduct a "review of the allegations in the complaint, the undisputed facts, if any, placed before the court by the parties, and—if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue—resolution of disputed issues of fact." *Virtual Countries*, 300 F.3d at 241 (quoting *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001)) (alterations omitted). "If the plaintiff meets that burden, a court resolves disputed facts to determine whether any of the FSIA's exceptions apply." *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2 F. Supp. 3d 550, 555 (S.D.N.Y. 2014) *aff'd* No. 14-917-CV, 2016 WL 403445 (2d Cir. Feb. 3, 2016). "[T]he foreign sovereign . . . bears the ultimate burden of persuasion that the FSIA exception does not apply." *Swarna*, 622 F.3d at 143

### III.   The Commercial Activity Exception

The FSIA provides a so-called "commercial activity" exception, which abrogates sovereign immunity in cases in which "the action is based upon:

[1] a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]"

28 U.S.C. § 1605(a)(2). For the purposes of the FSIA, "commercial activity" is defined as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). "[W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992).

Further, as relevant to all three clauses of the commercial activity exception, the Supreme Court recently re-examined the meaning of "based upon." The Court reiterated that FSIA's "'based upon' inquiry . . . first requires a court to 'identify the particular conduct on which the plaintiffs action is 'based.'" *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 395 (2015) (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 356 (1993)); *see also Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 155 (2d Cir. 2007) (finding the same definition of "based upon" applicable to all three clauses of the commercial activities exception). "[A] court should identify that 'particular conduct' by looking to the 'basis or foundation for a claim," i.e. "those elements that if proven would entitle a plaintiff to relief." *Sachs*, 136 S. Ct. at 395 (quoting *Nelson*, 507 U.S at 356). "[A]n action is 'based upon' the 'particular conduct' that constitutes the gravamen of the suit," or "the core of [the] suit." *Id*. at 396.

## DISCUSSION

### I.      Admissibility of Culp Declaration

Plaintiffs move to exclude the expert testimony of Christopher Culp, offered by the Statoil Defendants in support of their motion to dismiss. Culp is an economist specializing in derivatives, risk management, and structured finance, with significant experience in crude oil and other energy markets. (Culp Decl. ¶ 1.) In his declaration, Culp describes the "cause-and-effect chain" that he understands Plaintiffs to allege, finds it to be complex and indirect, and concludes that "the conduct alleged in the Complaints would *not* have had a direct effect on Brent-based exchange contract markets, much less U.S. physical crude markets or the prices of U.S. mineral interests." (*See* Culp. Decl. ¶¶ 2-9.)

Plaintiffs argue that the Court should exclude Culp's testimony as speculative and based on faulty assumptions. Specifically, Plaintiffs argue that Culp: (1) assumes that liquidity in the Brent physical market would serve to dissipate any artificiality introduced by Statoil but does not conduct any economic testing to confirm that assumption; (2) assumes that Platts weeded out manipulative Statoil trades before making price assessments but bases that assumption solely on Platts's own publications; and (3) concludes there is not a direct relationship between physical Brent transactions and the futures market without testing that assumption. Finally, Plaintiffs argue that Culp's testimony is irrelevant.

Taking the question of relevance first, Culp's testimony is clearly relevant to the question at hand under Clause 3 of the commercial activities exception: whether an act outside the United States caused a direct effect in the United States. 28 U.S.C. § 1605(a)(2). Culp opines at length about whether the alleged manipulations in the Brent physical market could have had a direct effect on futures markets or land and lease holdings in the United States. His conclusion that any effect on the futures market is indirect clearly constitutes evidence having a tendency to make the existence of a direct effect – a fact of consequence in determining the FSIA action – less

probable than it would be without the evidence. *See* Fed. R. Evid. 401 (defining relevance). This is true even if, as Plaintiffs argue, the question at hand is not whether the physical transactions had a direct effect on the futures market but whether the physical transactions had a direct effect on the United States as a whole. Culp's conclusion, if credited, makes a direct effect less probable, as it invalidates an entire category of allegedly direct effects.

Moving to the question of reliability, the Court finds Plaintiffs' arguments unavailing. First, as to whether Culp sufficiently tested his assertion that liquidity in the Brent physical market would serve to dissipate any artificiality introduced into it, Culp relies on publicly available literature to trace the increased liquidity in the market and relies on his training and experience in economics to argue that that liquidity would serve to mitigate the impact of "uneconomic" trades. (Culp Decl. ¶¶ 43-52.) Plaintiffs argue that this testimony constitutes "unscientific speculation offered by a purported genuine scientist," and fault his reliance on the literature and his background in the absence of "rigorous economic testing." (Pl.'s Mot. Limine 14-15.) However, Culp's reliance on literature and his background is permissible. *See Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 505 (S.D.N.Y. 2015) (finding expert's reliance on "articles about brand value and deposition testimony without performing an analysis of her own" permissible). Culp's "reasoning is based principally upon [his] experience and research in the world of economics, which qualify [him] to opine on such matters." *Id.* (alterations omitted) (quoting *Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 354, 364-65 (S.D.N.Y. 2014)). To the extent that Culp's conclusions are broader than supported by the data, an issue contested by the parties, that goes to weight rather than admissibility. *See, e.g., Louis Vuitton*, 97 F. Supp. at 505 (quoting *Bacardi & Co. v. N.Y. Lighter Co., Inc.*, No. 97 Civ. 7140, 2000 WL 298915, at *2 (E.D.N.Y. Mar. 15, 2000)) ("Although expert testimony should be

excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.")

The Court also rejects Plaintiffs' contentions that Culp's testimony regarding Platts' treatment of aberrant trades constitutes inadmissible "parroting" of Platts's materials, i.e. that it addresses "lay matters which [the trier of fact] is capable of understanding and deciding without the expert's help." *United States v. Mulder*, 273 F.3d 91, 101 (2d. Cir. 2001) (internal quotation marks omitted). In addition to summarizing Platts's publications, Culp provides analysis regarding Platts's economic incentives to implement protocols to ensure reliability of its price assessments. (*See, e.g.*, Culp Decl. ¶ 56.) Again, it is permissible for Culp to base his conclusions on a review of articles or other publications. And again, "Plaintiffs' arguments about the particular articles to which he refers go to weight rather than admissibility." *Drake v. Allergan, Inc.*, No. 2:13-CV-234, 2014 WL 5392995, at *3 (D. Vt. Oct. 23, 2014).

Finally, Plaintiffs' third argument as to reliability is similarly unmoving. Plaintiffs argue that Culp "did not apply any economic analysis to his conclusion that Statoil manipulated physical Brent prices or that Platts assessments did not impact Brent futures . . ." (Pl.'s Mot. Limine 18.) Even setting aside the fact that Plaintiffs overstate Culp's conclusion (*See* Culp. Decl. ¶ 118 ("[T]he conduct . . . would not have had a *direct* effect on . . . exchange contract markets . . ." (emphasis added)), this argument is puzzling. In reaching his opinion, Culp replicated the economic analyses put forth by Plaintiff to show the allegedly close relationship between Platts's assessments and futures contracts and examined the resulting data at different intervals than Plaintiffs had. (Culp Decl. ¶¶ 92-103.) Based on his replication of the analysis,

14

Culp concluded that Plaintiffs' assertions were not substantiated by their own method of analysis. (Culp Decl. ¶ 103.) Unsurprisingly, Plaintiffs do not contest the reliability of the methodology they themselves employed. They instead point to statements Culp made during his deposition acknowledging the limits to the data on which he based his conclusions. But those limits do not render his testimony "speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith." *Zerega Ave. Realty Corp. v. Hornbck Offshore Transp., LLC*, 571 F.3d 206, 213-214 (2d. Cir. 2009) (citation omitted).

Because Culp's testimony is reliable and relevant to the issue at hand, and the Court is equipped to disregard any impermissible inferences within it, the Court will admit it for the purposes of considering the Statoil Defendants' motion to dismiss.

## II.    Foreign Sovereign Immunities Act

The parties do not dispute that Statoil ASA is a foreign sovereign. (*See* Statoil Mot. Dismiss 9-10; Pl.'s Mot. Opp. 13.) But Plaintiffs argue that Statoil is not immune from jurisdiction because all three clauses of the commercial activity exception apply in this case. Because the Statoil Defendants meet their initial burden of presenting a *prima facie* case that Statoil ASA is a foreign sovereign, Plaintiffs must establish by a preponderance of evidence that the commercial activities exception applies in order for the case to proceed.[4] *See Swarna*, 622 F.3d at 143; *see also Virtual Countries*, 300 F.3d at 241. If Plaintiffs meet that burden, then the Statoil Defendants must, in order to claim immunity under FSIA, show by a preponderance of evidence that the alleged exception does not apply. *See Anglo-Iberia*, 600 F.3d at 175.

### a.  The Act Plaintiffs' Claims Are "Based Upon"

---

[4] The Landowner Plaintiff does not advance any arguments independent of the Trader Plaintiffs. (*See* Landowner Mot. Opp., Landowner ECF No. 66, 23.) Thus, the Court does not separately analyze any commercial activities relevant only to the Landowner Plaintiff, and to the extent that the Trader Plaintiffs fail to meet their burden, the Landowner Plaintiff does as well.

"As a threshold step in assessing plaintiffs' reliance on the 'commercial activity' exception, we must identify the act of the foreign sovereign State that serves as the basis for plaintiffs' claims." *Garb v. Republic of Poland*, 440 F.3d 579, 586 (2d Cir. 2006).

Plaintiffs implicitly argue that their claims are "based upon" Statoil's trades on NYMEX and ICE and on Statoil's importation of oil into the United States. (*See* Pl.'s Mot. Opp. 16-17.) Plaintiffs do not allege that Statoil engaged in *manipulative* trading on NYMEX and ICE; instead, Plaintiffs allege that Statoil trades on the exchanges and that Defendants' alleged manipulative physical trades affected the prices of futures transactions. (*See, e.g.*, SAC ¶¶ 474, 533.) The Statoil Defendants argue instead that Plaintiffs' claims are "based upon" "supposedly artificial trades and orders for the delivery of Brent Crude Oil at terminals in the North Sea, which were then assessed and reported on by Platts in London." (*See* Statoil Reply, ECF No. 287, 9-10.)

To determine what the action is based upon, "[r]ather than individually analyzing each of the Plaintiffs' causes of actions, [the Court] zero[s] in on the core of their suit." *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, No. 14-917-CV, 2016 WL 403445, *6 (2d Cir. Feb. 3, 2016) (quoting *Sachs*, 136 S.Ct. at 395). At the core of Plaintiff's action are the alleged manipulative and collusive trades and orders on the North Sea, later assessed and reported on by Platts. It is this conduct that Plaintiffs allege led to the subsequent manipulation of prices on NYMEX and ICE. (*See* SAC ¶ 9 ("By purposefully reporting inaccurate, misleading, and false Brent Crude Oil trade information to Platts and manipulating the MOC process . . . Defendants manipulated prices and restrained trade in both the physical Brent Crude Oil market and the Brent Crude Oil futures and derivatives market.") And it is this conduct that Plaintiffs must prove in order to be entitled to relief. *See Sachs*, 136 S. Ct. at 395.

16

Plaintiffs claim the action is "based upon" futures and derivatives trades made in the U.S. on NYMEX and ICE Futures, and Statoil's importation of oil into the U.S. But to deem these actions the core of the complaint would be to allow the tail to wag the dog. While these activities bore the alleged *effects* of the manipulations on the North Sea and in Platts reporting and allegedly motivated those manipulations, they are not the " 'but for' *cause* of the judgments that are the ground of this suit." *Kensington*, 505 F.3d at 155 (emphasis added) (quoting *Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384 (2d Cir. 2000); *see also id.* at 157 (rejecting plaintiff's argument that cause was "based upon" defendant's premium payments to a U.S. bank and oil shipments to U.S., as defendants' alleged scheme would have had same alleged effect even if shipments had been to destinations outside U.S. or premium payments had been made through a foreign office of the bank).

The alleged acts that Plaintiffs point to—the trades on NYMEX and ICE and Statoil's importation of oil into the United States—may be necessary elements of Plaintiffs' claims under the Sherman Act and the Commodity Exchange Act. But the Supreme Court has rejected such a "one-element test," finding that "the mere fact" that a certain act "would establish a single element of a claim is insufficient to demonstrate that the claim is 'based upon' that [act] for purposes of § 1605(a)(2)." *Sachs*, 136 S. Ct. at 395; *see also Kensington*, 505 F.3d at 156 (rejecting one-element test). Rather than proceed piecemeal through the elements of each of Plaintiffs' claims, the Court must instead look to the "core of the suit." *Id*. Here, that is the allegedly manipulative transactions and reporting that allegedly gave rise to manipulation on NYMEX and ICE. Having identified the acts of Statoil ASA that serve as the basis for Plaintiffs' claims, the Court turns now to Plaintiffs' arguments under each clause of the commercial activities exception.

### b. Clause One

"The first prong of the commercial activities exception applies if the plaintiff's action is 'based upon a commercial activity carried on in the United States by the foreign state.'" *Kensington*, 505 F.3d at 155 (quoting 28 U.S.C. § 1605(a)(2)). It is not enough that the foreign state "generally engages in commercial activity in the U.S."; rather, "the particular conduct giving rise to the claim" must be "part of commercial activity having substantial contact with the United States." *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1018 (2d Cir. 1991).

As stated above, the relevant acts here are Statoil ASA's alleged trades in the North Sea and alleged reporting to Platts. Plaintiffs do not establish by a preponderance of evidence that these acts were carried on in the United States. First, Plaintiffs do not credibly allege that the trades were carried out in the U.S. Plaintiffs allege a number of private transactions involving Statoil ASA (*see* SAC ¶¶ 254, 263, 271-272, 289, 391-392), and to the extent that Plaintiffs allege any location in relation to these transactions, the location is clearly outside the United States. (*See, e.g.,* SAC ¶¶ 391-392 (describing VLCC movement in the Far East and Korea).) Plaintiffs do assert that Statoil engages in "significant commercial trading activity from its Stamford, Connecticut and other U.S. offices" (SAC ¶ 474) and that Statoil engages a wide range of trading employees and market analysts in Stamford. (Exhs. B and C, Fata Decl., ECF No. 258.) But Plaintiffs nowhere tie the "significant commercial trading activity" or the trading employees or analysts to the trades at the heart of this case, and so, it is irrelevant. *See Shapiro*, 930 F.2d at 1018.

For the same reason, the Court is not swayed by decisions by this Court more than 25 years ago describing the Brent oil market as "primarily a U.S. market" and "part of U.S. commerce." *See Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*, 738 F. Supp. 1472 (S.D.N.Y.

18

1990); *Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*, 666 F. Supp. 581, 583 (S.D.N.Y. 1987). As an initial matter, the age of these cases alone limits their value: they pre-date later cases that make clear that for Clause One to apply, the particular conduct the claim is based upon must be part of commercial activity having substantial contact with the United States. *See Shapiro*, 930 F.2d at 1018; *Kensington*, 505 F.3d at 155. These decisions also came in the context of deciding the applicability of the Sherman Act and the Commodities Exchange Act, but as the Second Circuit recently clarified, the question of the applicability of antitrust laws to extraterritorial activities is distinct from the question of foreign sovereign immunity at issue here. *See Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 410 (2d Cir. 2014). In the FSIA context, the inquiry is not whether a market for the product exists in the United States or even if the market for the product is primarily based in the United States; instead, the inquiry is whether the *particular conduct giving rise to the claim* was part of a commercial activity having substantial contact with the United States. Plaintiffs do not allege that the physical trades at issue here had substantial contact with the United States.

Second, Plaintiffs do not adequately allege that any manipulative reporting to Platts was carried on in the United States. Plaintiffs allege that Platts is a unit of McGraw Hill Financial, headquartered in New York. (SAC ¶ 4.) Platts employees, Plaintiffs allege, must comply with New-York based McGraw hill's code of business ethics. (Exh E., Fata Decl.) Finally, Plaintiffs allege that Statoil ASA, like other market participants, can post real-time bids or offers either electronically through Platts' "eWindow" or by contacting a Platts market reporter. (Exh. D, Fata Decl.) But despite Platts' alleged connections to the United States, Plaintiffs do not allege that any of Statoil ASA's reporting to Platts was carried on in the United States. They, at most, allege

19

that "much of the manipulative reporting in Platts was directed toward the U.S. markets" (Pl.'s Opp. 16) but that is irrelevant to Clause One of the commercial activity exception.

To the extent that Plaintiffs implicitly argue that Statoil's "commercial trading activity" in the United States included reporting trades to Platts from the United States, they do not meet their burden. Plaintiffs nowhere make direct factual allegations to this effect. Furthermore, Defendants present evidence that the reporting to Platts took place abroad. Per publicly available materials published by Platts itself and Ernst and Young, Platts is headquartered in London and its editors there collect trade information from market contacts throughout the day. (*See* Exhs. E, F, G, H, Curtis Decl., ECF No. 201.) Plaintiffs do not dispute that information. Thus, based on a review of the allegations in the complaint and the undisputed facts, *see Virtual Countries*, 300 F.3d at 241, Plaintiffs have not shown that Statoil ASA carried on any relevant commercial activity in the United States and so Clause One of the commercial activity exception does not apply.

### c. Clause Two

"The second prong of the commercial activities exception applies if the plaintiff's action is 'based upon *an act performed in the United States* in connection with a commercial activity of the foreign state elsewhere.'" *Kensington*, 505 F.3d at 157 (emphasis in original) (alteration omitted) (quoting 28 U.S.C. § 1605(a)(2)). "This prong is generally understood to apply to *non-commercial* acts in the United States that relate to commercial acts abroad." *Id.* (emphasis in original) (quoting *Byrd v. Corporacion Forestal y Industrial de Olancho S.A.*, 182 F.3d 380, 390 (5th Cir. 1999)) (internal quotation marks omitted). Thus, "where . . . the plaintiff 'has not argued that any *non-commercial acts* performed by [the foreign sovereign] in the United States allegedly formed the basis of its complaint,' the second prong is simply 'inapplicable.'" *Schoeps*

20

*v. Bayern*, 27 F. Supp. 3d 540, 545 (S.D.N.Y. 2014) (emphasis in original) (quoting *Kensington*, 505 F.3d at 157) *aff'd sub nom. Schoeps v. Freistaat Bayern*, 611 F. App'x 32 (2d Cir. 2015); *see also Fir Tree Capital Opportunity Master Fund, LP v. Anglo Irish Bank Corp.*, No. 11 Civ. 0955 (PGG), 2011 WL 6187077, at *17 (S.D.N.Y. Nov. 28, 2011) ("Because Plaintiffs have not argued that any non-commercial acts performed by the Bank in the United States allegedly formed the basis for the amended complaint, this prong of the commercial activities exception is inapplicable" (alterations and internal quotation marks omitted)).

Plaintiffs relegate to a footnote the Second Circuit's guidance that the second clause generally applies to *non-commercial* acts only.[5] But the Court must follow the Second Circuit. Because Plaintiffs do not argue that any *non-commercial* acts performed by Statoil ASA in the United States form the basis of their complaint, the second prong is inapplicable.

### d.  Clause Three

"The third prong of the commercial activities exception applies when the plaintiff's action is based upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that *act causes a direct effect in the United States.*" *Kensington*, 505 F.3d at 157 (emphasis in original) (alterations and internal quotation marks omitted) (quoting 28 U.S.C. § 1605(a)(2)).

"An effect is direct if it follows as an *immediate* consequence of the defendant's activity." *Virtual Countries*, 300 F.3d at 236.. (emphasis in original) (alterations omitted) (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992)). An effect is "immediate"

---

[5] The case cited by Plaintiffs—in which this Court found the second clause applicable where a defendant negotiated and interfered with contractual relationships in the United States, in connection with construction of oil projects abroad—does appear to involve commercial activity in the United States. *U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras*, No. 98 Civ. 3099 (JGK), 1999 WL 307642, at *8 (S.D.N.Y. May 17, 1999) *aff'd sub nom. U.S. Fid. & Guar. Co. v. Braspetro Oil Servs., Co.*, 199 F.3d 94 (2d Cir. 1999). However, that case pre-dates the Second Circuit's subsequent guidance on the limited applicability of the Second Clause.

where, "between the foreign state's commercial activity and the effect, there was no 'intervening element.'" *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 74 (2d Cir. 2010) (citation omitted). "The common sense interpretation of a 'direct effect' within the meaning of § 1605(a)(2) is one which has no intervening element, but, rather flows in a straight line without deviation or interruption." *Martin v. Republic of South Africa*, 836 F.2d 91, 95 (2d Cir. 1987) (other internal quotation marks omitted).

Further, the conduct having a direct effect in the United States must meet the "legally significant acts test," which "requires that the conduct having a direct effect in the United States be legally significant conduct in order for the commercial activity exception to apply." *Filetech S.A. v. France Telecom S.A.,* 157 F.3d 922, 931 (2d Cir. 1998). While "the effect need not be substantial or foreseeable," it must be "something more than trivial or incidental," *Kensington*, 505 F.3d at 157, for "Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States." *Virtual Countries*, 300 F.3d at 236 (quoting *United World Trade, Inc. v. Mangyshlankneft Oil Prod. Ass'n*, 33 F.3d 1232, 1238 (10th Cir. 1994)); *see also id.* (quoting *Voest Alpine Trading USA Corp. v. Bank of China*, 142 F.3d 887, 894-95 n. 10 (5th Cir. 1998)). Because the FSIA provides the sole basis for obtaining jurisdiction over a foreign state in this country, "[t]he boundaries of the statutory exceptions to sovereign immunity, including the 'direct effect' exception . . . must be carefully patrolled to preserve the FSIA's general rule of immunity." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F. 3d 395, 410-11 (2d Cir. 2014) (quoting *In re Terrorist Attacks on Sept. 11, 2001,* 714 F.3d 109, 114 (2d Cir. 2013)) (other internal quotation marks omitted).

In line with the legislative purpose of FSIA, the Second Circuit has expressed skepticism that an effect is direct where the "effect falls at the end of a long chain of causation and is

mediated by numerous actions by third parties." *Virtual Countries*, 300 F.3d at 237. In a case where the plaintiff alleged that the foreign sovereign defendant had issued a press release abroad that negatively affected the plaintiff corporation in the United States, the Court noted, "At a minimum, two independent kinds of actors . . . intervened between the issuance of the press release and any alleged injurious effect on the plaintiff" and "[t]he press release's effect thus depended crucially on variables independent of the [foreign sovereign]." *Id.* Finding the case analogous to a Fifth Circuit case in which that Circuit had concluded that there was "no direct effect under any common sense reading of that phrase following a series of banking transactions from Sicily to London to New York to Paris," *id.* (quoting *United World Trade*, 33 F.3d at 1238 (alterations and internal quotation marks omitted), the Second Circuit concluded, "This tangled causal web does not provide the requisite immediacy to establish jurisdiction." *Id.* (citing *Weltover*, 504 U.S. at 618). "Defining 'direct effect' to permit jurisdiction when a foreign state's actions precipitate reactions by third parties, which reactions then have an impact on a plaintiff, would foster uncertainty . . ." *Id.*

Given the narrow meaning of "direct effect," this Court may not exercise jurisdiction over Statoil ASA under Clause Three of the commercial activities exception. Plaintiffs do not meet their burden of establishing that the action is based upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States. This is because, by their own theory, the allegedly direct effect "falls at the end of a long chain of causation and is mediated by numerous actions by third parties." *Virtual Countries*, 300 F.3d at 237. By Plaintiffs' own account, the acts upon which this action is based—the trades in the North Sea and the reporting to Platts—set off "effects that ripple throughout the Brent Crude Oil and futures market, impacting a wide variety

of derivative and futures contracts on NYMEX and ICE" (SAC ¶ 126), and diminishing the Landowner Plaintiff's profits off other varieties of crude oil. (Landowner SAC ¶ 178.) While Plaintiffs present evidence of a correlation between physical Brent crude oil prices and futures prices, they also present evidence that any effect the physical transactions have in the United States markets is mitigated by the actions of third parties. Plaintiffs themselves allege that after transactions are reported to Platts, Platts "applies judgment to the data it gathers." (SAC ¶ 99.) Further, Plaintiffs allege that the day after a suspicious transaction by Statoil ASA in January 2011, Platts made no mention of the transaction in its narrative summary of the day's activities. (SAC ¶¶ 289-90.) This raises the inference that Platts not only had the ability to exercise independent judgment but in fact did so. Plaintiffs' own expert, while questioning the efficacy of Platts's internal verification processes and the thoroughness of its oversight, allows that Platts does in fact investigate information before it reports it. (*See, e.g.* Osterwald Rpt., ¶ 27 ("It is surprising that *Platts* reported on these events without questioning the background *more* thoroughly" (emphasis added).) Defense expert Culp agrees, not only summarizing Platts' capacity for independent judgment but also describing its incentives to exercise that judgment. (Culp Decl. ¶¶ 53-55.)

Adding another layer of third-party action, the futures contracts in the U.S. are pegged not to the Platts Dated Brent assessment but to the ICE Brent Index. (SAC ¶ 123.) While Plaintiffs present evidence that the ICE Brent Index and Dated Brent indices are "highly correlated," they allow that the ICE Brent Index is assessed using a proprietary method. (Seyhun Rpt., ¶ 29.) For the ICE Brent Index, that method takes into account certain weighted averages of trades, as well as a straight average of "designated assessments published in media reports." (SAC ¶ 128 n. 3.) Again, defense expert Culp agrees with Plaintiffs' summary and summarizes

24

ICE's discretionary role. (Culp Decl. ¶¶ 86-87.) This constitutes an additional "intervening element" between the foreign state's commercial activity and any effect in the United States. *See Guirlando*, 602 F.3d at 74. Both the Platts assessment and the ICE assessment represent instances "when a foreign state's actions precipitate reactions by third parties, which reactions then have an impact on a plaintiff." *Virtual Countries*, 300 F.3d at 237. This cannot serve as a basis for jurisdiction.

Plaintiffs' argument that Statoil's import activities gave rise to direct domestic effects is also unavailing, as Plaintiffs do not allege any connection between Statoil's import activities and its alleged manipulative activities, and there must be a "material connection" between the commercial activity having the direct effect and the cause of action. *See Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 241 (2d Cir. 1994). While Plaintiffs allege that Statoil ships Brent crude oil into the United States, they do not explain the connection between the cause of action and shipping, other than asserting that Statoil's conduct did have an impact on spot Brent oil prices. (Pl.'s Opp. 24.)  This argument runs up against the same problems discussed above, as any impact Statoil's conduct had on import prices would be indirect and filtered through the independent Platts assessment, as the alleged manipulative trades did not themselves involve shipping oil to the United States.

Likewise, this case is distinct from those cases in which manipulative conduct directed at investors in the U.S. financial markets was found to constitute a direct effect. In those cases, unlike here, there was a direct tie between the foreign sovereign and the United States investors. *See Atlantica Holdings*, 2 F. Supp. 3d at 557 (finding a direct effect where a foreign sovereign bank subscribed 25 percent of its note offerings with individuals within the United States, then made a series of false or misleading statements about the health of the bank); *Wasserstein*

*Perella Emerging Markets Fin., L.P. v. Province of Formosa*, No. 97 Civ. 793 (BSJ), 2002 WL 1453831, at *9-10 (S.D.N.Y. July 2, 2002) (finding a direct effect where foreign sovereign issued an engagement letter in an attempt to hire a New York bank to secure a $40 million loan). There is no such direct relationship between Statoil ASA and investors or other United States actors here. Plaintiffs instead describe only a "tangled causal web," which "does not provide the requisite immediacy to establish jurisdiction." *Virtual Countries*, 300 F.3d at 241.

Based on a "review of the allegations in the complaint," and "the undisputed facts, if any, placed before the court by the parties," *Virtual Countries*, 300 F.3d at 241, Plaintiffs do not meet their burden of establishing by a preponderance of evidence that the third clause of the commercial activities exception applies. *See Swarna*, 622 F.3d at 143. Plaintiffs do not establish any direct effect in the United States, felt by Plaintiffs or by any other entity. *See Cruise Connections Charter Mgmt. 1, LP v. Attorney Gen. of Can.*, 600 F.3d 661, 666 (D.C. Cir. 2010) ("Nothing in the FSIA requires that the 'direct effect in the United States' harm the plaintiff . . . ) Because Plaintiffs have not met that burden, the Court need not proceed to the resolution of disputed issues of fact. *Virtual Countries*, 300 F.3d at 241.; *see also Atlantica Holdings*, 2 F. Supp. 3d at 555. Plaintiffs do not meet their initial burden and thus the Court may not exercise jurisdiction over Statoil ASA.

## CONCLUSION

For the foregoing reasons, the Court does not have subject-matter jurisdiction over the claims against Defendant Statoil ASA. Statoil ASA is therefore dismissed from this matter. The claims against Statoil U.S. remain and the Court will address Statoil U.S.'s non-jurisdictional arguments for dismissal in conjunction with the non-jurisdictional arguments advanced by the other remaining defendants.

26

**SO ORDERED.**

**Dated:** March 29, 2016

       **New York, New York**

                                       **ANDREW L. CARTER, JR.**
                                       **United States District Judge**