**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| In re:<br><br>**NORTH SEA BRENT CRUDE OIL FUTURES LITIGATION**<br><br>**This document applies to: ALL CASES** |

13-md-02475 (ALC)

**OPINION AND ORDER ON PERSONAL JURISDICTION MOTIONS**

**ANDREW L. CARTER, JR., United States District Judge:**

A putative class of futures and derivatives traders ("Trader Plaintiffs") and a putative class of the owners of landholding and lease-holding interests in United States oil-producing property ("Landowner Plaintiff," together with Trader Plaintiffs, "Plaintiffs") have asserted claims against a number of Brent crude oil producers, traders, and their selected affiliates. Plaintiffs allege that Defendants conspired to intentionally manipulate Brent crude oil prices and the prices of Brent crude oil futures and derivatives contracts traded on the New York Mercantile Exchange ("NYMEX") and the Intercontinental Exchange ("ICE Futures Europe") in violation of the Commodity Exchange Act, the Sherman Act, and the laws of various states.

Shell International Trading and Shipping Company Limited ("STASCO") and Phibro Commodities Limited, both Defendants in these actions, have moved to dismiss the Complaints for lack of personal jurisdiction. For the reasons set forth below, the Court finds that it has personal jurisdiction over Phibro Commodities, but that it does not have personal jurisdiction over STASCO. Plaintiffs' claims against STASCO therefore are dismissed.

## BACKGROUND

**I.     Factual Background**

The following facts are taken from the allegations contained in the Complaints and the parties' submissions in connection with the instant motions. Familiarity with the facts is

presumed and only those facts necessary to decide Phibro Commodities' and STASCO's motions to dismiss are described here.[1]

In short, however, Plaintiffs allege that Defendants, including Phibro Commodities and STASCO, who are producers, refiners, and traders of Brent crude oil, or their affiliates, "monopolized the Brent Crude Oil market and entered into unlawful combinations, agreements, and conspiracies to fix and restrain trade in, and intentionally manipulate Brent Crude Oil prices and the prices of Brent Crude Oil futures and derivatives contracts." ECF No. 308 (Traders' Second Amended Complaint ("Trader SAC")), at ¶ 2; *see also* Landowner ECF No. 96 (Landowner's Second Amended Complaint ("Landowner SAC")), at ¶ 3.[2] The alleged manipulative conduct included "selectively report[ing] bids, offers, 'spoof' orders and transactions with aberrant pricing" to Platts, a price reporting agency, during the Market-on-Close ("MOC") window and engaging in "prohibited wash sale transactions" with each other. Trader SAC ¶ 8; Landowner SAC ¶ 92. Plaintiffs do not allege that any of the Defendants engaged in manipulative futures or derivatives trading on NYMEX or ICE Futures Europe; rather, they allege that the manipulation of Platts' Dated Brent assessment, through manipulative physical trades and reporting, "has effects that ripple throughout the Brent Crude Oil and futures market." Trader SAC ¶ 126; Landowner SAC ¶ 142.

## A.    STASCO

STASCO is a limited company incorporated under the laws of England with its headquarters in London. ECF No. 345 (Declaration of Armand Lumens, dated Mar. 31, 2015

---

[1] For a complete statement of the facts of these cases, see the Court's decision on Defendants' joint motions to dismiss, also issued today. ECF No. 439.

[2] Unless otherwise noted, all references to "ECF" are to the electronic docket for Case No. 13-md-2475. "Landowner ECF" refers to the electronic docket for Case No. 13-cv-7443.

("Lumens Decl.")), at ¶ 3.[3] It has no offices or employees in the United States nor is it licensed or registered to conduct business in the United States. *Id.* ¶¶ 6-9. STASCO provides trading and shipping services for affiliates and subsidiaries of its affiliate, Royal Dutch Shell, plc ("RDS"). Lumens Decl. ¶ 4. It trades energy commodities, including crude oil, on its own behalf and on behalf of two affiliates of RDS. *Id.*; ECF No. 399 (Declaration of David E. Kovel, dated Jul. 6, 2016 ("Kovel Decl.")), Ex. 2 (Transcript of Deposition of Armand Lumens, dated June 15, 2016 ("Lumens Dep.")), at 31:5-24.

STASCO is part of Shell Trading & Supply, "an umbrella name for a network of legal entities" within the RDS family, including STASCO and Defendant Shell Trading (US) Company ("STUSCO"), involved in the trading and supply of crude oil, gas, and power. Lumens Dep. 13:1-14:3, 16:5-7. Shell Trading & Supply is managed by a Vice Presidential Leadership Team ("VPLT") which meets quarterly. *Id.* 56:24-57:11. Some of the members of the VPLT are STASCO employees. *Id.* 58:5-20.

In their Complaints, Plaintiffs allege that STASCO imports Brent crude oil into the United States, *see* Trader SAC ¶ 35, Landowner SAC ¶ 11; however, STASCO does not appear in the tables listing imports by "Defendants STASCO and STUSCO (and affiliates)." Trader SAC ¶ 491; *see also* Landowner SAC ¶ 226. Nor are any of the entities listed in these tables subsidiaries of STASCO. Lumens Dep. 114:14-15. In connection with the present motion, Plaintiffs provide customs data showing STASCO listed as either a shipper, consignee, or carrier on a number of Brent crude oil cargoes. Kovel Decl., Ex. 12-2 ("Panjiva" U.S. Customs Data for Jul. 2, 2007 to Dec. 26, 2014). It is STASCO's position that it "did not and does not import

---

[3] STASCO and Shell Trading (US) Company (together, "Shell Defendants") filed an identical declaration by Lumens, dated May 28, 2015, in support of their motion to dismiss the Landowner Plaintiff's Complaint. ECF No. 372.

Brent, Forties, Oseberg or Ekofisk cargoes into the United States." Lumens Decl. ¶ 5; *see also* Lumens Dep. 110:3-114:13. Even though STASCO may have been "part of a chain of transactions of cargoes that ultimately were sent to the United States," the ownership of the cargoes was transferred from STASCO to the buyer before that cargo reached the United States. Lumens Decl. ¶ 5.

Plaintiffs allege specific incidents of manipulation involving STASCO. For instance, Plaintiffs allege that STASCO engaged in suspiciously timed transactions aimed at manipulating the Forties crude oil market in June 2010, including selling a cargo of Forties (one of the four varieties of Brent crude oil) to Statoil during the MOC window, as part of a planned "staggered" transaction. Trader SAC ¶¶ 254, 269-70; Landowner SAC ¶ 99. Plaintiffs also allege that, in January 2011, STASCO engaged in a wash trade with Mercuria for Brent crude oil, timed to the MOC window, to manipulate the Brent crude oil market. Trader SAC ¶¶ 280-84. Plaintiffs identify additional anomalous or suspicious behavior by STASCO in February 2011, when they allege STASCO suppressed the market through "spoofing," wash trades, and other manipulative transactions during the MOC window, Trader SAC ¶¶ 319-68; Landowner SAC ¶¶ 116-28, and in September 2012, when they allege STASCO engaged in sham trades and misleading behavior, Trader SAC ¶¶ 369, 384-85, 389-91, 398-405; Landowner SAC ¶¶ 132-33.

In addition to the suspicious trades reported to Platts, Plaintiffs accuse STASCO of engaging in a variety of manipulative conduct through its strategic use of very large crude carriers ("VLCCs"), cargo ships that can hold one to two million barrels of crude oil. Trader SAC ¶¶ 331-33, 342, 391-95, 411-12; Landowner SAC ¶¶ 117-19, 126. For instance, Plaintiffs allege that STASCO chartered a VLCC, purportedly to transport Brent crude oil to Korea,

thereby decreasing supply in the nearby market and increasing prices. Trader SAC ¶¶ 391-95. STASCO, however, declined to comment its intentions. *Id.*

**B.  Phibro Commodities and Phibro Trading**

Phibro Commodities is a "United Kingdom private limited company." Trader SAC ¶ 45; Landowner SAC ¶ 18. It has no offices or employees in the United States. ECF No. 330 (Declaration of Roger Plaisted, dated Mar. 27, 2015 ("Plaisted Decl.")), at ¶ 2. However, it receives certain support services, including legal, accounting, and risk management services, from non-party Phibro Services LLC, based in Connecticut. *Id.* ¶ 8. Phibro Commodities is a wholly-owned subsidiary of Defendant Phibro Trading LLC, a United States limited liability company incorporated in Delaware with its headquarters in Connecticut. Plaisted Decl. ¶ 3.

Phibro Commodities engages in trades connected to the physical delivery of crude oil outside of the United States, but its employees also execute so-called "financial" trades in derivatives and futures products "for price discovery, to hedge price exposure of physical commodities, and to trade for profit." Plaisted Decl. ¶ 5. When Phibro Commodities traders direct the execution of these futures and derivatives trades on U.S. exchanges, including NYMEX, they do so in the name of Phibro Trading and the trades generally are maintained on Phibro Trading's books. *Id.* ¶ 6. However, these financial trades are directed by Phibro Commodities employees on behalf of Phibro Commodities. ECF No. 361 (Declaration of Lauren W. Pederson, dated May 8, 2015), Ex. A (Transcript of Deposition of Roger Plaisted, dated Apr. 29, 2015 ("Plaisted Dep.")), at 46:12-16. Additionally, when the financial trading relates to a specific physical crude oil trade, the benefits of that trade may be transferred from Phibro Trading's books to Phibro Commodities. Plaisted Decl. ¶ 6.

Plaintiffs allege specific incidents of manipulation involving Phibro Commodities. For instance, on February 24, 2011, STASCO and Phibro Commodities engaged in a trade during the MOC window; however Plaintiffs describe this trade as part of a scheme orchestrated by STASCO, not Phibro Commodities, to set the price levels in two types of Brent crude oil forward contracts. Trader SAC ¶¶ 352-55. Plaintiffs also allege that Phibro Commodities participated in a manipulative scheme with STASCO and other Defendants taking place in September 2012. Phibro Commodities allegedly conspired to move the price of Dated Brent downward when it purchased a cargo from BP on September 17 and then offered for sale that same cargo the following day for a price $0.30 less than it had paid BP. Trader SAC ¶¶ 369, 395-97; Landowner SAC ¶¶ 129-30.

## II.    Procedural Background

After the various cases in this litigation were centralized and transferred to this Court in October 2013, *see* ECF No. 1, the Trader Plaintiffs filed an Amended Complaint on July 3, 2014. ECF No. 166. The Landowner Plaintiff, proceeding in a related case, also filed an Amended Complaint on April 28, 2014. Landowner ECF No. 40.[4] Thereafter, all Defendants jointly filed three motions to dismiss: (1) a motion to dismiss the Trader Complaint; (2) a motion to dismiss the Landowner Complaint; and (3) a motion to dismiss both the Trader Complaint and the Landowner Complaint as exceeding the extraterritorial reach of United States law.

In addition, the Phibro Defendants and the Shell Defendants, like other Defendants, filed supplemental motions to dismiss, advancing arguments specific to them. ECF Nos. 329-30 (Phibro Trader Motion), 368-69 (Phibro Landowner Motion); 343-45 (Shell Trader Motion),

---

[4] Following a stipulation by all parties, the Trader Plaintiffs filed a Second Amended Complaint on February 27, 2015, *see* ECF No. 308, and the Landowner Plaintiff filed a Second Amended Complaint on April 30, 2015, *see* Landowner ECF No. 96. The Second Amended Complaints substituted Phibro Commodities for one of the John Doe defendants and substituted STASCO for Royal Dutch Shell, plc, but did not change any of the claims.

370-72 (Shell Landowner Motion). In support of their supplemental motions regarding the Court's lack of personal jurisdiction, both Phibro Commodities and the Shell Defendants submitted declarations of their executives. Phibro Commodities submitted the declaration of Roger Plaisted, the General Manager of Phibro Commodities Limited. ECF No. 330. The Shell Defendants submitted the declaration of Armand Lumens, the Executive Vice President Finance & Trading Supply of STASCO. ECF Nos. 345, 372.

The parties then engaged in limited jurisdictional discovery—Phibro Commodities by stipulation and STASCO on Plaintiffs' motion—consisting of depositions of Plaisted and Lumens. ECF No. 347, 389. The parties completed their briefing on the jurisdiction-challenging motions, and the Court considers the motions fully submitted. ECF Nos. 360-61, 366, 377, 379, 398-400.[5]

## LEGAL STANDARDS

On a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), a plaintiff has the burden to establish personal jurisdiction and "must make a *prima facie* showing that jurisdiction exists." *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167-68 (2d Cir. 2015) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013)) (internal quotation marks omitted). Where, as here, there has been jurisdictional discovery but no evidentiary hearing, "the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013) (citation omitted). In this posture, a

---

[5] The Landowner Plaintiff did not file any opposition to the Shell Defendants' supplemental motion to dismiss after the close of jurisdictional discovery, but confirmed his continued opposition to the motion by reference to the brief filed before jurisdictional discovery and his repeated incorporation by reference of the Trader Plaintiffs' arguments. ECF Nos. 401 (STASCO's Notice of Non-Opposition), 404 (Landowner Plaintiff's Response).

plaintiff cannot rely exclusively on the *prima facie* showing in the complaint; that "showing must be factually supported." *Id.* However, the court will credit a plaintiff's presentation of facts "notwithstanding any controverting presentation by the moving party." *Id.* at 86 (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)).

Plaintiffs allege claims under the Commodities Exchange Act and the Sherman Act, both of which provide for nationwide service of process. Accordingly, personal jurisdiction extends to the "limit permitted by the Due Process Clause of the Fifth Amendment." *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 526 (S.D.N.Y. 2008) (citing *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1339 (2d Cir. 1972)). Further, "[w]hen the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process . . . the Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state." *In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11-md-2262 (NRB), 2015 WL 4634541, at *18 (S.D.N.Y. Aug. 4, 2015) (quoting *SEC v. Straub*, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013)) (alteration in original).

A court may assert personal jurisdiction over a defendant under two theories: general or specific jurisdiction. Under either theory, the court must "undertake an analysis consisting of two components: the 'minimum contacts' test and the 'reasonableness' inquiry.'" *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002). General jurisdiction allows a court "to hear any and all claims" against defendants "when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011). Thus, "[a]side from 'an exceptional case' . . . a corporation is at home . . . only in a state that is the

company's formal place of incorporation or its principal place of business." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 135 (2d Cir. 2014) (quoting *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 & n.19 (2014)).

Unlike general jurisdiction, the minimum contacts necessary to establish specific personal jurisdiction must be related to the lawsuit. The defendant must have "purposefully directed his activities" at the forum and the litigation must "result[] from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citations and internal quotation marks omitted). Stated differently, "the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014); *accord Goodyear*, 564 U.S. at 923-24. Minimum contacts may be established where a defendant "purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Licci*, 732 F.3d at 170 (quoting *Bank Brussels Lambert*, 305 F.3d at 127). A defendant also establishes minimum contacts with the forum where "the defendant took 'intentional, and allegedly tortious, actions . . . expressly aimed' at the forum." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 674 (2d Cir. 2013) (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)) (alternation in original).

Once a plaintiff is able to establish the requisite minimum contacts, the court then considers whether the exercise of jurisdiction would be so unreasonable as to "offend traditional notions of fair play and substantial justice." *Asahi Metal Indus. Co. v. Superior Court of California, Solano Cty.*, 480 U.S. 102, 113 (1987) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (internal quotation marks omitted).

## DISCUSSION

### I.  The Court Lacks Personal Jurisdiction Over STASCO

As a preliminary matter, while STASCO included arguments regarding the Court's lack of both general and specific personal jurisdiction, in response, Plaintiffs argue that the Court has specific personal jurisdiction only.  ECF No. 398 ("Trader Shell Memo."), at 13-20.[6] Accordingly, the Court will evaluate only whether it has jurisdiction over STASCO under a specific personal jurisdictional theory.

#### A.  STASCO's Contacts with the United States Are Not Sufficiently Related to these Suits

Plaintiffs present a variety of contacts that STASCO, either itself or through affiliates of RDS, had with the United States.  However, to establish specific personal jurisdiction over STASCO, it is not sufficient for Plaintiffs to demonstrate that STASCO had the requisite minimum contacts with the forum.  Rather, the Court must evaluate whether the suit "arises out of or relates to [STASCO's] contacts with the forum."  *Goodyear*, 564 U.S. at 923-24 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)) (internal quotation marks and alterations omitted).  In their papers, Plaintiffs do not make this second step to connect STASCO's contacts with the United States to the allegations in their Complaint, namely STASCO's manipulative physical trades in Brent crude oil reported to Platts and other deceptive conduct on the North Sea.

First, Plaintiffs assert that "a STASCO executive was in charge of all crude oil trading for Shell Trading, and used U.S. entities and U.S. employees employed by those entities to trade for

---

[6]  The portion of the Landowner Plaintiff's omnibus responsive brief that addressed its opposition to RDS's jurisdiction testing motion (before STASCO was substituted for RDS) asserted that jurisdiction was appropriate under both general and specific personal jurisdiction theories.  ECF No. 252 at 13-22.  However, the Landowner Plaintiff subsequently adopted the Trader Plaintiffs' jurisdictional briefs, which limit the theory to specific jurisdiction.  ECF No. 404.  In any event, as discussed in this section, the Court finds that specific jurisdiction is lacking, making general jurisdiction even less likely.

the benefit of STASCO and other Shell entities that were operating in the U.S. as Shell Trading." Trader Shell Memo. at 15 (citing Lumens Dep. 96:3-8). While the Court must credit Plaintiffs' averment of jurisdictional facts, the materials on which Plaintiffs rely for this proposition do not support it. Lumens testified that all Shell Trading & Supply crude oil traders—including those in the United States—ultimately report to the Vice President for Crude Oil on the VPLT, who also happens to be a STASCO executive. Lumens Dep. 96:1-8. Lumens did not state that these traders all work for the benefit of STASCO, such that the Court could determine that STASCO purposely availed itself of the benefits of doing business in the United States through these other entities. Rather, it appears that these traders report to the Vice President for Crude Oil in his capacity as a member of the VPLT, not in his capacity as a STASCO executive.

Second, Plaintiffs explain that Shell Trading & Supply includes the "Shell Shipping organization," responsible for shipping oil worldwide, including to the United States. Trader Shell Memo. at 6-7. The Court granted Plaintiffs' motion for jurisdictional discovery, in part, on the lack of clarity regarding STASCO's role in importing Brent crude oil. After jurisdictional discovery, there still remains some question as to whether STASCO actually imported any Brent crude oil cargoes to the United States. Discovery confirmed that none of the STASCO- and STUSCO-affiliated entities listed in the Complaints as importing Brent crude oil to the United States are subsidiaries of STASCO. *See* Lumens Dep. 114:14-15 (discussing tables at Trader SAC ¶ 491 and Landowner SAC ¶ 226). However, Plaintiffs provide customs data showing STASCO listed as either a shipper, consignee, or carrier on 235 North Sea crude oil cargoes. Kovel Decl., Ex. 12-2 ("Panjiva" U.S. Customs Data for Jul. 2, 2007 to Dec. 26, 2014). During his deposition, Lumens explained that being listed as a "shipper" or "consignee" on customs data does not necessarily mean that STASCO was the entity responsible for importing the crude oil,

and that he would presume STASCO was *not* the ultimate shipper or consignee in light of

STASCO's policy to not conduct business in the United States. Lumens Dep. at 111:20-114:13.

Notwithstanding this "controverting presentation" by STASCO, given the procedural posture, the

Court must credit Plaintiffs' presentation of jurisdictional facts. *Dorchester Fin. Sec.*, 722 F.3d

at 86 (quoting *Marine Midland Bank*, 664 F.2d at 904).

Assuming, as the Court must, that STASCO had some role in importing Brent crude oil

to the United States, these minimum contacts with the United States still do not suffice to

establish specific personal jurisdiction over STASCO. Plaintiffs fail to demonstrate how that

conduct is related to their claims regarding manipulative trades in Brent crude oil reported to

Platts. Plaintiffs did not develop any facts during discovery to show that these shipments

included crude oil cargoes subject to the manipulative trading described in the Complaints nor

did they demonstrate that STASCO's Brent crude oil importing business played a role in the

alleged scheme. It is not enough that the prices at which the oil imported to the United States

ultimately was sold—likely by other RDS-affiliated entities—may have been inaccurate as a

result of Defendants' conduct in the North Sea. STASCO's "suit-related conduct must create a

substantial connection with the forum." *Walden*, 134 S. Ct. at 1121. Importing oil is not related

to the suit within the meaning of *Walden*. While the precise contours of "substantial connection"

are not clear, where, as here, the contacts are relatively limited, courts in this Circuit generally

require a causal connection between the defendant's conduct and the plaintiff's harm. *In re*

*LIBOR-Based Fin. Instruments Antitrust Litigation*, No. 11-md-02262 (NRB), 2015 WL

6243526, at *28 & n.46 (S.D.N.Y. Oct. 20, 2015) ("*LIBOR II*") (collecting cases). Plaintiffs

have failed to make such a showing with respect to STASCO's importation of Brent crude oil.

Finally, it does not matter that STASCO employees have traded West Texas Intermediate ("WTI"), a variety of crude oil, because this conduct is not related to the claims in this action. *See* Trader Shell Memo. at 6; Kovel Decl., Ex. 6 (CFTC Order). As discussed at greater length in the Court's Opinion and Order on Defendants' joint motions to dismiss, the Landowner Plaintiff's Complaint makes it clear that the prices for WTI and Brent crude oils merely moved in tandem. ECF No. 439 at 21-22. Plaintiffs' Complaints are devoid of any facts supporting the allegations that manipulation of Brent crude oil prices dictated the prices for WTI, and Plaintiffs did not develop any facts during jurisdictional discovery showing that impact to WTI prices was part of the alleged scheme. Accordingly, STASCO's involvement in WTI trading, to the extent there is any, is not related to the claims in this action.[7] Similarly, Plaintiffs' assertion that STASCO—by virtue of its inclusion in the Shell Shipping organization—operated vessels in U.S. waters and may respond to oil spills in the United States is not "suit-related conduct." *See* Trader Shell Memo. at 7.

**B.    STASCO Did Not Expressly Aim Its Conduct at the United States**

Plaintiffs also allege that STASCO is subject to this Court's specific jurisdiction under the so-called "effects test" articulated by the Supreme Court *Calder v. Jones*, 465 U.S. 783 (1984). Specific jurisdiction based on a defendant's out-of-forum conduct requires that the defendant's "(1) intentional, tortious actions; (2) which were expressly aimed at the United States; (3) [caused] harm, the brunt of which is suffered—and which the defendant knows is likely to be suffered—in the United States; and (4) the injuries that are the subject of the litigation arise from or relate to defendant's subject conduct." *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 478-79 (S.D.N.Y. 2010) (citing *Calder*, 465 U.S. at 789-90).

---

[7] While Plaintiffs refer to "STASCO's crude oil traders" here, as discussed in the next section, it seems that they really are referring to Shell Trading employees, more broadly.

"[T]he fact that harm in the forum is foreseeable . . . is insufficient for the purpose of establishing specific personal jurisdiction over a defendant." *In re Terrorist Attacks*, 714 F.3d at 674.

In the Complaints, Plaintiffs allege that Defendants, including STASCO, intended for their conduct to manipulate the prices for Brent crude oil derivatives and futures traded on NYMEX and ICE Futures Europe. *See* Trader SAC ¶ 2; Landowner SAC ¶ 3.[8] Plaintiffs further explain in their opposition to the instant motion that the "fundament of the Complaint is that STASCO and STUSCO manipulated the Platts MOC in order to benefit their derivatives positions." Trader Shell Memo. at 17. While that may prove to be true, STASCO does not have any derivatives positions in the United States to benefit by this alleged conduct. *See* Lumens Dep. 70:4-19, 116:9-18. Plaintiffs attempt to argue around this fact by asserting that "STASCO and STUSCO, *as part of Shell Trading*, traded these derivatives on exchanges in the United States." Trader Shell Memo. at 17 (emphasis added). It is undisputed that STASCO is part of Shell Trading, and that other Shell Trading entities, including STUSCO, trade Brent derivatives and futures in the United States, *see, e.g.*, Lumens Dep. 72:20-73:4; however, that STASCO might have known its allegedly manipulative conduct may ultimately benefit the business of other RDS entities operating in the United States does not establish that STASCO "expressly aimed" its conduct at the United States. Nor does the fact that a STASCO executive, in his capacity as a member of the VPLT, oversees crude oil trading by all Shell Trading entities mean that STASCO had any role in domestic trading operations, such that it could be found to have

---

[8] In its Opinion and Order on Defendants' joint motions to dismiss, the Court did not need to take a position on the question of whether transactions on ICE Futures Europe are "domestic transactions" within the meaning of *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012) for purposes of evaluating any extraterritorial application of the CEA. *See* ECF No. 439 at 14 n.5. The inquiry here is not guided by *Absolute Activist*, however, and ICE Futures Europe clearly is a London-based exchange, notwithstanding where the computer servers that match buy and sell order may be located. Trader SAC ¶ 141; Landowner SAC ¶ 156.

intended the consequences of its actions to be felt in the United States. *See* Lumens Dep. 92:19-96:8.

The decisions cited by Plaintiffs on this point are readily distinguishable and all support the finding that the Court does not have jurisdiction over STASCO. *See* Trader Shell Memo. at 17-18. For instance, in *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789 (LGS), 2016 WL 1268267, at *6-7 (S.D.N.Y. Mar. 31, 2016) ("*FOREX*"), the district court found that it had personal jurisdiction over two of the defendants, but not the third, under the effects test. The defendants' trading activity in the United States distinguished the two defendants over which jurisdiction was proper from the defendant that only traded in the United States through its subsidiary. Without any trading activity in the United States attributable to this third defendant, the court found that it did not have personal jurisdiction over it notwithstanding the allegation that the defendants "were 'dominant' players in the relevant market, and 'knew' the benchmark—there the WM/Reuters fix, here Dated Brent—'were disseminated in the United States, and were used to price . . . futures contracts, including CME and ICE . . . futures and options contracts." Trader Shell Memo. at 17 (quoting *FOREX*, 2016 WL 1268267, at *5).

The decision in *Amaranth* likewise is distinguishable. There, the district court exercised personal jurisdiction over a foreign defendant who traded on NYMEX, where it also was alleged that his trading patterns on NYMEX manipulated the price of natural gas futures listed on that exchange. 587 F. Supp. 2d at 536. Plaintiffs have failed to adduce any facts in jurisdictional discovery showing that STASCO traded Brent crude oil derivatives or futures in the United States, and, like the district court in *FOREX*, the Court declines to find that STASCO expressly

aimed its conduct at the United States solely on the basis of other RDS-affiliated entities' trading in the United States.[9]

### C. STASCO Is Not Subject to Specific Personal Jurisdiction under Agency or Conspiracy Theories

Finally, Plaintiffs assert that the Court may properly exercise specific personal jurisdiction over STASCO under an agency theory or a conspiracy theory. Trader Shell Memo. at 18-20. Neither theory is appropriate here.

#### 1. *Agency Theory*

Plaintiffs' invocation of an agency theory of specific personal jurisdiction presents several problems. First, the agency theory is based on the Second Circuit Court of Appeals' interpretation of New York state law specific to general personal jurisdiction. *See Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000) (defendant "doing business" through agents may be sufficient to satisfy New York general jurisdiction statute). Moreover, as Plaintiffs acknowledge, the validity of this theory has been questioned in light of the Supreme Court's holding in *Daimler*. Trader Shell Memo. at n.7 (citing *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 224 & n.2 (2d Cir. 2014) (questioning whether defendant can be "at home" in jurisdiction under *Daimler* through actions of agents)); *see also Daimler*, 134 S. Ct. at n.13; *Levitin v. Sony Music Entm't*, 101 F. Supp. 3d 376, 388-89 (S.D.N.Y. 2015).

Second, while an agency theory may continue to have validity in the specific personal jurisdiction context, in this Circuit, a plaintiff must demonstrate that the foreign defendant

---

[9] While Plaintiffs' conclusory allegations regarding STASCO's intent may have sufficed to establish a *prima facie* case prior to any jurisdictional discovery, after discovery, those allegations must be factually supported. *See Dorchester Fin. Sec.*, 722 F.3d at 85. Accordingly, Plaintiffs' reliance on two decisions in which the plaintiffs, without the benefit of jurisdictional discovery, made allegations in the complaints regarding defendants' intent is unavailing. *See* Trader Shell Memo. at 17-18 (citing *In re Western States Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716 (9th Cir. 2013) and *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498 (S.D.N.Y. 2004)).

exerted control over the domestic entity, among other factors. *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986) (while courts should "focus[] on the realities of the relationship in question rather than the formalities of agency law . . . some control is necessary to establish agency for jurisdictional purposes"); *Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333, 340-41 (S.D.N.Y. 2016); *Levitin*, 101 F. Supp. 3d at 389. Notwithstanding this well-established precedent, Plaintiffs argue that control is not required to prove an agency relationship for purposes of a jurisdictional analysis, citing to *Palmieri v. Estefan*, 793 F. Supp. 1182 (S.D.N.Y. 1992). Trader Shell Memo. at 18. However, *Palmieri* is a district court decision that pre-dates *Daimler* and addressed the propriety of exercising general, not specific, personal jurisdiction under an agency theory, and accordingly, it is neither relevant nor binding.

Thus, Plaintiffs have failed to establish that the Court's exercise of specific personal jurisdiction over STASCO would be appropriate under an agency theory because they have not alleged that any domestic Shell Trading entities "engaged in purposeful activities in [the United States] . . . for the benefit of and with the knowledge and consent of [STASCO] and that [STASCO] exercised some control over [the Shell Trading entities] in the matter." *N.Y. v. Mountain Tobacco Co.*, 55 F. Supp. 3d 301, 312 (E.D.N.Y. 2014) (quoting *Barron Partners, LP v. Lab123, Inc.*, No. 07-cv-11135 (JSR), 2008 WL 2902187, at *10 (S.D.N.Y. Jul. 25, 2008)). Plaintiffs discuss the ways in which STASCO and STUSCO are "operated as part of one overall entity in crude oil trading," but do not present facts that support an allegation that STASCO controlled STUSCO or any other domestic Shell Trading affiliate or that these entities disregarded corporate formalities. Trader Shell Memo. at 19; *see In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 232 (S.D.N.Y. 2015) (website touting "global reach of a family of companies" insufficient where corporate formalities observed). The fact that comes

closest to establishing some measure of control by STASCO still misses the mark because, as discussed above, the STASCO executive who oversees global trading for the Shell Trading umbrella organization does so as a member of the VPLT, not in his capacity as a STASCO executive.

    2.   *Conspiracy Theory*

The Court also cannot exercise personal jurisdiction over STASCO under a conspiracy theory. As STASCO notes, there is reason to think that basing specific personal jurisdiction on the acts of a defendant's co-conspirators is questionable after *Walden*. ECF No. 400 ("Shell Reply"), at 13-14. In *Walden*, the Supreme Court emphasized that personal jurisdiction must be based on "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." 134 S. Ct. at 1122. Stated differently, "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id.* at 1123. It therefore stands to reason that a defendant has not established minimum contacts with a forum on the basis of his co-conspirator's conduct in the forum state alone.

Even apart from *Walden*, in recent years, courts in this District have come to question the propriety of the conspiracy theory of personal jurisdiction more broadly. *See, e.g., Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419 (GBD), 2015 WL 1515358, at *3 (S.D.N.Y. Mar. 31, 2015) (collecting cases); *In re Aluminum*, 90 F. Supp. 3d at 227 ("The rules and doctrines applicable to personal jurisdiction are sufficient without the extension of the law to a separate and certainly nebulous "conspiracy jurisdiction" doctrine."); *Tymoshenko v. Firtash*, No. 11-cv-2794 (KMW), 2013 WL 1234943, at *4 (S.D.N.Y. Mar. 27, 2013) (use of conspiracy theory of personal jurisdiction has been "widely criticized by courts and scholars").

The Court need not decide whether *Walden* eliminates the availability of personal jurisdiction based on a conspiracy theory because the conspiracy theory of personal jurisdiction

is merely a variation on the agency theory. The single decision cited by Plaintiffs confirms that an agency relationship is required to uphold jurisdiction based on a conspiracy theory. *See* Trader Shell Memo. at 20 (citing *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 442-43 (S.D.N.Y. 2008) ("The New York activities of a co-conspirator may also be imputed to an out-of-state tortfeasor for jurisdictional purposes under an agency rationale.")); *see also LIBOR II*, 2015 WL 6243526, at \*29 ("The underlying rationale for exercising personal jurisdiction on the basis of conspiracy is that, because co-conspirators are deemed to be each other's agents, the contacts that one co-conspirator made with a forum while acting in furtherance of the conspiracy may be attributed for jurisdictional purposes to the other co-conspirators."). Accordingly, as the Court already has determined that STUSCO did not act as an agent of STASCO, the Trader Plaintiffs' conspiracy theory of jurisdiction over STASCO also must fail.

Accordingly, Plaintiffs have failed to meet their burden to show that this Court can exercise personal jurisdiction over STASCO and the actions against STASCO are dismissed.

## II. The Court Can Exercise Specific Personal Jurisdiction over Phibro Commodities

Plaintiffs argue that Phibro Commodities is subject to both general and specific personal jurisdiction based on its contacts with the United States. Among their theories of specific jurisdiction, Plaintiffs assert that Phibro Commodities' manipulative trading in the North Sea caused foreseeable effects in the United States. ECF No. 360 ("Trader Phibro Memo."), at 8-9.[10] As discussed above, not only must a defendant's conduct create foreseeable effects in the United States, but the conduct must be "expressly aimed" at the forum. *In re Terrorist Attacks*, 718 F.

---

[10] Phibro Commodities adopted the arguments made in support of its motion to dismiss the Trader Plaintiffs' Complaint to also support its motion to dismiss the Landowner Plaintiff's Complaint. ECF No. 369 ("Phibro Landowner Memo."), at 3. Therefore, the Landowner Plaintiff also incorporated by reference all arguments made by the Trader Plaintiffs in opposition to Phibro Commodities' motion to dismiss. ECF No. 377 ("Landowner Phibro Memo."), at 1.

Supp. 2d at 478-79 (citing *Calder*, 465 U.S. at 789-90). Phibro Commodities concedes that it directed at least some of its conduct at the United States, but argues that it still is not subject to the Court's specific personal jurisdiction because these limited contacts are not related to the substance of this action. *See* ECF No. 366 ("Phibro Reply Memo."), at 3-4. The Court disagrees and finds that Plaintiffs have presented a *prima facie* case that Phibro Commodities has sufficient minimum contacts with the United States and that the exercise of specific personal jurisdiction over Phibro Commodities is reasonable.

### A.   Phibro Commodities Has Sufficient Minimum Contacts with the Forum

First, Phibro Commodities concedes that it "directed some limited activities at the U.S.," including because "its traders caused trades to be executed in the U.S., albeit in the name of Phibro Trading." Phibro Reply Memo. at 3.[11] In addition to directing trades that were executed in the United States, Phibro Commodities' allegedly manipulative activities in the North Sea also caused effects in the United States, although quite indirectly. Trader SAC ¶ 126; Landowner SAC ¶ 142. Plaintiffs have presented facts sufficient for the Court to find at this stage that Phibro Commodities expressly aimed these out of forum trading activities at the United States. Assuming that the allegedly manipulative Brent crude oil trades impacted the price of at least some futures and derivatives traded on NYMEX, Phibro Commodities employees directed futures and derivative trading on NYMEX that could have benefitted from the allegedly manipulative activity. Plaisted Dep. 62:17-63:14; 64:20-65:24. Indeed, Plaintiffs allege that, for

---

[11] The nature of the relationship between Phibro Commodities and Phibro Trading is somewhat unclear in the context of Phibro Commodities traders' activities on U.S. exchanges. Phibro Commodities is a subsidiary of Phibro Trading, and its traders ultimately answer to the head of Phibro Trading, but, on a day-to-day basis, the traders are "responsible for making their own trading decisions." Plaisted Dep. 46:3-17, 101:15-102:15. When Phibro Commodities traders seek to execute derivatives and futures trades in the United States, however, they do so in the name of their parent company, Phibro Trading. Plaisted Decl. ¶ 6. Whether it is fair to say that Phibro Commodities acted as an agent of Phibro Trading in these trades or vice versa, it is clear that Phibro Commodities traders caused trades to be executed on U.S. exchanges and Phibro Commodities has conceded that it "directed some limited activities at the U.S." Plaisted Decl. ¶¶ 5-6; Phibro Reply Memo. at 3.

Phibro Commodities, this was a primary purpose of their participation in the manipulative physical trading. *See* Trader SAC ¶¶ 2, 537; Landowner SAC ¶ 3.

Phibro Commodities employees direct trades in the United States that are part of the company's overall trading strategy for both physical and financial trading. As Plaisted explained, Phibro Commodities traders manage a "book of trades" that includes both "physical oil trades" and "the indirect benefits of futures contracts and other derivatives that typically settle financially." Plaisted Decl. ¶ 5. While the financial trades are maintained on Phibro Trading's books, the Phibro Commodities traders "are responsible for making the [trading] decisions," Plaisted Dep. 63:10-14, and do so with any eye towards the relevant Phibro Commodities' trading book. *Id.* 63:10-67:3; 69:2-12. Sometimes, this trading serves "to hedge price exposure of physical commodities," generally, while, in other circumstances, the financial trades relate to specific "physical trading strategies." Plaisted Decl. ¶¶ 5-6. In the latter instance, the "benefits of those [financial] trades . . . are transferred to Phibro Commodities." *Id.* ¶ 6. The apparent interrelationship of Phibro Commodities' strategies for physical and financial trading suffices to allow the Court to find that Phibro Commodities intended the effects of its alleged conduct in the North Sea to be felt in the United States, particularly on NYMEX, where its employees executed trades. *See, e.g., Forex,* 2016 WL 1268267, at *6-7 (finding that defendants who traded in U.S. either expressly aimed conduct at forum or engaged in conduct there).[12]

---

[12] In their opening papers, Phibro Commodities notes that this action arises under federal laws that provide for nationwide service of process, *see* ECF No. 330 ("Phibro Trader Memo."), at n.1, yet nevertheless also maintains that Plaintiffs must demonstrate jurisdiction is proper under New York's long-arm statute. Phibro Trader Memo. at 4, 9-10. Phibro Commodities seems to have abandoned this position in its reply and, in any event, the argument is incorrect. Both the CEA and the Sherman Act (through the Clayton Act) provide for nationwide service of process, which "indicates a congressional intention to extend personal jurisdiction to the limit permitted by the Due Process Clause." *In re Amaranth,* 587 F. Supp. 2d at 526 (citing *Leasco Data Processing Equip. Corp.,* 468 F.2d at 1339).

Second, the Court finds that these contacts with the United States are substantially connected to the subject matter of this litigation. The Court rejects Phibro Commodities' contention that Plaintiffs were required to identify specific derivatives trades or positions that were part of the alleged manipulative scheme. *See* Phibro Reply Memo. at 4. Given the limited scope of the jurisdictional discovery conducted, it suffices for present purposes that Plaintiffs have presented facts showing that the same Phibro Commodities traders who allegedly engaged in the manipulative physical trades that form the basis of Plaintiffs' allegations also traded futures and derivatives products in the United States tied to Brent crude oil, and that the strategies for physical and financial trading were evaluated together. Plaisted Dep. 63:10-67:3; 69:2-12. The crux of Plaintiffs' Complaints is that the indirect impact on NYMEX was one of the primary reasons Phibro Commodities reported manipulative trading activity to Platts. Trader SAC ¶ 2, 537; Landowner SAC ¶ 3.[13]

**B.     The Exercise of Specific Personal Jurisdiction Over Phibro Commodities Is Reasonable**

Having found that Plaintiffs presented facts demonstrating Phibro Commodities' minimum contacts with the United States, the Court now must determine whether exercising specific personal jurisdiction over Phibro Commodities is reasonable. In making this determination, the Court considers five factors:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief;

---

[13] Plaintiffs also assert that the Court can exercise general jurisdiction over Phibro Commodities on the basis that it acted as an agent of Phibro Trading or, alternatively, was its alter ego. Trader Phibro Memo. at 10. With regard to Plaintiffs' agency argument, as discussed above, the applicability of this theory has been questioned in light of the Supreme Court's emphasis in *Daimler* that the defendant, itself, must be "at home" in the forum. *See Daimler*, 134 S. Ct. at n.13; *Sonera Holding*, 750 F.3d at 224 & n.2; *Levitin*, 101 F. Supp. 3d at 388-89. However, the Court need not reach this question, or the question of Plaintiffs' alter ego theory, given that it already has determined that Phibro Commodities has sufficient minimum contacts to justify the exercise of specific personal jurisdiction.

> (4) the interstate judicial system's interest in obtaining the most efficient
> resolution of the controversy; and (5) the shared interest of the states in
> furthering substantive social policies.

*Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164-65 (2d Cir. 2010) (citing *Asahi*, 480 U.S. at 113-14).

Generally, "the exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts at the first stage of the inquiry;" however, "it may be defeated where the defendant presents 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Id.* at 165 (quoting *Burger King*, 471 U.S. at 477); *accord Bank Brussels Lambert*, 305 F.3d at 129. Here, Phibro Commodities contends that exercising jurisdiction over it "would not comport with fair play or substantial justice," but has not addressed any of the five factors that the Court must consider. Phibro Reply Memo. at 5. Notwithstanding Phibro Commodities' failure to present any case regarding the unreasonableness of exercising jurisdiction, let alone a "compelling" one, the Court will examine each of the five factors to determine whether the exercise of jurisdiction over Phibro Commodities is reasonable.

First, the Court recognizes that there may be some burden on Phibro Commodities to continue to litigate this action here. However, in its regular course of business, Phibro Commodities interacts with affiliates, its parent company, and others in the United States. Plaisted Decl. ¶¶ 6, 8. Moreover, "the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago" in litigating internationally. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 574 (2d Cir. 1996).

The second and third factors weigh in favor of the reasonableness of exercising jurisdiction here. There is no question that the United States has a strong interest in providing

injured parties with relief from alleged violations of its laws. "[P]laintiffs have a similarly substantial interest in obtaining relief for [Defendants'] alleged violation of those laws." *In re Amaranth*, 587 F. Supp. 2d at 536. That is particularly true here, as all of the Plaintiffs are resident in the United States.

The fourth and fifth factors are neutral. With respect to the fourth factor, the efficient resolution of the controversy, courts often consider the location of witnesses and evidence. *See Metro. Life*, 84 F.3d at 574. While the parties have not suggested where evidence for this case might be found, it seems likely that it will be scattered around the globe, making this jurisdiction no more efficient than any other. With respect to the fifth factor, the shared interests of the states, Phibro Commodities has not offered any substantive social policies that would be furthered by having this case tried in another jurisdiction, nor is the Court aware of any.

The balance of the factors weighs in favor of Plaintiffs, and therefore, the exercise of personal jurisdiction over Phibro Commodities does not offend the traditional notions of fair play and substantial justice protected by the Due Process Clause.

## CONCLUSION

For the foregoing reasons, the Court may exercise specific personal jurisdiction over Defendant Phibro Commodities, but not over STASCO. Therefore, all claims against STASCO are dismissed. The Court will address Phibro Commodities' non-jurisdictional arguments in support of dismissal together with the non-jurisdictional arguments advanced by the other remaining Defendants.

**SO ORDERED.**

Dated: June 8, 2017
     New York, New York

                        **ANDREW L. CARTER, JR.**
                        **United States District Judge**