**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| **In re:** |
| **NORTH SEA BRENT CRUDE OIL FUTURES LITIGATION** |
| **This document applies to: ALL CASES** |

**13-md-02475 (ALC)**

**OPINION AND ORDER ON MOTIONS TO DISMISS**

**ANDREW L. CARTER, JR., United States District Judge:**

A putative class of futures and derivatives traders ("Trader Plaintiffs") and a putative class of the owners of landholding and lease-holding interests in United States oil-producing property ("Landowner Plaintiff," together with Trader Plaintiffs, "Plaintiffs") have asserted claims against a number of Brent crude oil producers, traders, and their selected affiliates. Plaintiffs allege that Defendants conspired to intentionally manipulate Brent crude oil prices and the prices of Brent crude oil futures and derivatives contracts traded on the New York Mercantile Exchange ("NYMEX") and the Intercontinental Exchange ("ICE Futures Europe") in violation of the Commodity Exchange Act, the Sherman Act, and the laws of various states. Defendants have moved to dismiss both Complaints on a number of theories. For the reasons, and to the extent set forth below, Defendants' motions are granted and the Complaints are dismissed.

## BACKGROUND

### I.      Factual Background

The following facts are taken from the allegations in Plaintiffs' Second Amended Complaints, which are presumed to be true for purposes of this motion to dismiss.

Plaintiffs allege that the Defendants, who are producers, refiners, and traders of Brent crude oil, or entities affiliated with these producers, refiners, and traders, "monopolized the Brent Crude Oil market and entered into unlawful combinations, agreements, and conspiracies to fix

and restrain trade in, and intentionally manipulate Brent Crude Oil prices and the prices of Brent Crude Oil futures and derivatives contracts." ECF No. 308 (Traders' Second Amended Complaint ("Trader SAC")), at ¶ 2; *see also* Landowner ECF No. 96 (Landowner's Second Amended Complaint ("Landowner SAC")), at ¶ 3.[1]

The Trader Plaintiffs are United States individuals and entities who trade Brent futures and derivatives contracts on NYMEX and ICE Futures Europe. Trader SAC ¶¶ 24-34. The Landowner Plaintiff is a Louisiana resident who is a "landowner and/or leaseholder" of oil-producing lands, as well as the owner of multiple royalty and working interests in oil leases in the State of Louisiana. Landowner SAC ¶ 10.

## A.    Brent Crude Oil

Brent crude oil is a variety of light, sweet crude oil pulled from the North Sea region of Europe. Trader SAC ¶ 4; Landowner SAC ¶ 30. Although Brent is one of the four fields from which crude oil is pulled in the North Sea (the others are Forties, Oseberg, and Ekofisk), reference to "Brent crude oil" encompasses oil from all four fields. Trader SAC ¶¶ 55, 76; Landowner SAC ¶ 30. Brent crude oil serves as a benchmark for two-thirds of the world's internationally-traded crude oil supplies. Trader SAC ¶ 4; Landowner SAC ¶ 30.

The Brent crude oil benchmarking function is facilitated by a number of price reporting agencies, including Platts, a London-based division of the New York-based McGraw Hill Financial. Trader SAC ¶ 4; Landowner SAC ¶ 64. The Brent crude oil physical market consists primarily of private ("over-the-counter") trades in cargoes of crude oil in the North Sea. Trader SAC ¶ 85; Landowner SAC ¶ 67. Because the trades are based on over-the-counter contracts, oil

---

[1] Unless otherwise noted, all references to "ECF" are to the electronic docket for Case No. 13-md-2475. "Landowner ECF" refers to the electronic docket for Case No. 13-cv-7443.

prices are not directly visible to the public; instead, Platts and other price-reporting agencies collect information on transactions from market participants and report them. *Id.*

Platts reports prices for a variety of submarkets in the Brent crude oil market, but the "primary benchmark" for Brent crude oil is "Dated Brent," physical cargoes of crude oil in the North Sea that have been assigned specific delivery dates. Trader SAC ¶¶ 88-89; Landowner SAC ¶¶ 69-70. To assess pricing for Dated Brent, Platts uses the so-called Market-On-Close ("MOC") methodology. Trader SAC ¶ 92; Landowner SAC ¶ 74. This methodology limits the analysis of market-pricing data to transactions that occur during a half-hour window at the end of the trading day (4:00 p.m. to 4:30 p.m. London time). *Id.* Platts collects information regarding trades in, and bids and offers for, contracts for crude oil from the Brent, Forties, Oseberg, and Ekofisk ("BFOE") fields during this period, known as the MOC window. Trader SAC ¶¶ 95-96; Landowner SAC ¶¶ 77-78. It then "carefully analyses transactional data to determine its fitness for an assessment of market value . . . appl[ying] judgment to the data it gathers" before publishing it. Trader SAC ¶ 99; Landowner SAC ¶ 82. In applying its independent judgment, Platts has, on occasion, declined to consider transactions reported to it by certain Defendants as not reflective of the market or otherwise anomalous. *See, e.g.*, Trader SAC ¶¶ 267, 285, 325-26.

**B.  Brent Crude Oil Futures and Derivatives**

Plaintiffs contend that Platts' and other price-reporting agencies' pricing assessments "are directly linked" to Brent crude oil futures and other derivative contract prices. Trader SAC ¶ 127; Landowner SAC ¶ 143. As a result, manipulation of Platts' Dated Brent assessment "has effects that ripple throughout the Brent Crude Oil and futures market." Trader SAC ¶ 126; Landowner SAC ¶ 142.

3

Plaintiffs focus specifically on futures and derivatives trading on NYMEX and ICE Futures Europe. Trader SAC ¶ 2; Landowner SAC ¶ 3. ICE Futures Europe is an electronic derivatives exchange headquartered in London that also conducts business out of offices in the United States. Trader SAC ¶ 141; Landowner SAC ¶ 156. Trades on ICE Futures Europe are placed through member entities and are cleared through ICE Clear Europe, an entity wholly-owned by the same entity that owns ICE Futures Europe. Trader SAC ¶¶ 150-63; Landowner SAC ¶ 157. As the name implies, ICE Futures Europe is not a CFTC-designated contract market, but, since 1999, U.S. traders have been permitted to trade there due to a no-action letter the exchange received from the CFTC. Trader SAC ¶¶ 143-44; Landowner SAC ¶¶ 158-59. NYMEX is a U.S.-based physical commodity futures exchange. Trader SAC ¶ 133; Landowner SAC ¶ 148.

A variety of Brent crude oil futures and derivatives contracts trade on NYMEX and ICE Futures Europe. Trader SAC ¶¶ 136, 175-223; Landowner SAC ¶ 151. The Brent futures contracts on NYMEX settle to the price of ICE Brent futures, which, in turn, have a settlement price based on the ICE Brent Index. Trader SAC ¶ 123, 128, 179; Landowner SAC ¶ 139, 144. ICE calculates its Brent Index as an average of (1) the weighted average of the 25-day BFOE market for cargoes due for delivery one month out (that is, forward contracts); (2) the weighted average of the 25-day BFOE market for cargoes due for delivery two months out plus a straight average of the spread between the first and second month cargo trades; and (3) an average of certain designated published assessments. Trader SAC ¶¶ 128 n.3, 179. While Platts may be one of the sources for ICE Futures Europe's published assessments, Platts' Dated Brent assessment, a spot price, is not one of those considered. *Id.* Nevertheless, Plaintiffs allege a

correlation of 85% or more between Platts' Dated Brent assessment and ICE Brent crude oil futures prices. Trader SAC ¶ 129; Landowner SAC ¶ 146.

While Dated Brent does not factor into the ICE Brent Index, Platts' Dated Brent assessment is incorporated as a pricing element for a limited number of derivatives contracts traded on NYMEX and ICE Futures Europe. Trader SAC ¶¶ 136, 205-11. For instance, the Brent CFD (contract for difference) traded on NYMEX is a short-term swap agreement that represents the difference between Dated Brent and a forward month BFOE cash contract. *Id.* ¶ 136. Similarly, ICE Futures Europe offers a variety of dated-to-frontline contracts which capture the difference between Dated Brent and short-term ICE futures contracts. *Id.* ¶¶ 205-10.

## C.    U.S. Crude Oil

The United States produces a variety of crude oils. Like Brent crude oil, West Texas Intermediate ("WTI") and Light Louisiana Sweet ("LLS") are light, sweet crude oils. Trader SAC ¶ 79; Landowner SAC ¶¶ 28-29, 33-39. WTI and Brent are the two major benchmarks for the world's oil prices. Landowner SAC ¶ 29. The crude oil produced and sold in the United States in which the Landowner Plaintiff has an interest is priced to WTI. *Id.* ¶ 62. Although WTI and LLS are crude oil benchmarks distinct from Brent, the Landowner Plaintiff alleges that there is a close correlation between the prices of these three light, sweet crude oil varieties. *Id.* ¶¶ 40-41. With respect to WTI, specifically, the Landowner Plaintiff contends that the correlation is, in fact, causation, with Brent crude oil influencing the price of WTI crude, not vice versa. *Id.* ¶ 41-51. The Landowner Plaintiff does not contemplate the possibility of an independent factor affecting the price for both WTI and Brent crude oil in the same manner.

### D. Alleged Manipulations

Plaintiffs allege that Defendants conspired to manipulate the Brent crude oil market, including the market for Brent futures and derivatives contracts, by engaging in manipulative conduct and fraudulent physical trades and then deliberately and systematically submitting information about those trades to Platts during the MOC window. Trader SAC ¶ 224; Landowner SAC ¶ 90. Plaintiffs do not allege that any of the Defendants engaged in manipulative trading on NYMEX or ICE Futures Europe; rather, they allege that the manipulation of Platts' Dated Brent assessment, through manipulative physical trades and reporting, "has effects that ripple throughout the Brent Crude Oil and futures market, impacting a wide variety of derivative and futures contracts on NYMEX and ICE." Trader SAC ¶ 126; Landowner SAC ¶ 142.

Plaintiffs describe in great detail a number of specific transactions and transaction chains occurring between June 2010 and September 2012 alleged to be manipulative. Trader SAC ¶¶ 251-419; Landowner SAC ¶¶ 96-136. For purposes of these motions to dismiss, however, it suffices to say that, generally speaking, Defendants allegedly "selectively reported bids, offers, 'spoof' orders and transactions with aberrant pricing" and engaged in "prohibited wash sale transactions" during the MOC window. Trader SAC ¶ 8; Landowner SAC ¶ 92. Plaintiffs explain that much of the conduct identified does not make economic sense for the Defendants participating in the transactions and can only be explained as part of a conspiracy to drive the price of Brent crude oil in a particular direction. *See, e.g.*, Trader SAC ¶¶ 380-81, 397; Landowner SAC ¶¶ 130, 133.

By way of example, both the Trader Plaintiffs and the Landowner Plaintiff identify two transactions involving Phibro Commodities in September 2012. Trader SAC ¶¶ 395-97;

Landowner SAC ¶¶ 129-30. On September 17, 2012, Phibro Commodities purchased a Forties

cargo from BP at a $0.05 premium, allegedly creating upward pressure on Forties prices. Then,

the following day, Phibro Commodities offered for sale that same Forties cargo at a price $0.30

per barrel lower. *Id.* Plaintiffs allege that Phibro Commodities intended this artificially low

offer, effectively a spoof offer,[2] to signal to the market that the price was heading lower, and that

this offer was part of a scheme with other Defendants, including Shell International Trading and

Shipping Company Limited, Trafigura, and Vitol, to move the price of Dated Brent downward at

the end of September. Trader SAC ¶ 369; Landowner SAC ¶ 135.

## II.     Procedural History

After the various cases in this litigation were centralized and transferred to this Court in

October 2013, ECF No. 1, the Trader Plaintiffs filed an Amended Complaint on July 3, 2014.

ECF No. 166. The Landowner Plaintiff, proceeding in a related case, filed an Amended

Complaint on April 28, 2014. Landowner ECF No. 40.[3] Thereafter, all Defendants jointly filed

three motions to dismiss: (1) a motion to dismiss the Trader Complaint (ECF Nos. 204 (Motion),

211, ("Defs.' Trader Memo."), 212 (Declaration of Daryl A. Libow)); (2) a motion to dismiss the

Landowner Complaint (ECF Nos. 218 (Motion), 219 ("Defs.' Landowner Memo.")); and (3) a

motion to dismiss both the Trader Complaint and the Landowner Complaint on the grounds that

they exceeded the extraterritorial reach of United States law (ECF Nos. 200 (Motion), 201

---

[2] "Spoofing" involves bidding on, or offering for sale, a particular cargo with the intent to cancel the bid or offer
prior to executing the trade. Trader SAC ¶ 70; Landowner SAC ¶ 236.

[3] Following stipulations by all parties, the Trader Plaintiffs filed a Second Amended Complaint on February 27,
2015, ECF No. 308 ("Trader SAC"), and the Landowner Plaintiff filed a Second Amended Complaint on April
30, 2015, Landowner ECF No. 96 ("Landowner SAC"). The Second Amended Complaints substituted certain
defendants but did not affect any of the substantive claims.

("Defs.' Extraterritoriality Memo."), 202 (Declaration of Douglas F. Curtis)).[4] Defendants also individually filed supplemental motions to dismiss advancing arguments specific to them, which are not addressed in this opinion.

Plaintiffs opposed the motions, although, with respect Defendants' extraterritoriality arguments, the Landowner Plaintiff merely incorporated by reference the Trader Plaintiffs' arguments. ECF Nos. 243 ("Trader Extraterritoriality Memo"), 252 ("Landowner Omnibus Memo."), 253 ("Trader Memo."). Defendants submitted reply briefs, and the Court considers the motions fully submitted. ECF Nos. 285 ("Defs.' Landowner Reply"), 286 ("Defs.' Extraterritoriality Reply"), 288 ("Defs.' Trader Reply").

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully," and accordingly, where the plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

---

[4] Defendants BP America Inc., BP Corporation North America Inc., Mercuria Energy Trading Inc., Shell Trading US Company, Trafigura Beheer B.V., Vitol S.A., and Vitol Inc. did not join in either of the motions to dismiss the Landowner Plaintiff's Complaint. *See* Defs.' Extraterritorial Memo. at n.2; Defs.' Memo. at n.1.

In considering a motion to dismiss, the court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *See Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008). However, the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Instead, the complaint must provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (citing *Twombly*, 550 U.S. at 555). The court "may consider the facts as asserted within the four corners of the complaint together with the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (citation and internal quotation marks omitted).

## DISCUSSION

## I.   The Trader Plaintiffs' Commodity Exchange Act Claims

Defendants argue that the Trader Plaintiffs' Commodity Exchange Act ("CEA") claims should be dismissed because application of the CEA to the facts alleged exceeds the territorial limitations of the statute. Because the Court agrees with Defendants that the Trader Plaintiffs' CEA claims are impermissibly extraterritorial, the Court need not reach Defendants' other arguments regarding further deficiencies in the Trader Plaintiffs' CEA claims.

### A.   Applicable Law

In *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010), the Supreme Court articulated a new test for determining when a U.S. statute appropriately may be applied extraterritorially. In formulating this test, the Court relied on the "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply

only within the territorial jurisdiction of the United States." 561 U.S. at 255 (citation and internal quotation marks omitted). Accordingly, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Id.* To determine whether there is any indication of extraterritorial application, courts apply a two-step process. First, a court must consider whether the relevant statute contains a clear statement of Congress' intent to overcome the presumption against extraterritoriality. *Id.* at 265-66. Second, recognizing that "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States," the Supreme Court advised lower courts to examine whether the focus of congressional concern in the particular statute suggests that extraterritorial application is appropriate. *Id.* at 266.

Applying that test to the facts at issue in *Morrison*—fraud based on securities traded on an Australian exchange—the Court found that § 10(b) of the Securities Exchange Act did not contain any congressional expression of extraterritorial effect. *Id.* at 262. The Court then examined the focus of the Exchange Act, which it found to be on securities purchase-and-sale transactions. *Id.* at 266-67. Accordingly, the Court held that the Exchange Act only reaches claims involving (1) "transactions in securities listed on domestic exchanges," or (2) "domestic transactions in other securities." *Id.* at 267.

In *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012), the Court of Appeals for the Second Circuit had occasion to analyze the second prong of the *Morrison* transactional test. As further clarified by this Circuit, a transaction that does not involve a security listed on a domestic exchange will be considered domestic in one of two circumstances: (1) "irrevocable liability" was incurred in the United States; or (2) "title was transferred within the United States." 677 F.3d at 68.

Two years later, the Court of Appeals again revisited *Morrison*'s application to an Exchange Act claim. *See Parkcentral Global Hub Ltd. v. Porsche Auto Holdings SE*, 763 F.3d 198 (2d Cir. 2014). In that case, the court was presented with the question of whether, "under *Morrison*, a domestic transaction in a security (or a transaction in a domestically listed security)—in addition to being a *necessary* element of a domestic § 10(b) claim—is also *sufficient* to make a particular invocation of § 10(b) appropriately domestic." 763 F.3d at 214. The court assumed for purposes of the decision that the transactions at issue were domestic, and held that "a domestic transaction is necessary but not necessarily sufficient to make § 10(b) applicable." *Id.* at 216. The transactions at issue were securities-based swap agreements tied to the price of a foreign company's shares on a foreign exchange, and the court held that the Exchange Act could not reach defendants who allegedly made fraudulent statements abroad that impacted the foreign company's share price. To hold otherwise would subject those defendants to the potentially incompatible securities regimes of the United States and the countries in which the shares actually traded. *Id.*

After *Morrison*, district courts applied its transactional framework to cases involving the CEA as well. *See, e.g.*, *Loginovskaya v. Batratcheno*, 936 F. Supp. 2d 357 (S.D.N.Y. 2013); *Starshinova v. Batratchenko*, 931 F. Supp. 2d 478, 485-87 (S.D.N.Y. 2013). The Court of Appeals explicitly adopted *Morrison*'s framework for cases challenging the extraterritorial reach of the CEA in *Loginovskaya v. Batratcheno*, 764 F.3d 266 (2d Cir. 2014). Following *Morrison*, the court first determined that the CEA lacked any express statements regarding extraterritorial application. 764 F.3d at 271-72. Moving to the second step of the inquiry, the court explained that, like § 10(b) of the Exchange Act, the relevant provision of the CEA has a "clearly transactional" focus. 764 F.3d at 272. In reaching its conclusion about the focus of

congressional concern, the court looked at § 22, which gives plaintiffs a private right of action for violations of the CEA "only when a plaintiff shows that one of the four transactions listed in § 22 occurred within the United States." *Id.*

Given the transactional focus of § 22, the court also relied on *Morrison*'s description of the two ways in which a transaction might be considered to have occurred domestically. The transaction at issue in *Loginovskaya* did not involve a domestic commodities exchange, and so the court looked to *Absolute Activist* for its clarification of the second prong of *Morrison*'s transactional test. *Id.* at 273-74. Accordingly, now both the framework laid out in *Morrison* and its test for domestic transactions, as amplified by the Court of Appeals in *Absolute Activist*, apply in private actions brought for violations of the CEA.

### B.     The Trader Plaintiffs' Commodity Exchange Act Claims Are Impermissibly Extraterritorial

Under the *Morrison* framework, the Court first must determine whether the relevant provisions of the CEA contain a clear statement of congressional intent to overcome the presumption against extraterritoriality. The CEA does not contain any statements suggesting that Congress intended the reach of the law to extend to foreign conduct. The Trader Plaintiffs have asserted claims under sections 6(c)(1) and 9(a) of the CEA, 7 U.S.C. §§ 9, 13(a)(2), as well as derivative claims for *respondeat superior* and aiding and abetting violations of the CEA. Trader SAC ¶¶ 531-68. Section 22 of the CEA, 7 U.S.C. § 25, gives the Trader Plaintiffs a private right of action to sue for these alleged violations. Examining § 6(c)(1) first, it prohibits the use of manipulative or deceptive devices "in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity." 7 U.S.C. § 9(1). Section 9(a) similarly provides that it is a crime to, among other things, "manipulate or attempt to manipulate the price of any commodity in interstate

commerce, or for future delivery on or subject to the rules of any registered entity, or of any swap . . . ." 7 U.S.C. § 13(a)(2). Finally, section 22 provides a private right of action to plaintiffs who engaged in one of four commodities-based transactions. 7 U.S.C. § 25(a)(1). Each of these provisions is silent as to any extraterritorial application and the Trader Plaintiffs do not argue otherwise.

Having determined that the relevant portions of the CEA apply only domestically on their face, the Court next considers the "focus of congressional concern." Consistent with *Loginovskaya*, the Court starts with the purpose of § 22, giving a plaintiff the right to sue, which is "clearly transactional." 764 F.3d at 272. It is not necessary, and perhaps not appropriate, to evaluate the focus of the substantive provisions because, as the Court of Appeals noted, it is "not remarkable" that suits by private plaintiffs may be more limited in scope than actions by the CFTC. *Id.* at 273. A commodities transaction will be considered domestic if (1) the transaction occurred on a domestic exchange; or (2) the transaction itself is domestic. *Morrison*, 561 U.S. at 267. Here, the parties have a fundamental disagreement as to which "transactions" the Court must consider under *Morrison* and *Loginovskaya*. The Trader Plaintiffs contend that it is their commodities transactions on NYMEX and ICE Futures Europe, *see* Trader Extraterritoriality Memo. at 5-13, while Defendants assert that the relevant transactions are those alleged to be manipulative—that is, their physical crude oil transactions in the North Sea and European loading ports, Defs.' Extraterritoriality Memo. at 13.

The overarching purpose of the CEA could be read to apply to either parties' definition of the relevant transaction. *See* 7 U.S.C. § 5 ("It is the purpose of this chapter to serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission.").

However, as the Court of Appeals noted in *Loginovskaya*, the statute only provides a private

right of action to plaintiffs who were part of "one of the four transactions listed in § 22," thereby

directing the focus on the commodities transaction rather than the conduct that allegedly gives

rise to a violation. 764 F.3d at 272. Further, in *Morrison*, the Court found that the Exchange

Act, was focused "not upon the place where the deception originated, but upon purchases and

sales of securities." 561 U.S. at 266. Given the noted similarity between the Exchange Act and

the CEA, the better argument is that the commodities transaction giving rise to the private right

of action is the relevant transaction for purposes of *Morrison*'s test. Therefore, the Court is

inclined to agree with the Trader Plaintiffs on this point. However, for the reasons discussed

further below, the Court need not decide this question to resolve the present motion.[5]

Assuming that the relevant transactions are those occurring on domestic exchanges

within the meaning of *Morrison*, the Court of Appeals' recent decision in *Parkcentral* suggests

that dismissal nevertheless is warranted on the facts presented. In *Parkcentral*, the Court of

Appeals held that, "while [*Morrison*] unmistakably made a domestic securities transaction (or

transaction in a domestically listed security) *necessary* to a properly domestic invocation of

---

[5] Assuming that the relevant transactions are those occurring on the commodities exchanges, no one disputes that NYMEX is a "domestic exchange" within the meaning of *Morrison*. The parties disagree, however, on the status of ICE Futures Europe. The Trader Plaintiffs argue that ICE Futures Europe is a "*de facto* domestic exchange." Trader Extraterritoriality Memo. 6-9. They also argue that activity on ICE Futures Europe constitutes domestic transactions, as further defined by *Absolute Activist*, on the basis of the domestic location of ICE Futures Europe's servers, where buy and sell orders are matched. *Id.* at 9-12 (citing Trader SAC ¶¶ 159-60). With respect to the first argument, Defendants assert that ICE Futures Europe is not a registered exchange to which the CEA anti-manipulation rules apply. Defs.' Extraterritoriality Reply at 7. Defendants also contend that transactions on ICE Futures Europe are not domestic transactions because the two formulations the Court of Appeals provided in *Absolute Activist* apply only to "off exchange" transactions. *Id.* at 8. Although the facts of *Absolute Activist* arose in the context of a private investment transaction, nothing in that decision suggests that its holding is limited to such transactions. Rather, the decision provides a framework for determining when "the purchase or sale of a security that is not listed on a domestic exchange should be considered 'domestic' within the meaning of *Morrison*." 677 F.3d at 66-67. Accordingly, its guidance is applicable to any transaction not on a domestic exchange, whether because the transaction is a private one or because the exchange on which the transaction occurred is not a domestic one. *See, e.g., City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014) (applying *Absolute Activist* test to securities traded on foreign exchange); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-07789 (LGS), 2016 WL 5108131, at \*26-27 (S.D.N.Y. Sept. 20, 2016) (same, in CEA claim) ("*FOREX*").

§ 10(b), such a transaction is not alone *sufficient* to state a properly domestic claim under the statute." 763 F.3d at 215 (emphasis added). As a result, the court rejected plaintiffs' claims against foreign defendants who allegedly made misrepresentations that impacted the price of shares listed on a foreign exchange merely because plaintiffs may have domestically traded derivatives pegged to the price of the foreign-listed shares. Notwithstanding the alleged domestic transactions, the claims were "so predominantly foreign," that to apply § 10(b) to the facts of the case "would seriously undermine *Morrison*'s insistence that § 10(b) has no extraterritorial application." *Id.* at 215-16.

While *Parkcentral* involved § 10(b) of the Exchange Act, the logic underlying the decision in *Parkcentral* is equally persuasive here in light of the parallels between § 10(b) and § 22 of the CEA. *See Loginovskaya*, 764 F.3d at 274. Here, while the Trader Plaintiffs may have purchased or sold Brent futures and derivatives on domestic exchanges or otherwise entered into domestic commodities transactions, the crux of their complaints against Defendants does not touch the United States. The Trader Plaintiffs' claims are based on Defendants' allegedly manipulative and misleading reporting to Platts in London about physical Brent crude oil transactions conducted entirely outside of the United States that indirectly affected the price of Brent futures and derivatives contracts traded on exchanges.

The Court of Appeals in *Parkcentral* cautioned that its holding "depends in some part on the particular character of the unusual security at issue" there, but the connection between Defendants' conduct and the Trader Plaintiffs' alleged harm is as attenuated as in *Parkcentral*, if not more so. 763 F.3d at 202. In *Parkcentral*, the plaintiffs traded securities-based swap agreements directly tied to the price of Volkswagen's shares on foreign exchanges. *See id.* at 205-07. Porsche's alleged misrepresentations regarding its intentions with respect to a potential

acquisition of Volkswagen impacted the company's share prices, which in turn directly affected

the swap agreements. By contrast, here, most of the futures and derivatives contracts available

on NYMEX and ICE Futures Europe are not priced by reference to the Dated Brent assessment

published by Platts (which allegedly was inaccurate by virtue of Defendants' manipulative

reporting), but instead to derivations of the ICE Brent Index, which does not incorporate the

Dated Brent assessment. Trader SAC ¶¶ 123, 128 n.3, 179. The extension of U.S. commodity

rules and regulations to Defendants' conduct raises the same concern motivating *Parkcentral* and

*Morrison* that individuals and entities will be subject to multiple, and potentially incompatible,

laws in the absence of clear congressional intent to do so. *Parkcentral*, 763 F.3d at 215

(discussing *Morrison*, 561 U.S. at 269). Accordingly, the Trader Plaintiffs have failed to state a

claim under the CEA, and their first four causes of action are dismissed.

## II.     Plaintiffs' Sherman Act Claims

Defendants also argue that both the Trader Plaintiffs' and the Landowner Plaintiff's

Sherman Act claims are impermissibly extraterritorial under the Foreign Trade Antitrust

Improvement Act. However, before the Court reaches that question, which has been defined as a

substantive, rather than jurisdictional, element of a Sherman Act claim, *see Lotes Co. v. Hon Hai

Precision Indus. Co.*, 753 F.3d 395, 408 (2d Cir. 2014), the Court must determine whether

Plaintiffs have antitrust standing. For the reasons that follow, the Court finds that Plaintiffs have

not alleged that they suffered any antitrust injury, and accordingly, the Sherman Act claims are

dismissed.

### A.      Applicable Law

Section 4 of the Clayton Act establishes a private right of action for "[a]ny

person . . . injured in his business or property by reason of anything forbidden in the antitrust

laws." 15 U.S.C. § 15(a). The Supreme Court and the Second Circuit have interpreted this

provision to require antitrust plaintiffs to demonstrate antitrust standing in addition to constitutional standing. *See Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 770 (2d Cir. 2016) (citing *Associated Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) ("*AGC*")). The question of antitrust standing is a "threshold inquiry resolved at the pleading stage." *Id.* When evaluating whether a plaintiff has antitrust standing, a court considers whether the plaintiff (1) has suffered an antitrust injury and (2) is an "efficient enforcer" of the antitrust laws. *Id.* at 772.

The first prong of this inquiry requires a plaintiff to "demonstrate that its injury is 'of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016) ("*Aluminum II*") (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). "Generally, only those that are participants in the defendants' market can be said to have suffered antitrust injury." *Id.* at 157. However, in *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), the Supreme Court "carved a narrow exception to the market participant requirement for parties whose injuries are 'inextricably intertwined' with the injuries of market participants." *Aluminum II*, 833 F.3d at 159 (citation and internal quotation marks omitted).

In the years since *McCready*, courts have grabbed onto the "inextricably intertwined" language, but there is real meaning behind this pat phrase. As the Supreme Court explained in *McCready*, a plaintiff who is not a participant in the same market as the defendant may nevertheless suffer an antitrust injury where the defendant's anticompetitive scheme hinges on harm to the plaintiff or the plaintiff's market. 457 U.S. at 479-80. In *McCready*, the plaintiff's injury was considered a "necessary step" and "the very means by which" the defendants affected

their anticompetitive scheme. *Id.* at 479. The Second Circuit Court of Appeals has clarified that the Supreme Court's "inextricably intertwined" language "does not erode the antitrust standing requirement that the putative plaintiff participate in the market that is directly manipulated by the collusive conduct. Rather, this observation supplies the *reason* defendants would bother to corrupt some market in which they do not participate." *Aluminum II*, 833 F.3d at 161. Stated differently, "sometimes the defendant will corrupt a separate market in order to achieve its illegal ends, in which case the injury suffered can be said to be 'inextricably intertwined' with the injury of the ultimate target." *Id.*

Under the second prong of the antitrust standing inquiry, the court considers whether a plaintiff is an "efficient enforcer" of the antitrust laws by reference to four factors:

> (1) whether the violation was a direct or remote cause of the injury; (2) whether there is an identifiable class of other persons whose self-interest would normally lead them to sue for the violation; (3) whether the injury was speculative; and (4) whether there is a risk that other plaintiffs would be entitled to recover duplicative damages or that damages would be difficult to apportion among possible victims of the antitrust injury.

*Gelboim*, 823 F.3d at 772. The factors that make up the efficient enforcer analysis contemplate consideration of "the 'chain of causation' between the violation and the injury." *Id.* (quoting *AGC*, 549 U.S. at 540).

## B.    Plaintiffs Have Not Alleged that They Suffered an Antitrust Injury

Defendants argue that neither the Trader Plaintiffs nor the Landowner Plaintiff have suffered an antitrust injury. With respect to the Landowner Plaintiff, Defendants also argue that he is not an "efficient enforcer" of the antitrust laws. As described further below, the Court dismisses Plaintiffs' Sherman Act claims for failure to allege antitrust injury and does not reach the question of whether either the Trader Plaintiffs or the Landowner Plaintiff are efficient enforcers of the antitrust laws.

In first arguing that Plaintiffs have not suffered an antitrust injury, Defendants largely

focused on a theory from *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d

666 (S.D.N.Y. 2013) ("*LIBOR I*"), that subsequently was rejected by the Court of Appeals in

*Gelboim*. Shortly after *Gelboim*, the Court of Appeals decided another case involving the

contours of antitrust injury, *Aluminum II*, and the parties submitted supplemental letters briefing

the applicability of this decision and the subsequent district court decisions relying on it. *See*

ECF Nos. 402-04, 412-15. These new arguments center on whether Plaintiffs participated in the

market directly restrained by Defendants' alleged conduct, either as participants in the same

market as Defendants or as participants in a market where the harm is inextricably intertwined

with harm to participants in Defendants' market.

The first point of contention is defining the market Defendants restrained by their alleged

anticompetitive conduct. Defendants present a narrow vision of the relevant market—"the

market for physical Brent Crude"—in which neither the Trader Plaintiffs nor the Landowner

Plaintiff operate. ECF No. 402 (Defendants' letter dated Aug. 17, 2016 ("Defs.' Aug. Letter")).

Plaintiffs, citing to the definition of "relevant market" in their Complaints, define the market

broadly. ECF No. 403 (Trader Plaintiffs' letter dated Aug. 24, 2016) ("Trader Aug. Letter"))

("The relevant market in this case is the Brent Crude Oil Market, which comprises: (1) the Brent

Crude Oil physical cargo market, including all cargoes priced as a differential to Brent Crude

Oil; (2) NYMEX Brent Futures, ICE Brent Futures and other Brent Crude Oil derivatives; and

(3) the Platts market for various types of physical cargoes and derivatives thereon.") (citing

Trader SAC ¶ 523); *see also* Landowner SAC ¶ 257.[6] Given this expansive definition of the

relevant market, Plaintiffs contend that they participated in the same market as Defendants, and

---

[6] The Landowner Plaintiff expressly adopted the arguments asserted by the Trader Plaintiffs in the supplemental
letters. ECF No. 414 (Landowner Plaintiff's letter dated Oct. 19, 2016).

there is therefore no need to engage in the "inextricably intertwined" analysis from *McCready*. Trader Aug. Letter; ECF No. 404 (Landowner Plaintiff's letter dated Aug. 24, 2016) ("Landowner Aug. Letter")). While the Court is bound by the factual allegations in the Complaints, Plaintiffs' reliance on these particular paragraphs is misplaced; their definition of the relevant market is a legal conclusion, not a factual one. The Court must examine the facts alleged in the Complaints to determine what market or markets allegedly were restrained based on Plaintiffs' theory of the case.

Plaintiffs allege that Defendants conspired to manipulate the price of Brent crude oil, and they did so by engaging in a variety of misleading conduct and sham transactions in the physical oil market and then reporting those transactions to Platts during the MOC window, where they would be most impactful for the reporting agency's Dated Brent assessment. Trader SAC ¶¶ 224, 248-50; Landowner SAC ¶¶ 90-92. Plaintiffs posit that Defendants engaged in this anticompetitive behavior for two, potentially conflicting, reasons. First, because certain of the Defendants are producers, refiners, or sellers of Brent crude oil, these Defendants might want to drive the price of Brent upwards to increase their sales' profits, or downward where related entities are both producers and refiners, so as to increase the margin, making the refining business more profitable. Trader SAC ¶¶ 234, 536-38; Landowner SAC ¶¶ 168. And, second, because the Dated Brent assessment is incorporated into certain futures and derivatives products traded on NYMEX and ICE Futures Europe (where certain Defendants and Trader Plaintiffs trade) and also closely correlates with the ICE Brent Index which serves as benchmark for other Brent futures and derivatives products traded on NYMEX and ICE. Trader SAC ¶¶ 460-88, 537; Landowner SAC ¶ 168, 197-220.[7] Accordingly, the relevant markets for purposes of the

---

[7] The Landowner Plaintiff does not allege that Defendants participated in or intended to restrain trade in the U.S. crude oil market, only that Defendants' conduct led to suppressed prices for WTI and LLS. *See, e.g.*, Landowner

antitrust standing analysis are the physical Brent crude oil market and the market for any derivative instrument that directly incorporates Dated Brent as benchmark or pricing element.

Courts in this Circuit consider manipulation of a price benchmark to constitute restraint of the market which that benchmark guides. *See, e.g., Gelboim*, 823 F.3d at 776-77; *FOREX*, 2016 WL 5108131, at *6; *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 59 (S.D.N.Y. 2016). In benchmark manipulation cases it is not necessary to evaluate whether harm to the plaintiff's market is "inextricably intertwined" with the defendants' anticompetitive scheme because the market guided by the benchmark is the market directly restrained.[8] This is true regardless whether the alleged anticompetitive conduct causing the benchmark manipulation took place in the market guided by it so long as defendants also operate in that market. For the vast majority of the claims in this action, however, Plaintiffs have not alleged manipulation of the relevant benchmark.

While the Landowner Plaintiff asserts generally that Brent crude oil prices serve as a benchmark for much of the world's crude oil supplies, he does not allege that Brent crude oil was a benchmark for WTI, the U.S. crude oil benchmark that allegedly affected the prices of his own interests, or LLS. Landowner SAC ¶¶ 30, 33, 40-45, 62. The fact that WTI and LLS prices

---

SAC ¶¶ 3-4. As a result, the Landowner Plaintiff does not suggest any purported motivation by Defendants to influence U.S. crude oil prices.

[8] *In re Commodity Exchange, Inc. Gold Futures and Options Trading Litig.*, No. 14-md-2548 (VEC), 2016 WL 5794776 (S.D.N.Y. Oct. 3, 2016) ("*Gold*") and *In re London Silver Fixing, Ltd., Antitrust Litig.*, No. 14-md-2573 (VEC), 2016 WL 5794777 (S.D.N.Y. Oct. 3, 2016) ("*Silver*") run somewhat counter to this conclusion. In the *Gold* and *Silver* cases, the district court held that harm to plaintiffs who traded gold, silver, and their derivatives was inextricably intertwined with the harm defendants intended to cause. In reaching this holding, the court expressed concern about defining the relevant market as the "Fixing," the process by which defendants set the benchmark prices for gold and silver, because it is "an artificially-constructed private 'auction' that was instituted for the sole purpose of allowing the Fixing Banks to set a market-wide benchmark." *Gold*, 2016 WL 5794776 at *10; *accord Silver*, 2016 WL 5794777, at *9. Defining the restrained market in this way would leave only the manipulating entities with standing to sue, an "absurd" result. *Id.* However, instead of defining the relevant market as those that incorporated the benchmark set at the Fixing, the district court turned to the "inextricably intertwined" test.

consistently have tracked Brent crude oil prices over time does not mean that Brent crude oil dictated WTI or LLS prices. Correlation is not the same as causation. Moreover, it is immaterial to this case that crude oil other than WTI may be priced as a differential to Brent because the Landowner Plaintiff only claims to have an interest in crude oil priced as a differential WTI. *Id.* ¶¶ 52, 62. Accordingly, the Landowner Plaintiff has not demonstrated that he participated in a restrained market, either by participating in the physical Brent crude oil market with Defendants or by virtue of Defendants manipulating the benchmark relevant to his crude oil interests.

The Trader Plaintiffs' claims are somewhat more complicated. With respect to much of the trading on NYMEX and ICE Futures Europe, the Trader Plaintiffs have not demonstrated that Defendants manipulated the relevant benchmark. By their own allegations, all of the Brent futures traded on NYMEX settle to ICE Brent futures, which in turn, are pegged to the ICE Brent Index. Trader SAC ¶¶ 123, 128 n.3, 179. The ICE Brent Index does not incorporate Dated Brent into its calculation. Trader SAC ¶¶ 128 n.3, 179. Similarly, many of the products traded on ICE Futures Europe also settle to the ICE Brent Index, not Dated Brent. *Id.* at ¶¶ 181-99; *see also id.* at ¶ 200-04 (minute marker contract does not settle to ICE Brent Index or Dated Brent). However, the Trader Plaintiffs identify a handful of derivative contracts traded on both ICE Futures Europe and NYMEX that incorporate Dated Brent as a pricing element. *Id.* at ¶ 136 (NYMEX Brent CFD), ¶¶ 205-11 (ICE dated-to-frontline and crude outright contracts); *see also* Trader Extraterritoriality Memo. at 26-27 & n.22. For this limited subset of financial instruments only, Dated Brent is a relevant benchmark. However, the Trader SAC is devoid of any allegations that the Trader Plaintiffs or any of the Defendants, in fact, participated in this restrained market; that is, that they bought or sold these particular derivative products. This is fatal to their claim. Merely participating in the Brent derivatives market, generally, does not give

rise to an antitrust injury here because the Trader Plaintiffs have not alleged facts showing anticompetitive harm to the derivatives market as a whole.

As a result, Defendants' reliance on *Aluminum II* is misplaced because the plaintiffs there did not allege manipulation of a relevant pricing element. The Court of Appeals upheld dismissal of Sherman Act claims asserted by plaintiffs who alleged that the impact of defendants' anticompetitive conduct in one market—warehouse services for aluminum—led to a higher regional premium for aluminum, which aluminum purchasers then passed down to plaintiffs, buyers of semi-fabricated aluminum and final aluminum products, in the form of increased prices. *Aluminum II*, F.3d at 155-56. Unlike the Dated Brent assessment, the allegedly manipulated regional premium was not incorporated as an element of the prices plaintiffs paid for their aluminum products.

Defendants further argue that the facts at issue in the motion to dismiss that followed the Court of Appeals' decision in *Aluminum II* are even more on point. ECF No. 412 (Defendants' Letter dated Oct. 12, 2016) (discussing *In re Aluminum Warehousing Antitrust Litig.*, No. 13-MD-2481 (KBF), 2016 WL 5818585 (S.D.N.Y. Oct. 5, 2016) ("*Aluminum III*")). However, the theory advanced by the plaintiffs in *Aluminum III* make it distinguishable from this case. In *Aluminum III*, a group of direct aluminum purchasers alleged that they participated in the same market as defendants because they competed in the market for physical aluminum, which incorporated the excessively high regional premium. The district court found that plaintiffs' new theory was nonsensical because it "undermine[d] the alleged economic benefits of [defendants'] alleged scheme: on a corporate-wide basis, that which one arm is alleged to have done, the other arm would pay for." 2016 WL 5818585, at *7.[9] Here, by contrast, the Trader Plaintiffs allege a

---

[9] To the extent that this issue did not form the sole basis of the district court's decision, the Court respectfully disagrees with the analysis. In an alternative holding, the district court relied on the Court of Appeals' rejection of

more complex scheme. They contend that because certain Defendants (or their affiliates) participated both in the physical and derivatives markets, they could take advantage of price swings in the Dated Brent assessment that allegedly resulted from Defendants' manipulative conduct. They further allege that Defendants, as a group, "must coordinate and compromise with each other on a daily basis" given their competing interests relative to physical oil and derivatives prices. Trader SAC ¶¶ 537-39.

With respect to the NYMEX and ICE Futures Europe financial instruments that do not incorporate Dated Brent into the pricing, the Trader Plaintiffs have not demonstrated that their injuries are inextricably intertwined with the harm to Defendants' market participants. To do so, they would need to allege that the harm to Trader Plaintiffs in the derivatives market was "the very means by which" Defendants affected their anticompetitive scheme in the physical Brent crude oil market. *Aluminum II*, 833 F.3d at 162. That is contrary to the Trader Plaintiffs' theory, in which Defendants manipulated the price of Brent crude oil by engaging in manipulative and misleading physical oil trades amongst themselves that, in turn, impacted the price of certain derivatives. *See id.* (alleged anticompetitive acts "were within the defendants' power to do" without reliance on injury to plaintiffs)

### III. Plaintiffs' State and Common Law Claims

Plaintiffs also assert a number of state and common law claims that Defendants seek to dismiss. The Trader Plaintiffs include a claim for unjust enrichment, *see* Trader SAC ¶¶ 590-98, and the Landowner Plaintiff claims injury under numerous states' unfair trade practices and

---

the downstream purchasers' theory that defendants had conspired to manipulate the regional premium. 2016 WL 5818585, at *8. However, even if the downstream purchasers proved that defendants intended to manipulate the regional premium, that regional premium was not directly incorporated into the price those plaintiffs paid for aluminum products. By contrast, the direct aluminum purchasers alleged that the increased regional premium was an explicit component of the price they paid. *See* 833 F.3d at 155.

antitrust statutes, *see* Landowner SAC ¶¶ 285-344. Defendants have moved to dismiss these claims for failure to state a cause of action. Defs.' Trader Memo at 39-40; Defs.' Landowner Memo. at 14-21. For the reasons described, the Court dismisses Plaintiffs' state law claims.

## A. The Trader Plaintiffs' Unjust Enrichment Claim

To state a claim for unjust enrichment under New York law, a plaintiff must allege that "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (2012) (quoting *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011) (internal quotation marks omitted)).[10] While a plaintiff need not demonstrate that he is in privity with the defendant, a plaintiff still must show that there is a "sufficiently close relationship" with the defendant that "could have caused reliance or inducement" by the plaintiff. *Id.* at 516-17 (citation omitted). Where the plaintiff and defendant "simply had no dealings with each other," the relationship is "too attenuated" to support an unjust enrichment claim. *Id.* at 517-18.

The Trader Plaintiffs have failed to allege a relationship of any kind with any of the Defendants, let alone one that is "sufficiently close" to have caused reliance or inducement. The decisions cited by the Trader Plaintiffs, in fact, support dismissal of their unjust enrichment claim. *See* Trader Memo. at 50. To the extent any of the decisions are factually analogous to this action, they resulted in dismissal of the plaintiffs' unjust enrichment claims. For example, in *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 547 (S.D.N.Y. 2008), the court dismissed an unjust enrichment claim based on defendants' alleged manipulation of the

---

[10] The Trader SAC does not specify pursuant to which state's common law the Trader Plaintiffs bring their unjust enrichment claim. Trader SAC ¶¶ 590-98. In briefing the motions to dismiss, the parties each assume New York law applies.

relevant market. Even though plaintiffs participated in the same market as defendants, plaintiffs did not base their unjust enrichment claim on their status as counterparties to any transaction with defendants. 587 F. Supp. 2d at 547 & n.229; *see also Gold*, 2016 WL 5794776, at *29 (unjust enrichment claim dismissed against defendants who allegedly manipulated relevant market); *In re Term Commodities Cotton Futures Litig.*, No. 12-cv-5126 (ALC) (KNF), 2013 WL 9815198, at *27-28 (S.D.N.Y. Dec. 20, 2013) (same); *LIBOR I*, 935 F. Supp. 2d at 737-38 (same).

Similarly, here, the Trader Plaintiffs allege that Defendants manipulated the Brent crude oil futures and derivatives market and that certain of Defendants traded in those markets. Trader SAC ¶ 593. They have not alleged that Defendants were their counterparties on any trades involving Brent futures or derivatives, however. Accordingly, the Trader Plaintiffs' unjust enrichment claim is dismissed.

### B.     The Landowner Plaintiff's State Law Claims

Defendants move to dismiss the Landowner Plaintiff's state law claims on a number of grounds. Defs.' Landowner Memo. at 14-21.

As a preliminary matter, Defendants argue that the Landowner Plaintiff does not have standing to bring claims under any state laws other than those of Louisiana, where he lives and owns or has interest in property relevant to the dispute. As the parties note, courts in this Circuit are divided on the appropriate reaction to challenges made to a named plaintiff's standing to bring claims under the laws of states to which his own claims have no connection. Defs.' Landowner Reply at 5-6; Landowner Memo. at 8-10.[11] The Court does not need to weigh in on

---

[11] Some courts have addressed the issue of standing under each state's laws as a threshold question regardless of the plaintiff's status as the representative of a putative class. *See, e.g.*, *In re HSBC BANK, USA, N.A., Debit Card Overdraft Fee Litig.*, 1 F. Supp. 3d 34, 48-50 (E.D.N.Y 2014); *Simington v. Lease Fin. Grp., LLC*, No. 10-cv-6052 (KBF), 2012 WL 651130, at *9 (S.D.N.Y. Feb. 28, 2012). Other courts have held that a named plaintiff

the dispute, however, because Defendants concede that the Landowner Plaintiff has standing to bring claims under Louisiana law. Defs.' Landowner Memo. at 15-16. And, for the reasons described in this section, those claims are dismissed. Without any valid claims, the Landowner Plaintiff cannot serve as the sole named plaintiff in this action. *See, e.g., Goldberger v. Bear, Stearns & Co.*, No. 98-cv-8677 (JSM), 2000 WL 1886605, at *1 (S.D.N.Y. Dec. 28, 2000) (citing *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976) and *Warth v. Seldin*, 422 U.S. 490, 497-502 (1975)).

First, Defendants argue that the Landowner Plaintiff's state antitrust claims should be dismissed for the same reason as his federal antitrust claims. Louisiana does not have a statute requiring courts to interpret its antitrust laws as coterminous with federal law. However, both state and federal courts interpreting Louisiana's antitrust laws recognize that, due to the similarity between the two regimes, "Louisiana courts routinely look to federal anti-trust jurisprudence as 'a persuasive influence on interpretation of our own state enactments.'" *Free v. Abbott Labs.*, 982 F. Supp. 1211, 1214 (M.D. La. 1997) (quoting *La. Power & Light v. United Gas Pipe Line*, 493 So. 2d 1149, 1158 (La. 1986)). In particular, Louisiana courts have found that the provision giving rise to a private right of action for damages under the state antitrust statute, La. Stat. Ann. § 51:137, is "virtually identical" to § 4 of the Clayton Act and therefore look to federal jurisprudence on questions of antitrust standing. *Free v. Abbott Labs., Inc.*, 176 F.3d 298, 299 (5th Cir. 1999), *aff'd*, 529 U.S. 333 (2000); *see also Lambert v. Bd. of Comm'rs of the Orleans Levee Dist.*, No. CIV A 05-5931, 2009 WL 152668, at *5 (E.D. La. Jan. 22, 2009).[12]

---

need only have standing to bring a claim under the statute applicable to his own claim because the named plaintiff is serving as a representative for those who may have claims under other states' statutes. *See, e.g., Blessing v. Sirius XM Radio Inc.*, 756 F. Supp. 2d 445, 450-52 (S.D.N.Y. 2010); *In re Bayer Corp. Combination Aspirin Prod. Mktg. & Sales Practices Litig.*, 701 F. Supp. 2d 356, 376-77 (E.D.N.Y. 2010).

[12] In the SAC, the Landowner Plaintiff is unclear as to whether he is seeking monetary damages, injunctive relief, or both, under state law. *See* SAC ¶¶ 344, XI.B (Prayer for Relief). If the Landowner Plaintiff is seeking injunctive relief for the alleged violation of Louisiana's antitrust law, that provision also mirrors the parallel portion of the

In dismissing the Landowner Plaintiff's Sherman Act claims, the Court found that the lack of antitrust injury was dispositive. The Landowner Plaintiff has not identified any Louisiana decisions that suggest the federal law on antitrust injury should not guide the Court's analysis on his state law claim. Given the similarities between the private rights of action in Louisiana and federal antitrust law, for the same reasons the Court found that the Landowner Plaintiff did not suffer a federal antitrust injury, the Court also dismisses the Landowner Plaintiff's claim under the Louisiana antitrust statute for lack of antitrust injury.

Second, for much the same reason that the Court has dismissed the Landowner Plaintiff's state and federal antitrust claims, the Landowner Plaintiff's unfair trade practices claim also must fail. The Louisiana Unfair Trade Practices Act, La. Stat. Ann. § 51:1401, *et seq.* ("LUTPA"), allows a plaintiff to bring a private cause of action if he "suffer[ed] any ascertainable loss of money or movable property . . . *as a result of* the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405." La. Stat. Ann. § 51:1409(A) (emphasis added); *accord Carroll Insulation & Window Co. v. Biomax Spray Foam Insulation, LLC*, 180 So. 3d 518, 524 (La. App. 2 Cir. 2015) ("To sustain a cause of action under LUTPA, two things must be proved: (1) an ascertainable loss was suffered; and (2) the loss must result from another's use of unfair methods of competition and unfair or deceptive acts

---

Clayton Act. Louisiana law provides that "[a]ny person may sue for and have injunctive relief, in any court having jurisdiction over the parties, against threatened loss or damage by a violation of the provisions of this Part under the rules governing such proceedings." La. Stat. Ann. § 51:129. The Clayton Act similarly provides that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws . . . ." 15 U.S.C. § 26. In any event, a plaintiff is required to demonstrate antitrust injury whether seeking injunctive or monetary relief. *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006) (citing *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110-11 & nn.5-6 (1986)).

or practices.") (citing *Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc.*, 35 So. 3d 1053, 1057 (La. 2010)).[13]

The Landowner Plaintiff alleges that he suffered losses tied to suppressed WTI crude oil prices, but his factual allegations do not support the conclusory assertion that this alleged loss occurred as a result of Defendants' "unfair or deceptive acts or practices." *See* Landowner SAC ¶¶ 62, 109, 115, 131. Although he refers to WTI prices during the relevant time frame as "suppressed," which, in turn, affected the price of his crude oil interests priced to WTI, the Landowner Plaintiff is quite clear that Brent crude oil does not serve as a benchmark for WTI and that these two crude oil benchmarks merely have moved in tandem over time. *Id.* ¶¶ 40-51. Rather, the Landowner Plaintiff relies on the statistical correlation between Brent and WTI prices as proof that Brent crude oil prices dictated the changes in WTI prices, but fails to provide any factual support for that assertion.

---

[13] The Landowner Plaintiff also is unclear about the relief sought in connection with his unfair trade practices claim. SAC ¶¶ 314, XI.B (Prayer for Relief). Under LUTPA, injunctive relief is limited to actions brought by the Louisiana State Attorney General. *See* La. Stat. Ann. § 51:1407.

**CONCLUSION**

For all of the foregoing reasons, the Landowner Plaintiff's Second Amended Complaint and the Trader Plaintiffs' Second Amended Complaint are dismissed. The motions filed by individual Defendants for dismissal of the Complaints as to them are denied without prejudice as moot.

The Court will hold a status conference in this matter on July 7, 2017, at 2:00 p.m. The parties (and/or counsel) should appear in person in Courtroom 1306 at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, NY, on the date and time specified above.

**SO ORDERED.**

Dated: June 8, 2017
      New York, New York

                                         **ANDREW L. CARTER, JR.**
                                         **United States District Judge**